1

2      IN THE UNITED STATES DISTRICT COURT FOR THE

3              SOUTHERN DISTRICT OF OHIO

4                  WESTERN DIVISION

5
                        - - -
6                         :
    SARAH UPDIKE,          :
7   et al.,               :
                          :
8          Plaintiffs,    :
                          :
9      VS.                : CASE NO. 1:22-cv-00374
                          :
10  SARA JONAS, et al.,   :
                          :
11         Defendants.    :
                        - - -
12

13          Deposition of LARRY HOOK, a

14  Defendant herein, called by the Plaintiffs for

15  cross-examination, pursuant to the Federal

16  Rules of Civil Procedure, taken before me,

17  Cynthia A. Oliver (Sposato), a Registered

18  Professional Reporter and Notary Public in and

19  for the State of Ohio, at the offices of

20  Lundrigan Law Group Company, LPA, 1080

21  Nimitzview Drive, Suite 402 Cincinnati, Ohio,

22  on Thursday, November 17, 2022, at 10:06 a.m.

23

24

APPEARANCES:

On behalf of the Plaintiffs:

    W. KELLY LUNDRIGAN, ESQ.
      and
    NICOLE M. LUNDRIGAN, ESQ.
    Lundrigan Law Group Co., LPA
    1080 Nimitzview Drive
    Suite 402
    Cincinnati, Ohio 45230

On behalf of the Defendants, Forest Hills School District:

    BERNARD W. WHARTON, ESQ.
    McCaslin, Imbus & McCaslin
    600 Vine Street
    Suite 800
    Cincinnati, Ohio 45202

On behalf of the Defendants, the Board:

    WILLIAM M. DETERS, II ESQ.
    Ennis Britton, LPA
    1714 Galbraith Road
    Cincinnati, Ohio 45202

On behalf of the Defendant, Leslie Rassmusen:

    DAVID E. HARDIN, ESQ.
    Freund, Freeze & Arnold
    8899 Brookside Avenue
    Suite 203
    West Chester, Ohio 45069

ALSO PRESENT:  Sara Jonas

           Natalie Hastings

        - - -

     S T I P U L A T I O N S

1    It is stipulated by and among counsel for

2    the respective parties that the deposition of

3    LARRY HOOK, a Defendant herein, called by the

4    Plaintiffs for cross-examination pursuant to

5    the Federal Rules of Civil Procedure, may be

6    taken at this time by the notary; that said

7    deposition may be reduced to writing in

8    stenotypy by the notary, whose notes may then

9    be transcribed out of the presence of the

10   witness; and that proof of the official

11   character and qualifications of the notary is

12   expressly waived.

13                    - - -

14                  I N D E X

15   Examination of LARRY HOOK           Page

16   By Mr. Lundrigan:                   4

17

18                    - - -

19   Hook Exhibit            Page Identified

20      No. 1                    14
        No. 2                    53
21      No. 3                    67
        No. 4                    72
22      No. 5                    120
        No. 6                    123
23      No. 7                    125
        No. 8                    127
24      No. 9                    129

1                LARRY HOOK,

2 of lawful age, the Defendant herein, having

3 been first duly cautioned and sworn, as

4 hereinafter certified, was examined and

5 testified as follows:

6                CROSS-EXAMINATION

7 BY MR. LUNDRIGAN:

8     Q.  Good morning, Mr. Hook.  My name

9 is Kelly Lundrigan; I represent the plaintiffs

10 in the lawsuit that we're here about this

11 morning.  Have you ever been deposed before?

12     A.  No.

13     Q.  Okay.  Well, I will give you the

14 full spiel then.  You're here today as if you

15 were in court and sworn to tell the truth.  The

16 court reporter is going to take down the

17 questions that I ask verbatim.  She's going to

18 take down your responses verbatim.  If we don't

19 talk over each other that makes it easier for

20 her to do that.  I know it's normal human

21 conversation to, you know, kind of anticipate

22 what somebody is asking, but try to wait until

23 I finish my question and I'll try to wait until

24 you finish your answer before I ask the next

question.

And if you need a break at any point, just let me know that. This isn't an endurance test and you can take a break, the only thing I ask is that we not do it in the middle of a question. And because this case has a history that is a little different than most of the ones that I deal with, I'm going to make a little preamble statement up front. This is a court proceeding. I know emotions have been running high with some folks in this case. This is going to be a very respectful proceeding and nobody is going to be calling anybody any names. There's not going to be any yelling, you know, no accusations are going to be thrown around. My goal here is to try to get to an understanding of what the district's position is in this case so that we can, you know, reach some kind of resolution of this case, either through a trial over a motion or otherwise if we can do that, but I need to know the facts and the reasoning that's behind the district's position so that we can find out where we differ and where we don't. Does that

| | |
|---|---|
| 10:08:31 | 1 | make sense? |
| 10:08:31 | 2 | A. Mm-hmm. |

         1    make sense?
         2            A.  Mm-hmm.
         3            MR. WHARTON:  You have to say yes
         4    or no instead of "mm-hmm" or "hmm-hmm".
         5            A.  Yes.  Okay.
         6            MR. WHARTON:  Right out of the
         7    gate.
         8    BY MR. LUNDRIGAN:
         9            Q.  That was next.
        10            A.  You can throw something at me.
        11            Q.  And she'll remind you.  So if you
        12    don't understand a question that I ask you,
        13    stop me and I'll rephrase it so that I know
        14    we're on the same page about what is being
        15    asked.  And if I don't understand one of your
        16    answers, I'm sure I'll tell you that and we can
        17    try to figure out where we're both coming from.
        18            Did you do anything to prepare for
        19    your deposition today?
        20            A.  Just met with Bernie.
        21            Q.  Did you review any documents at
        22    all?
        23            A.  No.
        24            Q.  Can you tell me what your home

10:09:36  1   address is?  And, actually, why don't we go off
10:09:38  2   the record for a few minutes so I can get some
10:09:42  3   personal information from Mr. Hook.
10:09:42  4               (Off the record.)
10:10:41  5   BY MR. LUNDRIGAN:
10:10:41  6        Q.  Can you give us an idea of what
10:10:48  7   your educational history is?
10:10:51  8        A.  Yes.  I have a bachelor's degree
10:10:56  9   from Central University of Iowa, in Pella,
10:11:02  10  Iowa.  It's in biology and physical education,
10:11:08  11  minor and major.  Then I've got my graduate
10:11:13  12  degree from Xavier University in education
10:11:18  13  administration, as well as my superintendent's
10:11:22  14  licensure in education there.
10:11:26  15       Q.  What year was that?
10:11:30  16            MR. WHARTON:  For which one?
10:11:31  17       Q.  XU?
10:11:34  18       A.  '94.
10:11:35  19       Q.  Did you get those both at the same
10:11:37  20  time?
10:11:37  21       A.  Oh, no.  No.
10:11:39  22       Q.  Okay.  How about the educational
10:11:41  23  administration?
10:11:42  24       A.  That's what I got at Xavier in

'94.

Q. And when you say your superintendent's certification, what --

A. Licensure.

Q. Okay. When was that?

A. '94 was when I completed that.

Q. Okay. That was Ohio, right?

A. Correct.

Q. No other states that you've had licensure in?

A. Iowa.

Q. When was that?

A. But that was for teaching. I didn't have my administrative licensure until I moved out here.

Q. Where did you teach in Iowa?

A. I taught at Radcliffe Community School when I first graduated and then I coached and taught at various colleges and universities for probably 11 to 12 years.

Q. What kind of sport did you coach?

A. Football.

Q. Football.

A. And track, but mainly football.

10:12:50  1          Q.  Were you ever terminated from any

10:12:52  2     university or college or teaching position?

10:12:58  3          A.  Well, in college, yes.  That's

10:13:03  4     because if you don't win, as an assistant

10:13:06  5     everybody goes when the head guy goes so.

10:13:10  6          Q.  Got it.  That was an assistant

10:13:13  7     coach?

10:13:13  8          A.  Yes.  I was assistant coach.

10:13:23  9          Q.  And you were superintendent in

10:13:27  10    Springboro; is that correct?

10:13:29  11         A.  Springboro, yes.

10:13:32  12         Q.  And when did that start?

10:13:34  13         A.  Two years prior to here, so it

10:13:37  14    would have started in August of '20.

10:13:46  15         Q.  How long was your contract with

10:13:49  16    Springboro?

10:13:51  17         A.  It was two years and then they

10:13:53  18    extended it another year.

10:13:58  19         Q.  And was the reason you left to

10:14:01  20    pursue the opportunity at Forest Hills?

10:14:05  21         A.  Yes.

10:14:08  22         Q.  You weren't terminated by

10:14:16  23    Springboro?

10:14:19  24         A.  No.

10:14:20   1          Q.  Some more background.  Do you have
10:14:22   2   a cell phone?
10:14:23   3          A.  Yes.
10:14:24   4          Q.  And did your cell phone change
10:14:27   5   when you became superintendent here?
10:14:32   6              MR. WHARTON:  Do you mean his cell
10:14:34   7   phone number or --
10:14:34   8   BY MR. LUNDRIGAN:
10:14:34   9          Q.  Do you have the same cell phone
10:14:37  10   now that you had when you were at Springboro as
10:14:42  11   superintendent there?
10:14:43  12          A.  Yeah.  It's physically the same
10:14:46  13   phone and the number.  It's changed in terms of
10:14:50  14   that district paid for my cellular service.
10:14:58  15   Here it's a reimbursement, so I put it into my
10:15:02  16   personal and then they reimburse.
10:15:04  17          Q.  Forest Hills reimbursing you now?
10:15:07  18          A.  Yes.  Twice a year for having a
10:15:09  19   phone.
10:15:09  20          Q.  And what carrier are you using
10:15:12  21   here for your cell phone?
10:15:13  22          A.  Verizon.
10:15:16  23          Q.  What carrier did you use or what
10:15:19  24   carrier did the school district use when were

10:15:23   1    you in Springboro?

10:15:25   2        A.   Verizon.

10:15:26   3        Q.   But your number did not change?

10:15:27   4        A.   No.  No.

10:15:27   5        Q.   It did not?

10:15:28   6        A.   Same number I've had for years.

10:15:32   7        Q.   Could we go off the record again

10:15:34   8    for a minute.

10:15:34   9            (Discussion off the record.)

10:16:15  10    BY MR. LUNDRIGAN:

10:16:15  11        Q.   Do you use, other than text

10:16:18  12    messages that you send on your phone, do you

10:16:21  13    have any other programs that you send text or

10:16:26  14    chat messages through on a laptop or anything

10:16:29  15    like that?

10:16:30  16        A.   WhatsApp, I think is the one that

10:16:41  17    my college reunion committee used so I had to

10:16:47  18    learn that this summer.

10:16:48  19        Q.   You're ahead of me then.

10:16:51  20        A.   That's the only one I've ever

10:16:53  21    used.

10:16:54  22        Q.   You guys don't use Teams through

10:16:57  23    the Forest Hills School District?

10:17:00  24        A.   No.  No.

Q. Any other type of instant messaging?

A. No. Not that I am aware of. Just email, text. That's about all I use.

Q. Do you have a Facebook account?

A. I have a personal one.

Q. Any other social media accounts that you have other than the WhatsApp and the Facebook account?

A. I think Instagram that I rarely look at it, other than to keep track of what my daughter is doing.

Q. And you do have a LinkedIn account; is that correct?

A. Yes. Sorry, I just don't look at it very often.

Q. No. That's okay. This stuff is all part of the discovery that lawyers do anymore and if I don't ask the questions, I'm being negligent so.

And do you have a personal email address that you use?

A. Yes.

Q. Could we go off the record, again,

10:18:16    1    for a second, Cindy?

10:18:16    2                    (Off the record.)

10:19:15    3    BY MR. LUNDRIGAN:

10:19:15    4            Q.  Has anybody asked you to search

10:19:21    5    your cell phone or has anybody searched your

10:19:25    6    cell phone or inspected your cell phone for

10:19:28    7    text messages that would be responsive to any

10:19:31    8    public records request that were sent to the

10:19:34    9    Forest Hills School District?

10:19:37   10            A.  Nobody has searched it.  I think

10:19:41   11    I've been asked do you have any record of -- I

10:19:46   12    can't tell you the specifics, but I don't do

10:19:50   13    much with it so.

10:19:51   14            Q.  Who asked you to do that?

10:19:55   15            A.  Usually, Josh Bazan is our -- he's

10:20:00   16    our communications coordinator and kind of

10:20:04   17    takes the lead on our public records.

10:20:06   18            Q.  Were there any text messages that

10:20:09   19    were responsive to any public records request

10:20:12   20    that you've produced so far?

10:20:14   21            A.  There were none that I had.

10:20:25   22            Q.  We're going to be talking about

10:20:28   23    the kindness resolution, that's what I am going

10:20:31   24    to call it for short today, and I want to make

10:20:34  1   sure that we're on the same page as to what

10:20:38  2   we're talking about when we refer to that.  Can

10:20:38  3   you mark that as Hook No. 1.

10:20:38  4   (Exhibit No. 1 was marked for identification.)

10:20:38  5    BY MR. LUNDRIGAN:

10:21:05  6            Do you recognize what is in front

10:21:06  7   of you as the resolution to create a culture of

10:21:12  8   kindness and equal opportunity for all students

10:21:15  9   and staff that was passed by the board in this

10:21:29  10  case?

10:21:29  11           A.  Yes.

10:21:29  12           Q.  And if you turn to the last page

10:21:32  13  of Exhibit 1, do you see there is a signature

10:21:36  14  there for the superintendent?

10:21:39  15           A.  Mm-hmm.

10:21:41  16           Q.  Now, this was actually -- the

10:21:44  17  kindness resolution was passed prior to your

10:21:48  18  becoming superintendent, correct?

10:21:49  19           A.  Correct.

10:21:50  20           Q.  Have you ever seen a version of

10:21:52  21  this resolution which was signed by the former

10:21:56  22  superintendent?

10:21:58  23           A.  No.

10:21:59  24           Q.  Do you know why it was not signed?

10:22:06  1          A.  No, I really don't, other than --

10:22:11  2  I don't know when he left, so I would not have

10:22:15  3  knowledge of why that --

10:22:16  4          Q.  Have you ever been asked to sign

10:22:18  5  the resolution?

10:22:23  6          A.  I have not.

10:22:30  7          Q.  And your first day of employment

10:22:32  8  with Forest Hills was 8/1 of '22; is that

10:22:37  9  right?

10:22:37  10          A.  Yes.

10:22:40  11          Q.  When was the first time that you

10:22:42  12  had the opportunity to speak with any of the

10:22:45  13  current board members of Forest Hills Board of

10:22:50  14  Education?

10:22:50  15          MR. WHARTON:  Separate from the

10:22:51  16  hiring process or once he became

10:22:55  17  superintendent?

10:22:55  18          Q.  As part of any communication that

10:22:58  19  you had.  When was the first time that you had

10:23:01  20  the opportunity to speak to any of them?

10:23:04  21          A.  Just the hiring process.  I don't

10:23:07  22  even remember the date, so it would have been

10:23:09  23  in and around -- don't hold me to it exactly,

10:23:18  24  the first part of June.

10:23:20  1         Q.  Of 2022?

10:23:23  2         A.  Yes.

10:23:24  3         Q.  So is it fair to say that prior to

10:23:29  4  the selection process to replace Scott Prebles

10:23:34  5  as the superintendent, you didn't know any of

10:23:38  6  the current board members and had never talked

10:23:41  7  to them?

10:23:42  8         A.  No.  Other than just the hiring

10:23:44  9  process.

10:23:47  10         Q.  When did you first find out about

10:23:50  11  the kindness resolution and that it would be

10:23:53  12  put on the agenda for the board and voted on?

10:24:00  13         A.  I didn't know prior.  I wasn't the

10:24:03  14  superintendent.  I was in the middle of, I

10:24:08  15  believe, the first round and second rounds of

10:24:11  16  interviews.  It happened prior to the second

10:24:15  17  round interviews, so I think I became aware of

10:24:18  18  it with the news article.

10:24:21  19         Q.  That was my next questions.  Did

10:24:23  20  you find out about it from the news?

10:24:25  21         A.  That's where I first heard about

10:24:28  22  it.

10:24:29  23         Q.  How many meetings with the Forest

10:24:34  24  Hills Board of Education did you have as part

10:24:37   1    of the hiring process?

10:24:41   2              MR. WHARTON:  And just so we're

10:24:43   3    clear, when you say with the board, do you mean

10:24:46   4    the board as an entity or any board member?

10:24:50   5         Q.  Let's keep it as an entity for the

10:24:54   6    time being.

10:24:55   7         A.  I think it was down to two times.

10:24:59   8    Twice.

10:25:00   9         Q.  And on those two occasions when

10:25:02  10    you met with the board as an entity, were those

10:25:07  11    also the occasions that there were members of

10:25:10  12    the public who were present at either those

10:25:14  13    meetings or subsequent to those meetings

10:25:17  14    directly afterwards to discuss questions with

10:25:21  15    you about the selection process?

10:25:25  16         A.  Can you clarify that?

10:25:28  17         Q.  Yes.  That was kind of a messy

10:25:29  18    question.  There were members of the public

10:25:30  19    that were selected to participate in the

10:25:33  20    process of hiring you.  Do you remember that?

10:25:38  21         A.  Yes, there was.

10:25:40  22         Q.  And were those discussions with

10:25:43  23    those community members, did those happen on

10:25:48  24    the same days that you had these two meetings

1   with the board of education as an entity?

2           A.  Yes.  It was one of them.

3           Q.  Did you ever meet with the folks

4   who were community members who were part of the

5   process separate from those two meetings that

6   you've identified?

7           A.  No.

8           Q.  And did you ever have

9   conversations with them by telephone, email or

10  otherwise, other than the conversations that

11  you had during those two meetings?

12          A.  No.  Do you mean subsequently now?

13  Up till now?

14          Q.  No.  I mean during the selection

15  process.

16          A.  No.

17          Q.  Thank you.  Same question with

18  regard to the board members individually, other

19  than the two meetings that you've identified

20  that were with the board as an entity, did you

21  have individual meetings with one or more board

22  members outside of those two meetings?

23          A.  Yes.

24          Q.  And do you recall when those were?

10:26:55   1          A.  Probably a week before the first

10:27:01   2   round I was asked if I would be interested in

10:27:09   3   meeting with the president and vice president.

10:27:12   4   I had not decided for sure whether I was

10:27:19   5   interested or not at that point in time, so I

10:27:24   6   met for a cup of coffee and Keith Kelly, one of

10:27:31   7   the search firms people were there and it was

10:27:35   8   just a casual conversation and --

10:27:38   9          Q.  Can you tell me the name of that

10:27:41  10   search firm again?

10:27:42  11          A.  I believe it's K12 is what it's

10:27:45  12   called.

10:27:49  13          Q.  And that was the firm used by the

10:27:52  14   district?

10:27:53  15          A.  By the district in the

10:27:55  16   superintendent search.

10:27:56  17          Q.  And who approached you about this

10:27:59  18   meeting?

10:28:00  19          A.  Initially, Frank Forsthoefel.

10:28:07  20   Don't ask me how to spell it.  I don't have a

10:28:13  21   clue.

10:28:13  22          Q.  And where did you -- I take it

10:28:16  23   that you took him up on the offer?

10:28:18  24          A.  Yes.

10:28:18 1        Q.  And where did you meet with the
10:28:21 2   president and the vice president of the board?
10:28:22 3        A.  Bob Evans.
10:28:24 4        Q.  On Beechmont?
10:28:27 5        A.  Off of Pfeiffer, I believe.
10:28:30 6        Q.  Can you tell us what the
10:28:32 7   discussion was that you had with them, to the
10:28:34 8   best of your recollection?  And first of all,
10:28:37 9   can you identify who the president and vice
10:28:40 10  president were?
10:28:41 11       A.  Linda Hausfeld and Bob Bibb.
10:28:51 12       Q.  Linda is the president?
10:28:53 13       A.  Yes.
10:28:54 14       Q.  And Bob is the vice president?
10:28:56 15       A.  Yes.
10:28:56 16       Q.  And can you tell us what you guys
10:29:00 17  discussed at the Bob Evans on Pfeiffer?
10:29:04 18       A.  It was -- boy, I can't really
10:29:08 19  recollect all of the specifics.  It was more
10:29:11 20  just kind of tell us about yourself and, you
10:29:15 21  know, and would you be interested in Forest
10:29:19 22  Hills.  Do you know anything about Forest
10:29:21 23  Hills?  Which I did so.
10:29:23 24       Q.  What did you know about Forest

1   Hills at that point?

2          A.  Other than I knew about the

3   district because I was, for about 12 years at

4   Milford as a teacher, coach, high school

5   principal, so I was very aware of the district,

6   and that's really about what I shared.  And I

7   shared what I had been doing at Springboro and

8   what I had done at Carlisle.

9          Q.  What was the Carlisle position?

10         A.  I was superintendent there for ten

11  years.

12         Q.  Where is that?

13         A.  Carlisle is in the northwest

14  corner of Warren County.

15         Q.  What time frame were you

16  superintendent at Carlisle?

17         A.  2010 through July of '20, ten

18  years.

19         Q.  And what were the circumstances of

20  you leaving Carlisle?

21         A.  I got a call from the board

22  president at Springboro, which is where I live.

23  I had been assistant superintendent prior to

24  going to Carlisle there and so he knew me.

1   They wanted an experienced superintendent and

2   asked if I would come over and talk to him and

3   the board and it just -- and within two weeks I

4   was going there so.

5           Q.  When you met with Bob Bibb and

6   Linda Hausfeld at Bob Evans, did they talk to

7   you about any agenda that they had for the

8   district?

9           A.  No.  They didn't really talk a

10  lot.  It was more I was just letting them know

11  who I was.

12          Q.  Did you do any research on

13  Ms. Hausfeld and Mr. Bibb before you had

14  breakfast with them or coffee?

15          A.  Just trying to get a picture of

16  them so I knew who I was looking for.

17          Q.  Did you look at their campaign web

18  pages?

19          A.  No.

20          Q.  Were you aware when you had coffee

21  with them that they were trying to prevent CRT

22  from being taught in Forest Hills Schools?

23          MR. WHARTON:  Objection.  Go ahead

24  and answer.

1    A.  No.  What did you say?

2         MR. WHARTON:  I just made an

3    objection to that.  You can go ahead and answer

4    that.

5         A.  No.

6    BY MR. LUNDRIGAN:

7         Q.  Were you aware of any specific

8    agenda that they had run on for school board?

9         A.  No.

10        Q.  Were you aware that they were

11   newly -- they were the newest members of the

12   board?

13        A.  Yes.  And I believe Frank shared

14   that with me.

15        Q.  Do you know why Frank suggested

16   coffee with Linda and Bob rather than anybody

17   else from the board?

18        A.  No.  Other than they were the

19   leadership of the board and that's an

20   assumption.  Sorry.

21        Q.  No, that's okay.  And by the way,

22   when I ask you questions today, if you don't

23   have personal knowledge of anything that I ask

24   you, you can say that, but what I'm looking for

10:33:02 1  is any knowledge that you have at all.  For

10:33:05 2  example, hearsay, that you might have heard

10:33:08 3  from somebody else, even if it's second- or

10:33:11 4  thirdhand, anything like that is fair game when

10:33:16 5  we're doing discovery.  It may not be at trial,

10:33:19 6  but it is for discovery purposes.  So if you

10:33:23 7  know something other than what's in your

10:33:25 8  personal observations, you can tell us that.

10:33:28 9        Did you ever meet with the other

10:33:31 10  members of the board other than Linda and Bob

10:33:35 11  separate from these two formal meetings that

10:33:39 12  you had with the board as an entity?

10:33:42 13        MR. WHARTON:  Prior to his being

10:33:43 14  hired?

10:33:44 15        Q.  Correct.

10:33:44 16        A.  No.

10:33:45 17        Q.  Did you ever have other meetings

10:33:49 18  with Linda and Bob?

10:33:51 19        A.  No.

10:33:52 20        Q.  I take it it would have been the

10:34:11 21  second meeting that you had with the board as

10:34:15 22  an entity at which the kindness resolution was

10:34:22 23  discussed; is that correct, or was it the

10:34:25 24  first?

10:34:29  1          A.  Well, first of all, it was never

10:34:32  2     discussed.  I just heard about it prior to the

10:34:37  3     second -- the finalist meeting.

10:34:45  4          Q.  And that was through the news?

10:34:47  5          A.  Through the news.

10:34:49  6          Q.  Did you ever discuss the kindness

10:34:53  7     resolution with any of the board members

10:34:57  8     individually?  Not at the two formal meetings,

10:35:02  9     but in any individual setting, either in

10:35:06  10    person, telephone or email, did you ever

10:35:09  11    discuss the resolution with any of them prior

10:35:13  12    to being hired?

10:35:14  13         A.  No.

10:35:15  14         Q.  How about the community members

10:35:18  15    who interviewed you as part of the selection

10:35:21  16    process, did they ever bring it up?

10:35:27  17         A.  I do believe so.  I can't remember

10:35:30  18    exactly how it was phrased because I think it

10:35:35  19    had just happened the day before, if I'm not

10:35:40  20    mistaken.

10:35:42  21         Q.  And had you even had a chance to

10:35:45  22    read the resolution when you were asked about

10:35:48  23    it by the community members on the panel?

10:35:54  24         A.  Just what I had heard on the news

1   and read.  I think they had sent an article of
2   it.
3       Q.  Do you remember during your
4   interview with the board that there were
5   protesters outside the district office when you
6   showed up to be interviewed?
7       A.  Yes.
8       Q.  Did you understand they were
9   protesting the resolution?
10      A.  Yes, I think so.  Let me back up.
11  I'm trying to -- I can't remember exactly what
12  was said.  They had us go to the back door to
13  come in so I just heard a lot of commotion.  My
14  assumption was that was what it is.
15          MR. WHARTON:  Don't assume, just
16  tell him what you know.
17      A.  Okay.
18  BY MR. LUNDRIGAN:
19      Q.  Do you remember what it was you
20  were asked by the community members on the
21  panel about the resolution?
22      A.  I believe the question -- I can't
23  remember it exactly, but it was something to
24  the effect of, do you -- what was my feeling on

it. And my response was -- I don't even know
if you want my response.

Q. If you gave them a response and
you can remember what it was, yes.

A. I think my response was something
to the effect of that was a board resolution, I
wasn't here. I don't have any background
knowledge of it so --

Q. Is it fair to say that you were
not able to give a substantive response at that
point because you were not familiar enough with
it?

A. Correct.

Q. Thank you. You're familiar with
it now?

A. Well, I've read it, but I haven't
memorized it or anything.

Q. Have you considered -- well, let
me back up. Prior to accepting the offer of
employment with Forest Hills as its
superintendent, did you consider the resolution
as part of that process? Did it make a
difference to you?

A. Did it make a difference? It made

10:38:59  1    me pause, you know, but again, the reason I

10:39:10  2    accepted the job is I just felt that I could

10:39:13  3    help Forest Hills be a better district, period.

10:39:17  4         Q.   And did you have any experience

10:39:19  5    with similar types of resolutions being

10:39:23  6    proposed at Springdale or Carlisle?

10:39:26  7         MS. LUNDRIGAN:   Springboro.

10:39:29  8         Q.   I'm sorry, Springboro or Carlisle.

10:39:32  9         A.   We never had a board resolution.

10:39:34  10        Q.   Were the same types of issues

10:39:36  11   surrounding Critical Race Theory,

10:39:41  12   intersectionality, were those all being

10:39:42  13   discussed at those districts as well?

10:39:44  14        A.   Oh, yeah.   I think it was pretty

10:39:46  15   much across the --

10:39:47  16        Q.   Is it fair to say that it's a

10:39:49  17   topic in most school districts right now; is

10:39:52  18   that true?

10:39:53  19        A.   Yeah.

10:39:54  20        Q.   So it would have been something --

10:39:59  21   was it your belief that it was something --

10:40:01  22   that kind of controversy is something you were

10:40:06  23   going to have to deal with wherever you might

10:40:08  24   go?

|            |    |                                                  |
|------------|----|--------------------------------------------------|
| 10:40:08   | 1  | A. Oh, yeah.                                      |
| 10:40:09   | 2  | Q. Fair enough. Did you consider it              |
| 10:40:14   | 3  | from the standpoint -- prior to being hired,     |
| 10:40:17   | 4  | did you consider it from the standpoint of --    |
| 10:40:20   | 5  | do you know what, strike that. Let me ask a      |
| 10:40:23   | 6  | foundational question first.                     |
| 10:40:25   | 7  | Do you agree with me that, in                    |
| 10:40:27   | 8  | general, with regard to Forest Hills School      |
| 10:40:30   | 9  | District and all the other independent school    |
| 10:40:32   | 10 | districts across the state of Ohio, that as a    |
| 10:40:37   | 11 | general proposition, it is the board's           |
| 10:40:42   | 12 | responsibility to make policy for a school       |
| 10:40:44   | 13 | district and it is your job as superintendent    |
| 10:40:47   | 14 | to implement that policy?                        |
| 10:40:49   | 15 | MR. WHARTON: Objection. Go ahead                 |
| 10:40:53   | 16 | and answer.                                      |
| 10:40:53   | 17 | A. Yes. Any policy.                              |
| 10:40:56   | 18 | BY MR. LUNDRIGAN:                                 |
| 10:40:56   | 19 | Q. Okay. You don't make the policies            |
| 10:41:00   | 20 | for the district, you let the board decide on    |
| 10:41:03   | 21 | the policies and you have to implement them; is  |
| 10:41:07   | 22 | that right?                                       |
| 10:41:07   | 23 | A. No. Typically policies -- there               |
| 10:41:13   | 24 | is an organization called Neola, which is one    |

of the major policy producers for schools in
Ohio, Michigan and the other one is OSBA, but
predominantly Neola is the largest one.  Twice
a year, you know, their team of lawyers are
taking law, putting it into policy and then we
meet with them, we review it as an
administrative staff.  It goes through a couple
of readings at the board level.  They certainly
can have input between first readings and
second readings, but we also have a board
member that's on that committee that rotates
around at different times.  So that's typically
how it comes.  Most of them are pretty much a
boilerplate type of policy.  There could be
some changes, but by and large the suggestions
would come from me then, or through Neola.  But
it can, I mean, it could come from another
direction, you know, from the board to say,
make a policy and review.

        Q.  Did you say that's Meola or Neola?

        A.  Neola.

        Q.  And do you know what that acronym
stands for?  National Educational --

        A.  Don't know.

10:42:53 1          Q.  Like most acronyms we use.

10:42:58 2          A.  I don't know.

10:42:58 3          Q.  But these policies that Neola puts

10:43:01 4     out there, they put them out in electronic form

10:43:04 5     and the school districts can subscribe and

10:43:07 6     adopt them?

10:43:09 7          A.  Yes.  You have to subscribe.  But

10:43:16 8     they have a -- typically, it's a former

10:43:18 9     superintendent or somebody that works as a

10:43:21 10    representative that comes in and meets with you

10:43:23 11    and goes through all of the policies to be

10:43:25 12    reviewed twice a year, typically.

10:43:31 13         Q.  And I noticed in your affidavit

10:43:33 14    that you indicated you were familiar with

10:43:35 15    Forest Hills School District's policies in its

10:43:39 16    manual.  Is that because they were similar or

10:43:42 17    identical to what you had worked with in

10:43:45 18    Springboro?

10:43:46 19         A.  Similar, yes.  We also use Neola

10:43:50 20    there.

10:43:50 21         Q.  Do you know whether or not

10:43:52 22    Springboro, when it adopted the most recent set

10:43:58 23    of policies promulgated by Neola, modified any

10:44:05 24    of those?

          A.  Which ones?  Which specifically or
any or just in general?

          Q.  Any of them or did they just adopt
them wholesale?

          A.  No.  Most updates are pretty much
standardized with any group, public school
that's using Neola.  They'll come in with those
updates based on changes in law so that your
board policy falls in line with it.

          Q.  And they are pretty standardized,
right, so that any district can adopt them and
they're going to apply?

          A.  Pretty much so.  But they're
always -- you know, a lot of times there's
options that fit your specific school or that
also fall in line legally.

          Q.  Do you know whether or not Forest
Hills adopted the Neola, the most recent Neola
promulgated standards in their entirety or
whether or not they modified any of them?

          A.  We had a second reading last night
of the fall updates, so, yeah, there's a couple
of dozen different ones.

          Q.  That were changed?

10:45:36
10:45:39
10:45:43
10:45:50
10:45:52
10:45:55
10:45:57
10:46:01
10:46:06
10:46:13
10:46:19
10:46:23
10:46:30
10:46:30
10:46:32
10:46:34
10:46:40
10:46:43
10:46:47
10:46:51
10:46:56
10:47:01
10:47:01
10:47:06

1        A.  Adjusted or brought up to speed

2   legally.  A lot of them are just wordsmithing

3   too.  It's not, like, big wholesale changes.

4        Q.  Do you remember what any of the

5   modifications were, off the top of your head,

6   that were made last night?

7        A.  Not really, except, you know,

8   obviously if there's one that's particularly

9   interesting or controversial, which this one

10  was the weapons that fall in line with the law

11  of allowing school districts to decide whether

12  to arm staff.  We elected no, that's not an

13  option for us.

14        Q.  Okay.

15        A.  And I'm sure there are districts

16  that do, but there's -- that's an example of

17  where it's adjusted towards the district.

18        Q.  Once the board had heard the

19  second reading and any changes that were going

20  to be made that were proposed or were on the

21  floor, how are the standards adopted at that

22  point?

23        A.  After the second reading then we

24  notify Neola that those were all approved, the

changes that we had in them and then it's
uploaded into our board docs, which is an
electronic version and that's where the public
can access it, the most up-to-date policies.
There's a little bit of a lag from them
uploading it.

Q. Does the board promulgate a
written resolution adopting the standards that
evidences the vote that they took?

A. They just vote. Other than the
vote to approve.

Q. So the minutes of the meeting that
show the vote?

A. Yes.

Q. In favor, the majority favor,
those are the evidence of what the action of
the board was?

A. Correct.

Q. Did you ever speak with Scott
Prebles prior to being hired by Forest Hills?

A. No.

Q. Did you ever have any
conversations with any board members at Forest
Hills about Mr. Prebles prior to being hired?

10:48:50   1          A.  No.

10:48:54   2          Q.  Did any board member ever ask you

10:48:57   3  if you would be willing to enforce the kindness

10:49:01   4  resolution prior to you being hired at Forest

10:49:04   5  Hills?

10:49:04   6          A.  No.

10:49:04   7          Q.  After review of it and being

10:49:07   8  familiar with it now, would you enforce it if,

10:49:12   9  in fact, there were not a stipulation in place

10:49:16  10  saying that it isn't going to be enforced

10:49:19  11  during the litigation?

10:49:20  12          MR. WHARTON:  Objection.  Answer

10:49:22  13  if you can.  The question enforcing this

10:49:28  14  resolution is something that hasn't been

10:49:31  15  fleshed out here yet.

10:49:32  16          A.  Well, based on what I've read,

10:49:37  17  there's no directive to do so.  Resolutions can

10:49:42  18  be directive in nature, resolution to go on a

10:49:50  19  ballot then direct a treasure to work through,

10:49:55  20  you know; some resolutions are simply

10:50:03  21  statements for what reason could be a statement

10:50:10  22  of position.  I've been a part of resolutions

10:50:14  23  that we've sent to legislators saying we don't

10:50:18  24  like this law.  Other than that, it's just --

10:50:23  1   so as I look at this resolution, to me it's --

10:50:30  2   there is no directive to, you know, create

10:50:35  3   policy or do anything, so it's -- I haven't

10:50:39  4   looked at it, to be honest with you since --

10:50:42  5   BY MR. LUNDRIGAN:

10:50:42  6       Q.  I'm sorry, I don't want to cut you

10:50:44  7   off.

10:50:44  8       A.  To be honest with you, I have not

10:50:47  9   looked at this since going back to the hiring,

10:50:54  10  my hiring.

10:50:55  11      Q.  Do you have an understanding of

10:51:00  12  the fact that school boards, this school board

10:51:03  13  in particular, Forest Hills, is a corporation

10:51:10  14  under Ohio law?

10:51:14  15      A.  I guess I don't understand what

10:51:15  16  you're saying here.

10:51:16  17      Q.  Do you understand that the Forest

10:51:20  18  Hills School District, the board is a

10:51:21  19  corporation, they act as a corporation and they

10:51:28  20  have bylaws, for example?

10:51:31  21          MR. WHARTON:  I'll make an

10:51:33  22  objection.  Answer if you can.

10:51:34  23      A.  Well, I'm not sure what that means

10:51:38  24  by corporation.  I do know we have bylaws that

10:51:42    1    are part of our policies.

10:51:44    2    BY MR. LUNDRIGAN:

10:51:44    3         Q.  What, in your understanding, is a

10:51:51    4    resolution?

10:51:51    5         A.  A resolution can be a couple of

10:51:56    6    things.  A resolution can be a statement of

10:52:02    7    belief.  As I've mentioned before, I've done a

10:52:08    8    couple of them to -- that were approved by the

10:52:14    9    board going typically to legislators or the

10:52:21    10   governor or somebody expressing a view or to

10:52:25    11   OSBA expressing a view and that's it.  Others,

10:52:30    12   resolutions are acknowledging, can be

10:52:33    13   acknowledging somebody for doing something

10:52:41    14   special.  And then there's some that have an

10:52:46    15   action that's required.  And typically those

10:52:50    16   are around levies, around that type of thing.

10:52:54    17        Q.  Do you think a resolution that

10:52:57    18   states a mandatory requirement or states a

10:53:03    19   mandatory prohibition is policy when it's

10:53:08    20   passed by the school board?

10:53:08    21            MR. WHARTON:  Objection.  Answer

10:53:10    22   if you can.

10:53:10    23        A.  No.  I try to follow policy.

10:53:12    24   That's what I'm required by law.

BY MR. LUNDRIGAN:

Q. And when you say policy, the definition that you're using here today and the definition that you used in your affidavit is how policy is defined by the policies of Forest Hills School District, correct?

A. The board policies, yes.

Q. Because they have a definition of what a policy is in the Neola policies, right?

A. Correct.

Q. Does it define what a resolution is?

MR. WHARTON: Do you mean it by, does the policies define a resolution?

Q. Correct. Is there a definition of resolution in the policy manual?

A. I'm not sure.

Q. So because you're not sure, you're not here today operating under any formal definition of what a resolution is because you don't know if it exists, correct?

MR. WHARTON: Objection. Answer if you can.

A. I'm operating under what I

10:54:13  1    understand resolution to be.

10:54:16  2    BY MR. LUNDRIGAN:

10:54:16  3         Q.  Okay.

10:54:16  4         A.  But nothing that I can recollect

10:54:19  5    in board policy, correct.

10:54:21  6         Q.  Are you given legal training on

10:54:25  7    legal issues as part of your certification to

10:54:28  8    be a superintendent?

10:54:30  9         A.  Yes.

10:54:32  10        Q.  Are you familiar with the Federal

10:54:34  11   Law 42 USC section 1983?

10:54:39  12        A.  No.

10:54:40  13        Q.  Are you familiar with the fact

10:54:41  14   that school districts and sometimes individual

10:54:44  15   board members and superintendents are sued

10:54:49  16   individually and as entities under federal law

10:54:53  17   for things like race discrimination or gender

10:54:58  18   discrimination and topics like that?

10:55:01  19        A.  That I'm aware of, sure.

10:55:02  20        Q.  And as part of your training, are

10:55:05  21   you taught about the issue of what official

10:55:07  22   policy is that fullfills the requirement for

10:55:14  23   liability under Section 1983?

10:55:16  24             MR. WHARTON:  Objection.  Answer

10:55:18　1　if you can.

10:55:19　2　　　　　A.　I need some more clarification on

10:55:23　3　that.

10:55:23　4　BY MR. LUNDRIGAN:

10:55:23　5　　　　　Q.　Have you read the lawsuit that's

10:55:25　6　been filed against Forest Hills?

10:55:27　7　　　　　A.　I glanced through it.　Yes.

10:55:29　8　　　　　Q.　Are you aware that we're alleging

10:55:33　9　that the resolution, the kindness resolution,

10:55:37　10　is official policy customer practice under

10:55:41　11　Section 1983 as one of the causes of action?

10:55:46　12　　　　　A.　I kind of remember that.

10:55:50　13　　　　　Q.　Are you equating the definition of

10:55:55　14　policy that you're using that's in the Forest

10:56:00　15　Hills policy manual as being equivalent to what

10:56:07　16　federal law means by policy practice or custom

10:56:12　17　for which a school district can be sued under

10:56:18　18　Section 1983?

10:56:20　19　　　　　A.　I follow board policy to the best

10:56:23　20　of my ability.

10:56:25　21　　　　　Q.　That's fine.　You're not a lawyer,

10:56:28　22　right?

10:56:28　23　　　　　A.　Correct.

10:56:29　24　　　　　Q.　You don't know whether or not the

| 10:56:33 | 1 | kindness resolution constitutes a policy |
| 10:56:36 | 2 | practice or custom for purposes of 42 USC |
| 10:56:42 | 3 | section 1983 one way or another; is that |
| 10:56:45 | 4 | correct? |
| 10:56:45 | 5 | MR. WHARTON:  Objection.  Go ahead |
| 10:56:47 | 6 | and answer. |
| 10:56:47 | 7 | A.  No, I don't.  Can you rephrase |
| 10:56:52 | 8 | that? |
| 10:56:52 | 9 | Q.  Sure.  Can you read that question |
| 10:56:52 | 10 | back? |
| 10:56:52 | 11 | (Record read by Reporter.) |
| 10:56:53 | 12 | BY MR. LUNDRIGAN: |
| 10:56:53 | 13 | Q.  Let me ask it again.  You don't |
| 10:57:49 | 14 | know, as you sit here today, whether or not the |
| 10:57:51 | 15 | kindness resolution constitutes policy custom |
| 10:57:57 | 16 | usage or something that can give rise to |
| 10:58:00 | 17 | liability under the federal law that we're |
| 10:58:03 | 18 | suing the school district under; is that |
| 10:58:06 | 19 | correct? |
| 10:58:06 | 20 | MR. WHARTON:  Objection.  Go ahead |
| 10:58:07 | 21 | and answer. |
| 10:58:07 | 22 | A.  My understanding is that is not |
| 10:58:09 | 23 | policy, as I read it. |
| 10:58:11 | 24 | BY MR. LUNDRIGAN: |

10:58:11  1          Q.  And the definition that you gain

10:58:14  2   that understanding from is the definition that

10:58:17  3   is in the policy manual for the Forest Hills

10:58:20  4   School District that was promulgated by Neola;

10:58:26  5   is that right?

10:58:26  6          A.  Correct.

10:58:26  7          Q.  Thank you.  So with regard to

10:58:32  8   resolutions, I will tell you that I've been

10:58:37  9   unable to find any definition of what a

10:58:40  10  resolution is in the Forest Hill School

10:58:42  11  District's policy manual, but I did look at the

10:58:47  12  Merriam-Webster definition of resolution, which

10:58:49  13  states that it's a formal expression of opinion

10:58:52  14  which you indicated earlier, correct?

10:58:54  15         A.  That's one usage, yes.

10:58:57  16         Q.  Or a formal expression of will,

10:59:01  17  would you agree with that?

10:59:04  18         A.  It can be.

10:59:05  19         Q.  Or a formal expression of intent

10:59:10  20  voted by an official body or assembled group.

10:59:16  21  Do you agree with that?

10:59:16  22         A.  It can be.

10:59:17  23         Q.  Do you think that the kindness

10:59:21  24  resolution is a statement of will or intent by

10:59:25　1　the Forest Hills School District?

10:59:27　2　　　　　　MR. WHARTON:　Objection.　Answer

10:59:28　3　if you can.

10:59:30　4　　　　　　A.　I don't know what their intention

10:59:32　5　is.

10:59:33　6　BY MR. LUNDRIGAN:

10:59:33　7　　　　　　Q.　You don't know, as you sit here

10:59:37　8　today, what the intention of the board was in

10:59:40　9　passing the kindness resolution?

10:59:43　10　　　　　　A.　Other than what I read there.

10:59:45　11　　　　　　Q.　You've never discussed it with the

10:59:49　12　individual board members?

10:59:51　13　　　　　　MR. WHARTON:　I'm going to make an

10:59:52　14　objection that any conversations involving

10:59:56　15　board members on any of the topics asked about

11:00:00　16　that are either involved or subject to

11:00:03　17　attorney-client privilege you're not to answer

11:00:04　18　about or that took place in executive session,

11:00:06　19　you're not to answer about, but subject to

11:00:09　20　those qualifications, you can go ahead answer

11:00:11　21　the question.

11:00:12　22　　　　　　A.　No.　I mean, I didn't have real

11:00:18　23　conversations at all just --

11:00:20　24　BY MR. LUNDRIGAN:

| | | |
|---|---|---|
| 11:00:20 | 1 | Q. Have you had individual |
| 11:00:22 | 2 | discussions with any of the board members |
| 11:00:24 | 3 | outside of the scope of board meetings or |
| 11:00:28 | 4 | executive session since you were hired? |
| 11:00:32 | 5 | MR. WHARTON: Objection. The same |
| 11:00:32 | 6 | with the attorney-client privilege applying to |
| 11:00:35 | 7 | those discussions, if any such did occur, but |
| 11:00:39 | 8 | go ahead and answer. |
| 11:00:40 | 9 | A. No. I'm trying to -- let me |
| 11:00:45 | 10 | think. As it relates to this? |
| 11:00:45 | 11 | BY MR. LUNDRIGAN: |
| 11:00:51 | 12 | Q. As it relates to the resolution, |
| 11:00:54 | 13 | correct. |
| 11:01:08 | 14 | A. I think of anything that I can |
| 11:01:12 | 15 | recollect, the most I've ever heard is that it |
| 11:01:17 | 16 | was a statement of belief. But there's never |
| 11:01:24 | 17 | been any discussions that I've had. |
| 11:01:29 | 18 | Q. Would you look at the resolution |
| 11:01:32 | 19 | that's in front of you that's been marked as |
| 11:01:35 | 20 | Exhibit 1. And would you agree with me that |
| 11:01:43 | 21 | the resolution pertains to curricula? |
| 11:01:48 | 22 | MR. WHARTON: Objection. Answer |
| 11:01:49 | 23 | if you can. |
| 11:02:35 | 24 | A. (Reviewing document) Other than |

11:02:37 1  just what's in the very first Whereas, the
11:02:41 2  first one is curricula.
11:02:43 3  BY MR. LUNDRIGAN:
11:02:43 4      Q.  And the first Whereas statement is
11:02:46 5  a declaration of the board's public official
11:02:50 6  opposition to the use of race-based or
11:02:54 7  identity-based curricula; is that correct?
11:02:56 8      A.  Training, curricula, methodology,
11:02:59 9  correct.
11:03:00 10     Q.  And further down in the Whereas
11:03:12 11 clauses, the sixth one, the Forest Hills policy
11:03:22 12 2240, entitled Controversial Issues, is
11:03:27 13 referenced; is that right?
11:03:28 14     A.  Right.
11:03:29 15     Q.  And 2240 is a policy that's been
11:03:32 16 enacted and officially promulgated by the
11:03:36 17 Forest Hills School Board; is that right?
11:03:38 18     A.  That is correct.
11:03:40 19     Q.  And the Controversial Issues
11:03:47 20 policy contains language that is recited in
11:03:51 21 this Whereas clause; is that correct?
11:03:55 22     A.  Can you repeat that?
11:03:58 23     Q.  The Controversial Issues policy
11:04:01 24 contains language that is recited in this

1  Whereas clause; is that right?

2         A.  I don't know if it's verbatim, but

3  it's -- in general, yes.

4         Q.  I'm not asking you to certify that

5  it's accurate, but it purports to be citing to

6  it; is that right?

7         A.  Yes.

8         Q.  So the resolution purports to

9  incorporate this portion of the controversial

10  issues policy within it, right?

11        A.  Right.  Yes.

12        Q.  And do you see the ninth whereas

13  clause which reads, The Critical Race Theory,

14  CRT, anti-racism, and all related euphemistic

15  surrogates should similarly not be advocated in

16  any form, in Forest Hills School District's

17  curricula or staff training?

18        A.  Mm-hmm.

19        Q.  Do you agree with me that that's

20  what that whereas provision says?

21        A.  Well, I'm not sure what it means.

22  What is euphemistic surrogates?  I don't know

23  what that refers to.

24        Q.  Yeah, that's a great question.  I

11:05:30  1    don't know that I can give you an answer to it.

11:05:33  2    But do you know what anti-racism is or how it

11:05:36  3    was meant in this resolution?

11:05:39  4              MR. WHARTON:  Objection.  Answer

11:05:41  5    if you know.

11:05:41  6         A.  I don't know what it -- what that

11:05:45  7    definition is.

11:05:45  8              MR. LUNDRIGAN:  Why don't we take

11:05:52  9    a break.

11:09:12  10             (Brief recess.)

11:25:32  11   BY MR. LUNDRIGAN:

11:25:32  12        Q.  You mentioned earlier when you

11:25:34  13   were deciding whether or not to pursue the

11:25:38  14   position with Forest Hills that the resolution

11:25:43  15   gave you pause.  Can you explain why it gave

11:25:47  16   you pause?

11:25:54  17        A.  Well, first of all, my

11:26:02  18   understanding was that it just -- well, from

11:26:07  19   the news it created some havoc, some pretty

11:26:15  20   vocal responses, and that's what made me pause,

11:26:20  21   just because it created some pretty strong

11:26:30  22   emotion.

11:26:31  23        Q.  And did that give you pause

11:26:33  24   because you didn't necessarily want to be in

the middle of that or because you were worried about litigation over it or both?

A. I hadn't even thought about litigation. That wasn't even part of my thought process at that time.

Q. How about the being in the middle of the controversy part of it, is that what gave you pause?

A. Just because the final interviews were the next day. I'm just -- why it happened that way, which I had really no knowledge of why, but just caused me to blink.

Q. Did you believe that it was -- that the resolution was procedurally defective in the way it was passed?

MR. WHARTON: Objection. Answer if you can.

A. Well, I had no knowledge, but I have no knowledge of that procedure -- or procedurally or what they had or hadn't followed.

BY MR. LUNDRIGAN:

Q. As you sit here today, knowing -- you do know how it was passed as you sit here

11:28:02  1  today?
11:28:02  2      A.  Yes.
11:28:03  3      Q.  And you're aware that the -- and I
11:28:06  4  think you've pointed it out in your affidavit
11:28:08  5  that the district's written policy manual
11:28:12  6  requires that something like this be put on the
11:28:15  7  agenda for two meetings and voted on at the
11:28:20  8  second one?
11:28:20  9          MR. WHARTON:  Objection.  Answer
11:28:21 10  if you know.
11:28:25 11      A.  I know policy is, not resolutions,
11:28:30 12  necessarily.
11:28:30 13  BY MR. LUNDRIGAN:
11:28:30 14      Q.  So you don't know if that applies
11:28:33 15  to this?
11:28:33 16      A.  No.
11:28:34 17      Q.  So you don't have an opinion one
11:28:37 18  way or another whether or not it was
11:28:42 19  procedurally defective to put this on the
11:28:43 20  agenda the same night that it was voted on?
11:28:46 21          MR. WHARTON:  Objection.  Answer
11:28:48 22  if you can.
11:29:02 23      A.  Again, I'm not -- all I know is
11:29:06 24  that it was brought up and it was passed and --

|          |    |                                                    |
|----------|----|----------------------------------------------------|
| 11:29:12 | 1  | so as far as how it got there or -- I have no      |
| 11:29:16 | 2  | knowledge of that.                                 |
| 11:29:17 | 3  | BY MR. LUNDRIGAN:                                   |
| 11:29:17 | 4  | Q.  Okay.  Would you agree with me                 |
| 11:29:33 | 5  | that the resolution, regardless of its binding     |
| 11:29:38 | 6  | effect, is a public statement by the school        |
| 11:29:41 | 7  | board that they are officially opposed to          |
| 11:29:43 | 8  | teaching any identity-based curricula?             |
| 11:29:50 | 9  | MR. WHARTON:  Objection.  Answer                   |
| 11:29:51 | 10 | if you can.                                         |
| 11:29:57 | 11 | A.  Can you repeat that?                            |
| 11:29:58 | 12 | BY MR. LUNDRIGAN:                                   |
| 11:29:58 | 13 | Q.  Would you agree with me that the               |
| 11:30:01 | 14 | resolution, regardless of its binding effect,      |
| 11:30:05 | 15 | is a public statement of the board of education    |
| 11:30:13 | 16 | of Forest Hills as to its public opposition to     |
| 11:30:14 | 17 | teaching any identity-based curricula?             |
| 11:30:19 | 18 | MR. WHARTON:  Objection.  Go ahead                 |
| 11:30:21 | 19 | and answer.                                         |
| 11:30:21 | 20 | A.  Yes.  I think to me it's a                     |
| 11:30:27 | 21 | statement of just their belief.                    |
| 11:30:31 | 22 | BY MR. LUNDRIGAN:                                   |
| 11:30:31 | 23 | Q.  And the same is true with regard               |
| 11:30:33 | 24 | to any race-based curricula by the resolution's    |

11:30:37    1    own language?

11:30:38    2         A.  Yes.

11:31:02    3         Q.  Were you aware that another

11:31:04    4    candidate for superintendent withdrew from the

11:31:07    5    selection process after learning of the passage

11:31:11    6    of the kindness resolution?

11:31:14    7         A.  Yes.

11:31:48    8         Q.  Would you agree with me that the

11:31:51    9    passage -- from your experience since being

11:31:54   10    hired, do you agree that the passage of the

11:31:59   11    resolution has caused teachers in the

11:32:03   12    Forest Hills School District to question what

11:32:07   13    they teach on certain topics or ideas?

11:32:10   14         MR. WHARTON:  Objection.  Answer

11:32:11   15    if you know.

11:32:14   16         A.  No.  It shouldn't impact them.

11:32:18   17    BY MR. LUNDRIGAN:

11:32:18   18         Q.  Why should it not impact them?

11:32:22   19         A.  Because at my very first meeting

11:32:27   20    with the entire district I said, Teach the

11:32:31   21    curriculum, okay.  And that was it.  Teach the

11:32:38   22    standards that are provided from the Ohio

11:32:43   23    Department of Education's website; that is our

11:32:47   24    model, that is what we follow, that's what you

11:32:50    1    teach.  If it's an AP course, you follow the

11:32:53    2    college board design curriculum.

11:32:59    3        Q.  Do you receive specific questions

11:33:01    4    from teachers about how to avoid conflict with

11:33:08    5    the resolution and what it stated?

11:33:10    6        A.  No.

11:33:12    7        Q.  Not from anyone?

11:33:13    8        A.  No, not really.  Probably wouldn't

11:33:20    9    have raised to my level anyway.

11:33:25    10        Q.  Do you know if other members of

11:33:28    11    the administration at Forest Hills received

11:33:31    12    questions from teachers about how to steer

11:33:35    13    clear of the restrictions of the kindness

11:33:38    14    resolution or how to comply with it?

11:33:41    15        A.  I don't know if they have been

11:33:44    16    individually asked, but in my meetings with

11:33:49    17    principals, I said the same thing.  Focus on

11:33:51    18    kids, focus on the curriculum that we have

11:33:55    19    that's adopted that we follow and that's it.

11:34:24    20        Q.  Mr. Hook, you were also -- do you

11:34:27    21    prefer I call you Mr. Hook or Larry?

11:34:30    22        A.  Larry is fine.

11:34:32    23        Q.  You were also a candidate for the

11:34:36    24    state board of education; is that true?

11:34:41  1        A. Yes.

11:34:41  2  (Exhibit No. 2 was marked for identification.)

11:36:24  3  BY MR. LUNDRIGAN:

11:36:24  4        Q. Let me know when you're finished

11:36:26  5  reviewing it.

11:36:27  6        A. (Reviewing document)  Okay.

11:36:28  7        Q. I think your answer was yes, you

11:36:31  8  were a candidate for the Ohio Board of

11:36:38  9  Education.

11:36:39  10        A. Yes, for superintendent.

11:36:40  11        Q. And these, what's been marked as

11:36:44  12  Exhibit 2, were questions that were submitted

11:36:47  13  to you that you answered as part of that

11:36:49  14  process?

11:36:50  15        A. Yes.

11:36:50  16        Q. We got these off the website, so

11:36:54  17  these are public, right?

11:36:55  18        A. Oh, yeah.

11:36:55  19        Q. I'm looking at your answer to

11:36:58  20  No. 10, which is at the top of page 4.

11:37:00  21        A. Mm-hmm.

11:37:07  22        Q. I want to ask you some questions

11:37:11  23  to clarify your position on some of this.

11:37:16  24        A. Okay.

11:37:20   1          Q.  The bullet points are what I'm
11:37:23   2   specifically looking at.  And I think -- well,
11:37:31   3   let me ask it this way: The first bullet point
11:37:34   4   that you've answered is that learning standards
11:37:39   5   should not and will not include the following
11:37:43   6   topics that:  Teach from a perspective that the
11:37:49   7   United States and/or its legal system is
11:37:54   8   systematically racist and designed to create
11:37:56   9   and maintain inequalities between genders,
11:37:56   10  ethnicities, different religious heritages, or
11:38:02   11  races.  Do you see that?
11:38:03   12         A.  Yes.
11:38:04   13         Q.  And you believe that, right?
11:38:06   14         A.  Correct.
11:38:07   15         Q.  And my question for you is, when
11:38:12   16  you say that that shouldn't be taught from a
11:38:18   17  perspective that it is systemically racist, et
11:38:23   18  cetera, you're not saying that whether or not
11:38:27   19  our legal system is systemically racist should
11:38:32   20  not be discussed?
11:38:33   21         A.  No.
11:38:34   22         Q.  So it's not your idea that the
11:38:38   23  idea itself should be stifled and not
11:38:41   24  discussed?

11:38:42  1          A.  Correct.

11:38:43  2          Q.  That's the way I read it; I just

11:38:45  3     wanted to make sure that we agreed with that.

11:38:48  4     So essentially what you're saying here is that

11:38:53  5     when these topics are being discussed, the

11:38:59  6     teacher in the process of discussing them

11:39:03  7     should not be telling the students this is how

11:39:07  8     it is, our system is systemically racist; they

11:39:11  9     should be asking the students to consider the

11:39:15  10    idea that some people have, that the system is

11:39:18  11    systemically racist.  Would you agree with

11:39:21  12    that?

11:39:21  13         MR. WHARTON:  Objection.  Go ahead

11:39:22  14    and answer if you can.

11:39:24  15         A.  I agree that they should not teach

11:39:27  16    from the perspective that the United States is

11:39:32  17    systemically racist.

11:39:37  18         Q.  Okay.

11:39:37  19         A.  But that it can come up in

11:39:40  20    conversation, you know, I believe I've --

11:39:45  21    well --

11:39:48  22         Q.  You agree that the United States

11:39:51  23    does have a history of systemic racism that was

11:39:58  24    embodied in law at one point, correct?

11:40:01  1              MR. WHARTON:  Objection, answer if

11:40:03  2      you can.

11:40:03  3              A.  I'm not sure.  Am I aware that

11:40:10  4      there were moments in our history that were --

11:40:16  5      I guess I don't really understand what you

11:40:18  6      mean.

11:40:19  7      BY MR. LUNDRIGAN:

11:40:19  8              Q.  Well, I'm going all the way back

11:40:23  9      to the formation of the constitution, slavery,

11:40:28  10     and school segregation.

11:40:28  11             A.  Okay.

11:40:29  12             Q.  At one point we did have a

11:40:32  13     systemically racist system in the United

11:40:36  14     States, would you agree with that?

11:40:37  15             A.  I would --

11:40:39  16             MR. WHARTON:  Objection.  Go

11:40:40  17     ahead.

11:40:40  18             A.  I would say certainly in some

11:40:42  19     parts of the country.

11:40:43  20     BY MR. LUNDRIGAN:

11:40:43  21             Q.  And that gets discussed as part of

11:40:47  22     the curricula that students study, especially

11:40:51  23     as they become more mature in high school,

11:40:54  24     right?

A. Yes.

Q. And different people in our society have different ideas about how to remedy the aftereffects of that and whether or not there should be remedies, correct?

A. What do you mean by remedies?

Q. Well, some people suggest reparations, some people talk about affirmative action, all that stuff.

A. I've heard of all of that. Yes.

Q. And you're not saying, as an educator, that any of those topics ought to be off base for discussion; you just don't think that kids should have it drilled into their heads that one side or the other is correct; is that true?

MR. WHARTON: Objection.

A. Well, going back -- correct. Do those topics come up? Yes. Can they be discussed? Yes.

BY MR. LUNDRIGAN:

Q. And you agree that it's a good thing to discuss those in a history class?

A. It happens. Some of it happened.

Q. Obviously, you can't take the whole year because they don't have the time, but those topics come up and you don't believe that they ought to be -- the teachers ought to be told don't discuss that, don't discuss slavery, don't discuss racism, don't discuss the fact that our schools were segregated. You're not advocating that any of those topics be prohibited from being taught?

A. No. Absolutely not.

Q. To the extent that the kindness resolution would prohibit discussion of any of those topics, do you believe that it is unconstitutional?

MR. WHARTON: Objection. Answer if you can.

A. That what's unconstitutional?

BY MR. LUNDRIGAN:

Q. The kindness resolution. To the extent that if it is binding or if it, in fact, causes teachers or administrators to believe that discussions about those topics are off limits and should not be part of the curriculum, do you believe that if that is, in

11:43:03  1  fact, its effect that it is unconstitutional?

11:43:09  2          MR. WHARTON:  Objection.  Answer

11:43:11  3  if you know.

11:43:12  4          A.  Well, from my perspective it's not

11:43:17  5  binding, so it's --

11:43:22  6  BY MR. LUNDRIGAN:

11:43:22  7          Q.  Let me ask it a different way.  I

11:43:25  8  want you to assume that it is binding.

11:43:28  9          MR. WHARTON:  No.  No.  No.  He's

11:43:30  10  not here to answer hypothetical questions like

11:43:33  11  that.  He's not an expert witness.

11:43:35  12          MR. LUNDRIGAN:  Are you willing to

11:43:37  13  stipulate to that?

11:43:38  14          MR. WHARTON:  Yes.  He's not here

11:43:40  15  as an expert witness.  He's here as a fact

11:43:42  16  witness and as a defendant.

11:43:43  17          MR. LUNDRIGAN:  Okay.

11:43:43  18  BY MR. LUNDRIGAN:

11:43:47  19          Q.  If you are told by the board,

11:43:50  20  implement this resolution, create a policy that

11:43:56  21  talks about how complaints can be lodged by

11:44:02  22  students, teachers, or parents about perceived

11:44:08  23  violations of it, do you think that the

11:44:12  24  resolution is constitutional if you have to do

that?

MR. WHARTON:  Same objection,
Kelly.  He said it's not binding, so you're now
asking him to assume something that he's
testified against, so that's not fair to him.
He's here giving you what his personal
knowledge is and his personal knowledge is this
is not a binding resolution that has any sort
of effective mechanism to make school board or
school employees do anything.  He's testified
to that.

MR. LUNDRIGAN:  I understand that.

MR. WHARTON:  So now to ask him to
assume that it does.

MR. LUNDRIGAN:  No, that's not
what I'm asking him.

MR. WHARTON:  Yes, you are.
You're asking him to assume that it's binding.

MR. LUNDRIGAN:  Listen to the
question.

MR. WHARTON:  Read the question --

MR. LUNDRIGAN:  Listen to the
question.

BY MR. LUNDRIGAN:

11:44:51     1          Q.  Your testimony is that no
11:44:53     2     mechanism has been put in place by the school
11:44:57     3     board yet to make this kindness resolution an
11:45:00     4     official policy of the district; is that
11:45:03     5     correct?
11:45:03     6          A.  That is correct.
11:45:04     7          Q.  And therefore, at this point you
11:45:08     8     have no obligation as the superintendent to
11:45:10     9     enforce it; is that right?
11:45:13    10          A.  That's correct.
11:45:14    11          Q.  Do you have an understanding of
11:45:21    12     whether or not, if the school board comes to
11:45:26    13     you next month or when the stipulation ends or
11:45:31    14     when the lawsuit ends and they say, Okay, we
11:45:35    15     won, the lawsuit is over, now implement the
11:45:41    16     resolution and create a policy that is for the
11:45:44    17     enforcement of it, are you going to do that?
11:45:49    18          MR. WHARTON:  Objection.  Answer
11:45:50    19     if you can.
11:45:52    20          A.  Well, I guess at that point you
11:45:54    21     have to decide how many of them -- if you can
11:45:57    22     count to three, you've got to know which -- you
11:46:00    23     know, do it or not.  My advice would be to
11:46:05    24     stick to the curriculum, period.

BY MR. LUNDRIGAN:

Q. Okay.

A. Because you're going to have to change other policies then.

Q. Got it. So you believe that if the board did come to you and tell you, implement the policy, implement the kindness resolution, that other policies are going to have to be changed as well?

MR. WHARTON: Objection. Answer if you know.

A. I would -- yes, because we follow -- our course of study is the state standards, so anything that's in there about state standards, those would kind of -- the same thing now.

BY MR. LUNDRIGAN:

Q. So you agree that implementing the kindness resolution would violate those state standards?

MR. WHARTON: Objection. Answer if you know.

A. I don't know if it would, particularly. I would -- at that point I would

11:47:12　1　probably be calling Bill and staying --

11:47:12　2　BY MR. LUNDRIGAN:

11:47:17　3　　　　　Q.　I understand.　So you don't know

11:47:19　4　the answer to that.　But as you sit here, you

11:47:22　5　believe that it may conflict with some aspects

11:47:25　6　of the curricula as it exists right now?

11:47:27　7　　　　　MR. WHARTON:　Objection.　Answer

11:47:28　8　if you can.

11:47:31　9　　　　　A.　Again, I don't know what some of

11:47:37　10　that resolution actually means.

11:47:41　11　BY MR. LUNDRIGAN:

11:47:41　12　　　　　Q.　Okay.　Do you agree that it is --

11:48:44　13　strike that.

11:48:45　14　　　　　Do you agree that individual board

11:48:47　15　members should not become personally involved

11:48:50　16　in taking action to enforce policies of the

11:48:53　17　district?

11:48:54　18　　　　　MR. WHARTON:　Objection.　Answer

11:48:55　19　if you can.

11:48:58　20　　　　　A.　Individual board members have no

11:49:01　21　authority.

11:49:03　22　BY MR. LUNDRIGAN:

11:49:03　23　　　　　Q.　Explain what you mean by that.

11:49:05　24　　　　　A.　The board operates under a

majority rule, so individuals can have
individual beliefs, but they don't individually
make up the board.  It's a collective --

Q.  So no individual board member has
the authority, in your view, to contact an
administrator or a principal and say this
teacher has violated this policy, I want you to
take action against her?

A.  Oh, they can call them, just like
any parent can, but it doesn't mean that they
have to do it.  Or they typically, if there is
an issue, they'll let me know.

Q.  Well, let's distinguish.  They're
not parents, right, they're board members with
legal responsibilities, right?

MR. WHARTON:  Do you mean, are you
asking whether any of the board members are
actually parents?

Q.  Well, he equated them to parents a
few minutes ago, a few seconds ago.

A.  No, just like parents.  Just like
parents, anybody can call.

Q.  A parent can call for whatever
reason they want, right?  They don't have any

11:50:31  1    legal obligations not to violate anyone's

11:50:39  2    constitutional rights, correct?

11:50:39  3                MR. WHARTON:  Objection.

11:50:39  4    BY MR. LUNDRIGAN:

11:50:40  5          Q.  Board members do, right?

11:50:42  6          A.  Board members can call as well.

11:50:44  7          Q.  Okay.  But what I'm asking is,

11:50:46  8    board members have legal responsibilities not

11:50:49  9    to do things that are illegal; would you agree

11:50:52  10   with that?

11:50:53  11         A.  Sure.

11:50:54  12         Q.  Okay.  They have legal

11:50:56  13   responsibilities not to take actions that

11:51:00  14   they're not legally authorized to take; would

11:51:03  15   you agree with that?

11:51:05  16         A.  Yes.  I would say so.

11:51:08  17         Q.  And taking actions against

11:51:13  18   individual teachers that they're not legally

11:51:17  19   authorized to take could give rise to personal

11:51:25  20   liability on the part of board members,

11:51:25  21   correct?

11:51:26  22               MR. WHARTON:  Objection.  Answer

11:51:27  23   if you know.

11:51:29  24         A.  Well, again, they don't have any

11:51:31 1  authority as individuals.  I don't know if I
11:51:34 2  answered that very well.  Sorry.
11:51:36 3  BY MR. LUNDRIGAN:
11:51:36 4          Q.  If the stipulation that was
11:52:11 5  entered into between the school board and the
11:52:15 6  plaintiffs prior to you being hired that the
11:52:19 7  resolution would not be enforced and no action
11:52:23 8  would be taken on it while the litigation was
11:52:26 9  pending, if that didn't exist, what would the
11:52:31 10 normal course of events be for you to act on
11:52:37 11 developing a policy to implement the
11:52:40 12 resolution?
11:52:40 13         MR. WHARTON:  Objection, answer if
11:52:45 14 you can.
11:52:45 15         A.  I would not have done anything
11:52:48 16 different than I'm doing now, which is really
11:52:51 17 nothing, because there's no directive to do
11:52:55 18 anything.
11:52:56 19 BY MR. LUNDRIGAN:
11:52:56 20         Q.  When you're considering curriculum
11:53:01 21 and reviewing policies to establish curriculum,
11:53:05 22 you wouldn't consider the resolution, the
11:53:11 23 kindness resolution in doing that, even though
11:53:14 24 it directly addresses and mandatorily prohibits

11:53:20  1  certain curricula?

11:53:20  2        MR. WHARTON:  Objection.  Answer

11:53:21  3  if you can.

11:53:21  4        A.  No.  I would say what I've told

11:53:25  5  everybody is, we will teach the standards from

11:53:30  6  the Ohio Department of Education in all subject

11:53:33  7  matters and the AP college board.

11:53:33  8  (Exhibit No. 3 was marked for dentification.)

11:55:43  9  BY MR. LUNDRIGAN:

11:55:43  10        Q.  Mr. Hook, could you identify what

11:55:56  11  I marked as Exhibit 3?

11:55:59  12        A.  Yes.  This is a series of

11:56:04  13  questions that Bernie asked me to respond to in

11:56:18  14  reference to the lawsuit.

11:56:30  15        Q.  You're not thinking of discovery

11:56:33  16  requests.  This is your affidavit, right?

11:56:37  17        A.  Yes.

11:56:38  18        Q.  And you prepared this for the

11:56:41  19  motion to dismiss that your counsel filed; is

11:56:49  20  that right?  If you know.  You prepared this --

11:56:51  21        A.  They asked me to fill it out.  I

11:56:55  22  think that's correct.

11:56:56  23        Q.  Did you draft this?

11:57:03  24        A.  I think there were questions and I

11:57:07  1   answered the questions as they related to

11:57:10  2   these.  He knew -- obviously, he knew when I

11:57:14  3   started.  I wanted to make sure that they knew

11:57:19  4   my roles and --

11:57:22  5          Q.  And, again, you were familiar with

11:57:25  6   the policies in the Forest Hills policy manual

11:57:29  7   because you had seen the Neola policies already

11:57:32  8   as part of Springboro's administration,

11:57:38  9   correct?

11:57:38  10         A.  Right.

11:57:40  11         Q.  Thank you.  But you didn't

11:57:45  12  actually write this affidavit, right?

11:57:49  13         A.  No, I didn't actually write it.

11:57:53  14         Q.  You reviewed it?

11:57:54  15         A.  I reviewed it, made corrections

11:57:58  16  and made sure that it was accurate.

11:58:41  17         Q.  Do you believe that if the

11:58:46  18  stipulation agreeing that the resolution won't

11:58:49  19  be enforced during the litigation was not in

11:58:52  20  place that teachers would question what they're

11:59:01  21  allowed to teach?

11:59:03  22         MR. WHARTON:  Objection.  Answer

11:59:04  23  if you can.

11:59:09  24         A.  Well, I'm not sure what they would

think.  Pretty much every year that I've been a
superintendent, opening in services I always
say, you know, teach the standards.  That's
pretty much my shtick.

BY MR. LUNDRIGAN:

Q.  Are you familiar with what the
C.A.R.E Program was at Forest Hills?

A.  No.

Q.  You don't know anything about
that?

A.  No.  Is that an acronym?

Q.  I believe it is, actually, and I
can't tell you what the acronym stands for,
but.  Are you familiar with the fact that the
C.A.R.E Program at Forest Hills was dismantled
after the three board members who were elected
most recently, aside from Ms. Rasmussen?

MS. LUNDRIGAN:  Four of them.

Q.  I'm sorry, four of them.  Are you
familiar with the fact that they ran on a
platform of doing away with the C.A.R.E.
Program?

MR. WHARTON:  Objection.  Answer
if you know.

12:00:30  1      A.  I have no knowledge of that.

12:00:32  2  BY MR. LUNDRIGAN:

12:00:32  3      Q.  Are you familiar with the fact

12:00:33  4  that they -- so I take it you would not be

12:00:46  5  familiar with the fact that those four board

12:00:49  6  members, other than Ms. Rasmussen equated the

12:00:53  7  C.A.R.E. Program to Critical Race Theory?

12:00:57  8      MR. WHARTON:  Objection.  Answer

12:00:59  9  if you know.

12:01:00 10      A.  I have no knowledge of that.

12:01:03 11  BY MR. LUNDRIGAN:

12:01:03 12      Q.  Have you read about or heard about

12:01:09 13  or otherwise learned about the fact that the

12:01:12 14  four board members, other than Ms. Rasmussen,

12:01:15 15  who were elected to the school board who were

12:01:19 16  in support of the kindness resolution, also

12:01:24 17  voted to do away with Diversity Day at Turpin

12:01:35 18  High School?

12:01:35 19      MR. WHARTON:  Objection.  Answer

12:01:37 20  if you know.

12:01:37 21      A.  I don't know much about it.  I

12:01:40 22  don't have a lot of knowledge of what happened

12:01:41 23  other than what I heard on the news and other

12:01:44 24  than it was canceled.

BY MR. LUNDRIGAN:

Q. And do you believe that the cancellation of the Diversity Day was part of those four board members' agenda that's also expressed in the kindness resolution?

MR. WHARTON: Objection. Answer if you know.

A. I have no direct knowledge of that.

BY MR. LUNDRIGAN:

Q. Do you recognize what's been marked as Hook No. 4?

A. I believe -- yes, I believe I've seen this, but don't ask me to quote anything.

Q. It's a long document, I wouldn't ask you to do that. But you have read it?

A. Yes, I've read through it.

MR. LUNDRIGAN: All right. Actually, this may be a good spot to break for lunch if you want to do that.

MR. WHARTON: Okay. That's fine.

(Whereupon lunch recess was taken.)

(Whereupon Sara Jonas and

1     Natalie Hastings left deposition.)

2    (Exhibit No. 4 was marked for identification.)

3    BY MR. LUNDRIGAN:

4         Q.  I think we marked the complaint as

5    Exhibit 4, and you had identified it before we

6    broke.  I wanted to ask you about some of the

7    specifics.  Actually, this is the amended

8    complaint.  So if you would look at paragraph

9    23 of the amended complaint, which is on page

10   13 of the amended complaint.  Paragraph 23

11   relates to the C.A.R.E. Committee.  And I think

12   you indicated earlier that you were not

13   familiar with how the C.A.R.E. Committee came

14   to be disbanded; is that accurate?

15        A.  Correct.

16        Q.  If that was done by motion alone

17   without a resolution, without any policy change

18   being implemented, would you think that that is

19   consistent with your position about what has

20   happened in this case with the resolution?

21        MR. WHARTON:  Objection.  Answer

22   if you can.

23        A.  I don't know anything about how or

24   why it would disband, really.

BY MR. LUNDRIGAN:

Q. Let me shift gears for a minute. Have you personally recommended to any member of the board that they rescind the kindness resolution?

A. No. Not to my recollection.

Q. Have you had discussions with individual board members about rescinding the kindness resolution as part of the effort to get support for the levy that you are advising the board that they need to pass?

MR. WHARTON: I'm going to object subject to the attorney/client privilege and the executive session privilege with respect to any discussions that implement those privileges; other than that, go ahead and answer.

A. No, not with any board member.

BY MR. LUNDRIGAN:

Q. Is there an executive session that involved discussions which you cannot testify to over your attorney's objection?

MR. WHARTON: Any executive session he can't testify about, so I don't

13:03:33    1    know.

13:03:37    2              MR. LUNDRIGAN:  Correct.  But if

13:03:38    3    you're going to object on the basis of an

13:03:41    4    executive session, I think you need to tell us

13:03:45    5    which one, what the date of it was.

13:03:46    6              MR. WHARTON:  Well, I don't know

13:03:47    7    that there is.  I'm making the objection to

13:03:49    8    give him that instruction because I'm not

13:03:52    9    present for every discussion that they've had

13:03:55   10    in executive session.  All I know is it's

13:04:00   11    privileged.  Now, if you want to ask something

13:04:03   12    that clarifies that for you, you can, but, you

13:04:08   13    know, it's just like an attorney-client

13:04:10   14    privilege, you know.  He doesn't have the

13:04:12   15    ability to testify about things that were

13:04:16   16    subject to the attorney-client privilege just

13:04:19   17    as he can't testify about things that were said

13:04:21   18    in executive session.

13:04:27   19    BY MR. LUNDRIGAN:

13:04:27   20         Q.  Are there discussions that

13:04:29   21    occurred in executive session that you are not

13:04:33   22    able to talk about today because of your

13:04:37   23    attorney's objection based on executive session

13:04:40   24    privilege?

13:04:42  1          MR. WHARTON:  I'll object.  But
13:04:44  2    I'll say go ahead and answer this question.
13:04:46  3          A.  No.
13:04:58  4    BY MR. LUNDRIGAN:
13:04:58  5          Q.  Do you know what social and
13:05:01  6    emotional learning principles are?
13:05:18  7          A.  Well, I'd want to know what you --
13:05:22  8    what the definition of that is.  That's --
13:05:27  9          Q.  I don't have it.  I don't have
13:05:31 10    a definition, but I will tell you that the
13:05:34 11    four board members, who do not include
13:05:40 12    Ms. Rasmussen, have indicated they are
13:05:43 13    opposed to social and emotional learning
13:05:47 14    principles.  Do you have any idea what that
13:05:49 15    means?
13:05:50 16          A.  I don't know what that means.
13:06:31 17          Q.  Have you personally reviewed
13:06:38 18    curricula for the Forest Hills School District
13:06:42 19    to determine whether or not there are any
13:06:46 20    Critical Race Theory components in it?
13:06:55 21          A.  Personally, I have not gone
13:06:57 22    through item by item.  I've been assured that
13:07:03 23    we are not, that we teach the standards.
13:07:07 24          Q.  And Critical Race Theory is not

| | |
|---|---|
| 13:07:13 | 1 |
| 13:07:16 | 2 |
| 13:07:17 | 3 |
| 13:07:18 | 4 |
| 13:07:21 | 5 |
| 13:07:57 | 6 |
| 13:08:05 | 7 |
| 13:08:08 | 8 |
| 13:08:14 | 9 |
| 13:08:19 | 10 |
| 13:08:19 | 11 |
| 13:08:19 | 12 |
| 13:08:33 | 13 |
| 13:08:36 | 14 |
| 13:08:40 | 15 |
| 13:08:40 | 16 |
| 13:08:42 | 17 |
| 13:08:44 | 18 |
| 13:08:52 | 19 |
| 13:08:55 | 20 |
| 13:08:56 | 21 |
| 13:08:56 | 22 |
| 13:08:56 | 23 |
| 13:09:01 | 24 |

1  part of the standards promulgated by the State

2  of Ohio?

3         A.  From what I understand, critical

4  -- I don't even know what Critical Race Theory

5  is, to be totally honest with you.

6         Q.  Would you consider Diversity

7  Day -- I think it happened for about six, maybe

8  eight years in a row.  Would you consider that

9  program part of the curricula for Turpin High

10  School?

11         MR. WHARTON:  Objection.  Go ahead

12  and answer.

13         A.  I am not aware that it is part of

14  the curriculum specifically, Diversity Day.

15  BY MR. LUNDRIGAN:

16         Q.  And that's kind of my question.

17  I'm trying to think of the best way to ask

18  this.  Events that are like an annual event

19  where speakers come in and they talk on a

20  topic.

21         MR. WHARTON:  An assembly?

22         Q.  There you go.

23         A.  Okay.  Now I'm on the same page.

24         Q.  An assembly where speakers are

13:09:04  1    brought in to talk on a topic, would you

13:09:09  2    consider that to be -- to fall under the

13:09:12  3    umbrella of curricula or not?

13:09:25  4         A.  It should or should have a very

13:09:35  5    strong connection to it.

13:09:36  6         Q.  So if Diversity Day did involve

13:09:41  7    that, speakers who came in and talked on

13:09:41  8    various topics that were related to curriculum

13:09:46  9    that was being taught to the students, do you

13:09:51  10   think that it should have been done away with

13:09:55  11   by motion or by modification of a policy?

13:09:59  12        MR. WHARTON:  Objection.  Answer

13:10:02  13   if you can.

13:10:03  14        A.  I don't know how was canceled.  I

13:10:10  15   don't know that.

13:10:10  16   BY MR. LUNDRIGAN:

13:10:10  17        Q.  Well, if it was curricula or

13:10:14  18   curriculum, then it should have been modified

13:10:17  19   by means of a policy change, according to your

13:10:20  20   affidavit; is that accurate?

13:10:21  21        MR. WHARTON:  Objection.  I don't

13:10:23  22   know that he testified that it is curriculum.

13:10:25  23   I think he said it has a connection to

13:10:27  24   curriculum.

BY MR. LUNDRIGAN:

Q. Correct. And what I'm asking you is, if it was curriculum -- I know you're not familiar with it, but if it was curriculum, part of the curricula, and they wanted to do away with it, should that have been done by a policy change or could it be done by a mere motion?

MR. WHARTON: Objection. Go ahead and answer if you can.

A. Typically, it never gets to the board level. It would have gone through -- if there were questions, for whatever reason, it would come probably to the principal and then up the chain of command and it may be this was or wasn't following or connected to the curriculum. It could have been any of that. And I'm speculating there a little bit.

BY MR. LUNDRIGAN:

Q. So you as -- let me make sure I understand your testimony. So the principal for Turpin, who is Mr. Fellows -- is that correct?

MS. LUNDRIGAN: Mr. Spencer.

13:11:25  1              Q.  I'm sorry, Mr. Spencer.

13:11:25  2              A.  Spencer.

13:11:27  3              Q.  -- could have canceled Diversity

13:11:31  4     Day on his own authority?

13:11:35  5              A.  Could have.  Anything, though,

13:11:37  6     that's -- he might check with, you know, the

13:11:42  7     director or assistant superintendent of

13:11:46  8     curriculum and instruction.

13:11:47  9              Q.  Who is that person?

13:11:49  10             A.  Kim Tensley.

13:11:52  11             Q.  Do you know how her last name is

13:11:53  12    spelled?

13:11:53  13             A.  T-E-N-S-L-E-Y.

13:12:00  14             MS. LUNDRIGAN:  It was Kim Pence.

13:12:03  15             Q.  Is that her married name, Pence?

13:12:07  16             MS. LUNDRIGAN:  I don't know.

13:12:08  17             A.  She just got married this summer,

13:12:11  18    so it's now Tensley.  But usually -- I'm sorry,

13:12:22  19    I shouldn't interject.

13:12:25  20             Q.  That's fine.  If the

13:12:29  21    superintendent wanted to cancel Diversity Day,

13:12:35  22    it's your belief that they could do that -- you

13:12:37  23    could do that on your own accord?

13:12:39  24             MR. WHARTON:  Objection.  Answer

13:12:40    1    if you know.

13:12:40    2            A.  Yes.  Unless there was something

13:12:42    3    that specifically in policy said I couldn't,

13:12:46    4    which I'm not aware of.

13:12:57    5    BY MR. LUNDRIGAN:

13:12:57    6            Q.  If it was being canceled by you or

13:13:01    7    by Mr. Spencer because they felt it did not

13:13:05    8    comply with directives regarding curricula,

13:13:09    9    would you think that that could be done by

13:13:12   10    either you or Mr. Spencer without the approval

13:13:17   11    of the board?

13:13:17   12            A.  Yes.

13:13:18   13            Q.  How about decisions about whether

13:13:32   14    or not to allow discussion of Critical Race

13:13:38   15    Theory in curricula, could you, as the

13:13:41   16    superintendent, order that there be no

13:13:45   17    discussions of Critical Race Theory without

13:13:48   18    approval of the board?

13:13:50   19            MR. WHARTON:  Objection.  Answer

13:13:52   20    if you can.

13:13:53   21            A.  Well, I'd want to know what your

13:13:56   22    definition of Critical Race Theory is because

13:14:00   23    all I have is a Google knowledge.

13:14:06   24    BY MR. LUNDRIGAN:

13:14:06   1              Q.  Yeah, I understand.  I don't know
13:14:08   2    that I can give you a good definition, but can
13:14:14   3    you make curriculum decisions like that on your
13:14:19   4    own?
13:14:19   5              A.  Yeah.  I would believe so, yes.
13:14:24   6    Unless, you know, because I have the state
13:14:28   7    standards, I can access those at any moment.
13:14:32   8              Q.  So you don't have to go to the
13:14:34   9    board to change curricula?
13:14:39  10              A.  Oh, to change curriculum?  Oh,
13:14:46  11    yeah, if it went away, because that's our
13:14:47  12    accepted course of study is now the state
13:14:51  13    standards.
13:14:53  14              Q.  So if Critical Race Theory were
13:14:56  15    being taught at Turpin High School, is it your
13:15:00  16    testimony that Mr. Spencer could not, of his
13:15:03  17    own accord, that he would not have the
13:15:06  18    authority to say stop teaching it?
13:15:09  19              MR. WHARTON:  Objection.  Answer
13:15:10  20    if you can.
13:15:10  21              A.  He has the authority to stop
13:15:13  22    anything that's not curriculum by design, if
13:15:22  23    there's any teacher going off, away from those
13:15:25  24    standards.

13:15:28 1    BY MR. LUNDRIGAN:

13:15:28 2         Q.  Okay.  And you don't believe

13:15:41 3    Critical Race Theory is part of the curriculum

13:15:44 4    that's approved by the state standards?

13:15:44 5              MR. WHARTON:  Objection.  Answer

13:15:47 6    if you know.

13:15:47 7              A.  In my opinion, no, it is not part

13:15:51 8    of the standards.

13:15:55 9    BY MR. LUNDRIGAN:

13:15:55 10        Q.  Is it your testimony that there's

13:15:57 11   anything -- strike that.

13:16:05 12             Is it your testimony, as you sit

13:16:07 13   here today, that if a teacher was talking about

13:16:11 14   the topic of Critical Race Theory and having

13:16:18 15   students consider it in the context of, say a

13:16:22 16   history class, is it your opinion that that

13:16:26 17   violates state standards for curricula?

13:16:35 18             MR. WHARTON:  Objection.  Answer

13:16:36 19   if you can.

13:16:36 20             A.  I would have to know specifically

13:16:38 21   what.

13:16:40 22   BY MR. LUNDRIGAN:

13:16:40 23        Q.  What Critical Race Theory is?

13:16:43 24        A.  Yes.

13:16:44    1          Q.  How about anti-racism, same answer

13:16:47    2   there?

13:16:47    3          A.  Yes.  I would want to have that

13:16:52    4   definition.

13:16:53    5          Q.  Do you not believe, as you sit

13:16:56    6   here right now, that you know what anti-racism

13:17:00    7   is?

13:17:02    8          A.  Well, your anti-racism is just the

13:17:23    9   word.  I know what racism is and I know what

13:17:27   10   anti means, so that's -- I guess I understand

13:17:29   11   it to that degree.

13:17:31   12          Q.  And would you agree with me that

13:17:36   13   teaching curriculum that includes principles of

13:17:41   14   anti-racism has been approved as part of the

13:17:47   15   state approved curriculum?

13:17:50   16          MR. WHARTON:  Objection.  Answer

13:17:51   17   if you know.

13:17:52   18          A.  I'm not aware of specifically

13:17:55   19   that, but I can't sit here and tell you that I

13:18:01   20   can quote every part of it either.

13:18:03   21   BY MR. LUNDRIGAN:

13:18:03   22          Q.  Yeah.  Let me think of a different

13:18:06   23   way to ask it.  What I'm trying to get at is

13:18:13   24   teachers, at least to my recollection, and it's

13:18:16  1   been a long time, I will admit that, but
13:18:20  2   teachers teach in public school and have for
13:18:23  3   quite a while that racism is a bad thing.  Do
13:18:30  4   you agree with that?
13:18:31  5           A.  Yeah.
13:18:33  6           Q.  Really?  I'm sorry, did you say
13:18:36  7   yes?
13:18:36  8           A.  Yes.  I'm sorry.
13:18:37  9           Q.  That's okay.  So it wouldn't -- it
13:18:47  10  shouldn't surprise anybody if a teacher is
13:18:48  11  talking about the history of slavery in the
13:18:51  12  United States being a negative thing, a bad
13:18:54  13  thing, right?
13:18:54  14          A.  That would not surprise me.
13:18:56  15          Q.  Okay.  That's a valued judgment
13:18:59  16  that's accepted at this point?
13:19:01  17          A.  Yes.
13:19:02  18          Q.  The same thing with segregation of
13:19:06  19  public schools, would you agree with me?
13:19:07  20          A.  Yes.
13:19:08  21          Q.  So anti-racism in those senses, in
13:19:12  22  those two examples that I just gave, that's
13:19:15  23  part of the accepted, approved curriculum of
13:19:19  24  the State of Ohio.  Would you agree with that?

13:19:21    1              MR. WHARTON:  Objection.  Answer
13:19:22    2    if you know.
13:19:22    3          A.  It is discussed, yes.
13:19:31    4    BY MR. LUNDRIGAN:
13:19:31    5          Q.  Nobody is going to come in and
13:19:33    6    tell a teacher at Turpin High School, You can't
13:19:38    7    teach that slavery is wrong because you have to
13:19:41    8    give both sides of the issue.  That's not going
13:19:44    9    to happen, right?
13:19:45   10              MR. WHARTON:  Objection.  Answer
13:19:46   11    if you know.
13:19:47   12          A.  I wouldn't think so.
13:19:58   13    BY MR. LUNDRIGAN:
13:19:58   14          Q.  Did you also hear that students
13:20:01   15    had a walkout because of the cancellation of
13:20:08   16    Diversity Day at Turpin High School?
13:20:10   17          A.  Yes.
13:20:10   18          Q.  Were you aware at any point that
13:20:16   19    Sara Jonas inquired of Scott Prebles about
13:20:20   20    disciplinary action against the students who
13:20:22   21    were doing the walkout?
13:20:23   22          A.  No knowledge of that.
13:20:28   23          Q.  Would you have concern about that
13:20:30   24    if that happened while you were superintendent?

13:20:33  1       MR. WHARTON:  Objection.  Answer
13:20:35  2   if you can.  If what, the student walkout or
13:20:39  3   the --
13:20:39  4       Q.  A board member requesting
13:20:41  5   discipline for students who were engaging in a
13:20:45  6   protest.
13:20:48  7       A.  And the question was?
13:20:49  8       Q.  Would that concern you as
13:20:53  9   superintendent?
13:20:54 10       A.  Oh, I understand.  Concern me to
13:21:05 11   the degree that that's really not their role
13:21:08 12   maybe.
13:21:08 13       Q.  Not the board member's role?
13:21:11 14       A.  Right.  Concern that if I didn't
13:21:14 15   know it was happening, no, I take that
13:21:17 16   information but.
13:21:20 17       Q.  Do you think students have a
13:21:22 18   constitutional right to engage in a walkout or
13:21:25 19   a protest?
13:21:27 20       MR. WHARTON:  Objection.  Answer
13:21:28 21   if you know.
13:21:40 22       A.  Well, I guess it kind of depends a
13:21:45 23   little bit on what they're walking out for.
13:21:47 24   BY MR. LUNDRIGAN:

13:21:47   1          Q.  It would have to be a legitimate
13:21:51   2   protected interest, correct?
13:21:53   3          A.  I could say that, yes.  They don't
13:21:56   4   shed their rights at the door.
13:21:57   5          Q.  They can't walk out because they
13:22:00   6   want to have pizza three days a week instead of
13:22:06   7   two days a week?
13:22:07   8          A.  That's probably pressing the limit
13:22:07   9   a little bit.
13:22:24   10          Q.  Have you heard about Go Offline
13:22:26   11   Day and the cancellation of that?
13:22:38   12          A.  I think I may have heard about it
13:22:40   13   either -- and I don't even know where I heard
13:22:43   14   about it from, to be honest with you.  But I
13:22:47   15   know no specifics.
13:22:47   16          Q.  Okay.  You weren't involved in any
13:22:50   17   of that?
13:22:50   18          A.  No.
13:22:51   19          Q.  Do you agree that the
13:23:11   20   controversial issues policy No. 2240 is
13:23:18   21   authorization for enforcement of the kindness
13:23:29   22   resolution?
13:23:29   23          A.  I don't think so.
13:23:30   24          Q.  What's your reasoning for that?

13:23:32  1          A.  I think it's talking about -- I
13:23:38  2    can't quote it per se, but it's about making
13:23:41  3    sure that controversial issues are vetted
13:23:50  4    properly and be neutral and that it applies to
13:23:52  5    curriculum.
13:23:53  6          Q.  Are you aware that Sara Jonas
13:23:57  7    claims to have authored the kindness resolution
13:24:00  8    herself?
13:24:02  9          A.  I have no knowledge of that.
13:24:06  10          Q.  Well, we went through it earlier
13:24:08  11    and it does reference the controversial issue,
13:24:17  12    issues policy in the kindness resolution
13:24:17  13    itself, correct?
13:24:26  14          A.  And your question again was?  What
13:24:29  15    am I looking for?
13:24:30  16          Q.  It's the sixth whereas.
13:24:31  17          A.  Gotcha.
13:24:32  18          MR. WHARTON:  It's the one that
13:24:32  19    has the 6 drawn next to it.
13:24:35  20          A.  I found that real quick.
13:24:35  21    BY MR. LUNDRIGAN:
13:25:03  22          Q.  So do you think by referencing
13:25:07  23    that policy provision explicitly in the
13:25:12  24    kindness resolution that Ms. Jonas was relying

13:25:17   1   upon the controversial issues policy as the

13:25:20   2   policy by which the kindness resolution would

13:25:25   3   be implemented?

13:25:25   4            MR. WHARTON:  Objection.  Answer

13:25:25   5   if you know.

13:25:27   6            A.  I don't know what she was

13:25:28   7   thinking.

13:26:18   8   BY MR. LUNDRIGAN:

13:26:18   9            Q.  Were you aware that when the

13:26:21   10   resolution, the kindness resolution, was

13:26:23   11   passed, that at that board meeting

13:26:26   12   Defendant Jonas, Sara Jonas, indicated

13:26:28   13   that she wanted to set the tone for the new

13:26:31   14   superintendent, which turned out to be you,

13:26:34   15   with the resolution?

13:26:36   16            A.  I'm not aware of it.

13:26:38   17            Q.  I'm going through and trying to

13:27:14   18   cut out some of this so I can get you out of

13:27:17   19   here.

13:27:17   20            A.  I appreciate that.

13:27:29   21            Q.  I looked at the anti-racism policy

13:27:35   22   that you referenced in your affidavit.  Are you

13:27:38   23   familiar with that policy, off the top of your

13:27:42   24   head or do you need to look at it?

13:27:44  1          MR. WHARTON:  What is the
13:27:45  2   anti-racism policy?
13:27:48  3          MS. LUNDRIGAN:  I think it's the
13:27:50  4   nondiscrimination policy.
13:27:51  5          MR. LUNDRIGAN:  Nondiscrimination
13:27:53  6   policy, I'm sorry.  The words are loaded here
13:27:58  7   so I have to get them correct.
13:27:58  8          MS. LUNDRIGAN:  It might be 1422.
13:28:00  9   Is that in his affidavit?  I think it's 1422.
13:28:00  10         MR. WHARTON:  I don't think the
13:28:13  11  nondiscrimination policy was part of his
13:28:16  12  affidavit.
13:28:16  13         MR. LUNDRIGAN:  Was it not?
13:28:18  14         MR. WHARTON:  No.
13:28:18  15  BY MR. LUNDRIGAN:
13:28:18  16      Q.  Are you familiar with the
13:28:20  17  nondiscrimination policy?  I think it is
13:28:24  18  actually somewhere.
13:28:31  19          The reason I ask is this -- maybe
13:28:33  20  you can answer it without looking at it,
13:28:35  21  specifically.  There is a policy at Forest
13:28:41  22  Hills and every other school district that I
13:28:44  23  know of that prohibits racial discrimination or
13:28:50  24  harassment against students, correct?

13:28:51    1          A.  Against all people.  Yes.

13:28:53    2          Q.  And most -- Neola, was that the

13:29:01    3    organization that promulgates the standards?

13:29:04    4          A.  Yes, Neola.

13:29:07    5          Q.  They, in fact, have a

13:29:11    6    nondiscrimination policy, but when I read

13:29:14    7    through it and I read through Forest Hills, it

13:29:16    8    looks to me like it only applies to employees

13:29:19    9    the way it's worded.  Are you familiar with

13:29:21   10    that?

13:29:22   11          A.  I would have to read it.

13:29:23   12          MR. WHARTON:  Actually, Kelly,

13:29:25   13    I'll tell you, each section or chapter of the

13:29:29   14    policies will announce who it pertains to.  So

13:29:33   15    there's some for staff, some for students, but

13:29:36   16    there's a nondiscrimination policy in each one

13:29:40   17    of those sections.  So there is one that

13:29:42   18    pertains to students.

13:29:44   19          MR. DETERS:  Yes.  Typically, it

13:29:44   20    parrots the other versions, it just has a

13:29:44   21    couple word differences.

13:29:44   22          MR. LUNDRIGAN:  Got it.

13:29:45   23          MR. DETERS:  That's because policy

13:29:46   24    companies can't add it together because they

| | | |
|---|---|---|
| 13:29:48 | 1 | want to charge you by the word. |
| 13:29:50 | 2 | A. They're really good at it too. |
| 13:29:56 | 3 | MR. DETERS: It's actually insane. |
| 13:29:57 | 4 | It could be one policy. It's actually the |
| 13:29:59 | 5 | exact same policy; it could just refer to all |
| 13:30:02 | 6 | of them at once. |
| 13:30:02 | 7 | A. Different types of employees, |
| 13:30:06 | 8 | certified, classified. It's interesting. |
| 13:30:10 | 9 | MR. WHARTON: You'd have to look |
| 13:30:11 | 10 | at the student chapter of the policy to get |
| 13:30:16 | 11 | that specific one. |
| 13:30:16 | 12 | MR. LUNDRIGAN: Okay. |
| 13:30:16 | 13 | BY MR. LUNDRIGAN: |
| 13:30:33 | 14 | Q. You've never talked to any of the |
| 13:30:35 | 15 | plaintiff parents, I take it? |
| 13:30:38 | 16 | A. Who would they be? |
| 13:30:40 | 17 | Q. Sarah Updike is one. She's a |
| 13:30:43 | 18 | teacher? |
| 13:30:44 | 19 | A. I wouldn't know Sarah if she |
| 13:30:47 | 20 | walked by me. |
| 13:30:58 | 21 | Q. Would you look at page 27 of the |
| 13:31:01 | 22 | Amended Complaint that's Exhibit 4. I'm sorry, |
| 13:31:10 | 23 | if I said it's 57, I meant 27. |
| 13:31:12 | 24 | MR. WHARTON: You said page 27. |

13:31:17  1    It's paragraph 57.

13:31:17  2    BY MR. LUNDRIGAN:

13:31:29  3         Q.  Paragraph 57 relates to an event

13:31:32  4    that occurred either in late June or early July

13:31:36  5    that's alleged to have occurred which is about

13:31:38  6    a month before you started, right?

13:31:42  7         A.  Yes.  At least a month.

13:31:45  8         Q.  Are you familiar with the

13:31:48  9    allegations of this paragraph, and did you ever

13:31:52  10   investigate them to see if anybody could

13:31:56  11   confirm whether or not they occurred?

13:32:16  12        A.  I'm not knowledgeable about this.

13:32:19  13        Q.  And you've never talked to anybody

13:32:21  14   about whether or not this incident actually

13:32:24  15   occurred?

13:32:26  16        A.  Other than real briefly, Kim Pence

13:32:32  17   -- not Pence, Kim Tensley said that an issue

13:32:37  18   that was dealt with at the time.

13:32:41  19        Q.  What did she say the issue was?

13:32:43  20        A.  Something about a meeting or a

13:32:46  21   presentation.

13:32:50  22        Q.  And did she say how it was dealt

13:32:52  23   with?

13:32:52  24        A.  That they left.

13:32:55  1          Q.  And did she say that it was
13:32:58  2      because of the topic of what was being
13:33:01  3      discussed at the presentation?
13:33:05  4          A.  Yes, I think it was.  I think she
13:33:10  5      did say that.
13:33:15  6          Q.  And did she confirm that the
13:33:17  7      teacher's belief was that it ran afoul of the
13:33:25  8      resolution, the kindness resolution?
13:33:27  9          MR. WHARTON:  Objection.  Answer
13:33:28  10     if you know.
13:33:28  11         A.  I don't know that part.
13:33:48  12     BY MR. LUNDRIGAN:
13:33:48  13         Q.  Would you look at page 28 of the
13:33:54  14     complaint.
13:33:55  15         A.  Yes.
13:33:56  16         Q.  This is part of the paragraph 58.
13:33:59  17     And it, again, relates to the term Social
13:34:05  18     Emotional Learning.  And it indicates that
13:34:09  19     Forest Hills School District counselors have
13:34:14  20     been directed by Forest Hills School District
13:34:16  21     that they may not utilize the term Social
13:34:20  22     Emotional Learning.  Do you know whether or not
13:34:22  23     that's true?
13:34:23  24         A.  I'm unaware.  I have not ordered

13:34:26  1    that or -- no, I'm not aware of that.

13:34:32  2            Q.  Have you heard whether or not

13:34:37  3    anybody else has ordered that?

13:34:38  4            A.  Not that I've heard.

13:34:50  5            Q.  How about the next subparagraph B,

13:34:52  6    and it talks about the needs assessment, which

13:34:56  7    was a survey.  Are you aware of whether or not

13:34:58  8    that's been done away with?

13:35:06  9            A.  I am aware that one survey by a

13:35:25  10   third party is not being used.  And, in fact,

13:35:31  11   we're doing our own needs survey, doing it that

13:35:37  12   way.

13:35:37  13           Q.  Is it the American School

13:35:40  14   Counseling Association's Survey that was done

13:35:42  15   away with?

13:35:43  16           A.  That doesn't ring a bell.

13:35:45  17           Q.  So you don't know what

13:35:47  18   organization's --

13:35:50  19           A.  Which one -- not off the top of my

13:35:53  20   head.  That I don't think was it.

13:35:56  21           Q.  Whose survey is being used now, if

13:36:02  22   you know?

13:36:02  23           A.  We're developing one ourselves.

13:36:10  24           Q.  Who's involved in that process?

13:36:13   1             A.  Curriculum department.

13:36:15   2             Q.  Is that Kim?

13:36:17   3             A.  Kim is the head of it.

13:36:19   4             Q.  Who else is in the curriculum

13:36:23   5  department?

13:36:24   6             A.  Bob Buck is the elementary

13:36:29   7  director of the curriculum or teaching and

13:36:32   8  learning, and then Shane Hartley is the

13:36:38   9  secondary.

13:36:38  10            Q.  Did you say Jane?

13:36:41  11            A.  Shane Hartley, S-H-A-N-E.

13:36:46  12            Q.  Anybody else?

13:36:49  13            A.  Those are the three.  Kim Tensley

13:36:58  14  is the assistant -- she's their immediate

13:37:02  15  supervisor.

13:37:03  16            Q.  Do you know whether or not they

13:37:06  17  have a draft prepared at this point?

13:37:10  18            A.  No.  I think it's still a work in

13:37:13  19  progress.

13:37:13  20            Q.  So there hasn't been a needs

13:37:16  21  assessment survey done for any students for

13:37:19  22  this academic year to date?

13:37:22  23            A.  Not that I am aware of.

13:37:24  24            Q.  Do you know if the survey that's

13:37:33  1   being developed by these folks includes

13:37:38  2   questions about information about diverse

13:37:42  3   backgrounds and diverse needs, about diversity?

13:37:46  4           A.  I have not seen the draft of it

13:37:49  5   yet or any parts of it yet.

13:37:52  6           Q.  Is there any direction that's been

13:37:54  7   given in writing to the folks on this committee

13:37:58  8   who are developing it about what to include in

13:38:01  9   it?

13:38:01  10          A.  No, not that I am aware of.

13:38:05  11          Q.  If there had been direction, would

13:38:09  12  that have come from Kim?

13:38:12  13          A.  Yes.  But I would know about it

13:38:14  14  too.

13:38:15  15          Q.  Why was the old survey discarded?

13:38:21  16          A.  I think it was -- part of the

13:38:27  17  reason that -- if I remember the discussion

13:38:29  18  with Kim was that we just didn't have control

13:38:33  19  over who had our data.

13:38:42  20          Q.  Does that mean who was collecting

13:38:45  21  the data and keeping it in a repository?

13:38:50  22          A.  Yes.  Whoever had the storage of

13:38:53  23  it, which it wouldn't have been us.

13:38:55  24          Q.  And now with the new survey, the

13:38:58  1    school itself will keep the data?

13:39:00  2          A.  Correct.

13:39:01  3          Q.  Were the board members, any of the

13:39:04  4    board members critical of the old survey?

13:39:09  5          A.  I'm not sure.

13:39:19  6          Q.  How about the school climate

13:39:29  7    survey, are you familiar with that?

13:39:32  8          A.  School climate survey.

13:39:38  9          Q.  That's in subsection C on the next

13:39:41  10   page.  Sorry.

13:40:01  11         A.  The only thing that I'm aware of,

13:40:07  12   and this may be the same thing as was called

13:40:13  13   panorama or something to that effect.  That's

13:40:17  14   what I assumed you were talking about.  That

13:40:19  15   may be what you're referencing there.

13:40:22  16         Q.  And can you tell me what you know

13:40:24  17   about panorama and whether or not it's still --

13:40:28  18         A.  That was the third party group

13:40:31  19   that didn't like the idea of information being

13:40:42  20   held somewhere else out of our control.

13:40:51  21         Q.  And would you look at paragraphs

13:40:56  22   59 and 60.  And tell me whether or not -- now

13:41:01  23   this was after you began your position as

13:41:05  24   superintendent.  And can you tell me whether or

13:41:07  1    not you know about this situation?

13:41:17  2          A.  Yes, I'm aware of this.

13:41:36  3          Q.  Can you tell us your version of

13:41:38  4    what happened.

13:41:40  5          A.  A student was using a school

13:41:43  6    district account to survey on their own, their

13:41:51  7    own information, and that's really not an

13:41:55  8    appropriate use of school resources.  And so

13:42:01  9    she wants to -- I believe it was a girl.  I

13:42:04  10   can't remember.  I believe it was.  If she

13:42:07  11   wants to do that survey, then she can use her

13:42:12  12   own system, her own way of reaching kids so.

13:42:18  13         Q.  So she was sending the survey

13:42:20  14   through her Forest Hills School District email

13:42:24  15   address, correct?

13:42:25  16         A.  I believe that was -- I believe

13:42:27  17   that's correct.

13:42:28  18         Q.  Which is through Google?

13:42:31  19         A.  I believe so.  Yes.

13:42:34  20         Q.  And is it accurate that her Google

13:42:37  21   account was frozen?

13:42:39  22         A.  To the degree that the survey was.

13:42:46  23   Yes.

13:42:46  24         Q.  And the survey that she was

13:42:54    1    sending out was about the effect of the

13:42:56    2    resolution and whether or not it was impacting

13:42:59    3    students' education; is that correct?

13:43:01    4        A.  I'm -- well, I don't know that 100

13:43:04    5    percent.

13:43:04    6        Q.  You didn't read the survey?

13:43:06    7        A.  I did not.  No.

13:43:07    8        Q.  Who brought it to your attention?

13:43:09    9        A.  I believe Kim Tensley.

13:43:13   10        Q.  And what did she tell you?

13:43:15   11        A.  I believe it was in reference to

13:43:20   12    opinions on a resolution.  Just opinions -- I

13:43:33   13    can't remember a lot of the specifics other

13:43:36   14    than to say was it approved -- you know, my

13:43:39   15    response was, We shouldn't be using school

13:43:43   16    resources for things that are not school

13:43:47   17    related or personal in nature, as much as

13:43:51   18    possible.

13:43:52   19        Q.  So did you make the decision to

13:43:56   20    shut down her ability to use the school email

13:44:00   21    for the survey?

13:44:02   22        A.  Ultimately.  Ultimately, it's me,

13:44:05   23    but I think it was already in process.  I think

13:44:10   24    they all kind of thought it was stretching the

bounds of what we should be doing.  But
ultimately, it's me.

Q.  Does the school email system allow
students to look up emails for other students
in the district?

A.  I believe you can start typing a
student's name, it may come up.  They have a
little bit different restrictions than adults,
so I don't know 100 percent how that works.

Q.  There's no restriction against
students emailing each other through that
system, right?

A.  I would have to find out what the
restrictions are.  I think you can.  Some of
the settings that you can put on there to
restrict it, I just don't know if ours is.  But
it doesn't sound like it is, but I can't sit
here and swear to it.

Q.  Do you know whether or not there's
a public address book that students can access
that will give them the names and email
addresses of other students in the district?

MR. WHARTON:  When you say public,
like available to the public or just available

to the students?

Q. Available to the students. When I say public, what I mean is one that is not on their personal computer, it's one that's on the server that they can look up other --

MR. WHARTON: Is there a student directory that other students can access?

A. I am not aware of that. Again, Google has different restriction policies that you can set. I'd have to -- I would have to know more, a little bit more.

Q. And you didn't think this was a school-related topic?

A. Certainly not approved.

Q. What do you mean by approved?

A. There was no request made to use the school's system for any type of survey.

Q. Is it required that students seek approval to email each other and seek approval of the topic that they're going to be emailing about?

MR. WHARTON: Versus doing a survey?

Q. Well, it sounds like the reason

13:47:12   1   that this was shut down is because of the

13:47:15   2   topic.

13:47:16   3          A.   No.   I think it was more because

13:47:19   4   of the survey.  It may have been partially, but

13:47:23   5   my guess it's more about the survey, just doing

13:47:27   6   a survey.  Now, if it was -- that's as far as I

13:47:32   7   know.

13:47:32   8          Q.   Do you know if other students have

13:47:34   9   done surveys using the Forest Hills School

13:47:41  10   District email system in the past?

13:47:42  11          A.   Not specific knowledge, no.

13:47:44  12          Q.   When you say this wasn't school

13:47:47  13   related, do you mean the fact that it submitted

13:47:53  14   or asked questions about the resolution and its

13:47:57  15   impact was not school related; is that what

13:48:00  16   you're saying?

13:48:00  17          MR. WHARTON:  No.  He said it

13:48:02  18   wasn't school approved, not that it wasn't

13:48:04  19   school related.

13:48:04  20          Q.   Well, I think you said both at

13:48:06  21   different points; is that correct?

13:48:08  22          MR. WHARTON:  Then he can go ahead

13:48:11  23   and answer.

13:48:11  24          A.   Well, any time you do surveys or

13:48:15 1  do any of those kind of things, it needs to be

13:48:18 2  approved.

13:48:18 3          Q.  So do you think that the topic of

13:48:22 4  the resolution and whether or not it has

13:48:23 5  impacted other students is an appropriate

13:48:29 6  topic, an appropriate school-related topic?

13:48:34 7          MR. WHARTON:  Objection.  Answer

13:48:35 8  if you can.

13:48:36 9          A.  I'm not sure how to answer that.

13:48:36 10

13:48:53 11 BY MR. LUNDRIGAN:

13:48:53 12         Q.  Well, let me give you an analogy.

13:48:56 13 If somebody -- does Turpin have a school

13:48:59 14 newspaper?

13:49:03 15         A.  I'm not aware of that yet.

13:49:09 16         Q.  Okay.  If they do have a school

13:49:12 17 newspaper, the school doesn't -- the school

13:49:17 18 wouldn't look at the school newspaper and

13:49:19 19 prohibit a student from writing about the topic

13:49:22 20 of the resolution, would they?

13:49:24 21         MR. WHARTON:  Objection.  Answer

13:49:26 22 if you know.

13:49:30 23         Q.  Or would they?

13:49:32 24         A.  Well, it would depend on what the

content of the article said too.  We do have
advisors that review and there's appropriate
ways to write in journalistic form.  Typically
that's a class that those come out of, not
always.

     Q.  But you'll agree that it wouldn't
be appropriate for an advisor or for anybody
else in the administration to say, No, I don't
want you to write about that topic because it's
critical of the current board?

     MR. WHARTON:  Objection.  Answer
if you can.

     A.  Well, again without knowing
exactly what it was, that's hard to say.  But
if it's done appropriately and not --
BY MR. LUNDRIGAN:

     Q.  Is there a specific policy at
Forest Hills that says that surveys from
students have to be preapproved?

     A.  I can't pull one right off the top
of my head, no.  But I can't sit here and tell
you that there isn't one either.

     Q.  You're saying that you can't say
that there's not one in writing?

13:51:23    1        A. Correct.

13:51:23    2        Q. But you said earlier that it's

13:51:25    3 school policy that surveys be approved, right?

13:51:29    4        A. Did I? I'm not sure I -- did I

13:51:39    5 say school policy?

13:51:40    6        Q. I thought that's what you said.

13:51:42    7 Is it school policy that students have to get

13:51:46    8 pre-approval of surveys?

13:51:49    9        A. Well, it's common that students

13:51:54   10 have to have approval to do -- to use our

13:52:00   11 software, our, you know, to do surveys, yes,

13:52:08   12 that's pretty typical, that there's an approval

13:52:11   13 process, typically through teacher, through the

13:52:14   14 building level first.

13:52:15   15        Q. But there's nothing in writing

13:52:17   16 that you know of that requires that, right?

13:52:19   17        A. Not right off the top of my head

13:52:24   18 that I'm aware of.

13:52:25   19        Q. So there are unwritten policies

13:52:27   20 that exist in the district that govern things

13:52:31   21 like speech, right?

13:52:33   22        MR. WHARTON: Objection. Answer

13:52:34   23 if you can.

13:52:36   24        A. Well, I think there's -- yeah, I

don't think you can possibly have a policy that
covers everything that we do, so we have to --
administrators are expected to make some common
sense judgments on things, so.

BY MR. LUNDRIGAN:

Q.  Are there other surveys used for
sports and clubs and things like that?

A.  There could be, but I don't know
about specifics.

Q.  There's a tool that Google has to
do surveys, for example, to find dates for
meetings and things like that, decide what kind
of pizza you want to have at a club meeting.
Do you guys use that, if you know?

A.  Yeah.  Probably.

MR. WHARTON:  Just say if you know
or not.

A.  I'm not sure.

Q.  How does a student know what they
have to get approved by the administration to
talk about with other students in an email?

MR. WHARTON:  Objection.  Answer
if you can.

BY MR. LUNDRIGAN:

A. Well, the only thing that I can answer there is, we try to teach kids proper use of email and all technologies as they matriculate through the grades, but I don't know if that's what you're looking for so much.

Q. Well, it sounds like there's nothing specific in the school handbook or anything like that that this student that sent the survey could have looked at and realized, hey, I have to get approval to do this?

MR. WHARTON: Well, again, there's a difference between students sending emails to each other and students using the survey function.

MR. LUNDRIGAN: No, I understand and that's what I'm talking about is the survey that was sent.

MR. WHARTON: All right. Because you used email in the last question.

MR. LUNDRIGAN: Well, she emailed the survey.

BY MR. LUNDRIGAN:

Q. So what I'm asking is: Is there anything that you know of in writing that she

13:55:13　1　could have looked at that would have told her

13:55:16　2　that I have to get approval to send this?

13:55:22　3　　　　　MR. WHARTON:  Answer if you can.

13:55:29　4　　　　　A.  I'm unaware of it.

13:55:36　5　　　　　Q.  Rather than simply freeze her

13:55:40　6　Goggle account, did anyone consider going to

13:55:42　7　the student and saying, Hey, you have to get

13:55:44　8　approval for this; why don't you tell us what

13:55:47　9　you're doing and we'll consider it?

13:55:50　10　　　　　MR. WHARTON:  Objection.  Answer

13:55:51　11　if you know.

13:55:51　12　　　　　A.  I'm not aware if that happened or

13:55:54　13　not.

13:55:54　14　BY MR. LUNDRIGAN:

13:55:54　15　　　　　Q.  Do you think that should have

13:55:56　16　happened?

13:55:56　17　　　　　MR. WHARTON:  Objection.  Answer

13:55:57　18　if you can.

13:55:58　19　　　　　A.  Yes.  That usually goes through a

13:56:08　20　teacher or the building administration.

13:56:13　21　BY MR. LUNDRIGAN:

13:56:13　22　　　　　Q.  And do you agree with me that no

13:56:26　23　one in the administration specified to the

13:56:29　24　student what rule, specifically, it was that

13:56:31  1   she had violated?

13:56:35  2           MR. WHARTON:  Objection.  Answer

13:56:36  3   if you know.

13:56:36  4           A.  I don't know.  I don't know the

13:56:39  5   answer to that.

13:56:43  6   BY MR. LUNDRIGAN:

13:56:43  7           Q.  Did you discuss the survey

13:56:46  8   incident with any board members at all?

13:56:57  9           A.  Not that I can recollect.

13:57:08  10          Q.  This one I remember.  Maybe you'll

13:57:12  11  remember it too.  Look at paragraph 64, please.

13:57:16  12  I'm sorry, I'm going to have to take a break

13:57:18  13  for about five minutes.

13:57:18  14          (Discussion off the record.)

13:57:23  15  BY MR. LUNDRIGAN:

13:57:23  16          Q.  Did you get a chance to read 63

14:00:28  17  and 64?

14:00:29  18          A.  Oh, I didn't read 63.  I read 64.

14:00:33  19  Hold on.  (Reading document.)

14:00:57  20          Q.  And my questions to you, it sounds

14:00:59  21  to me and it sounded like to me when I saw this

14:01:03  22  permission slip come home for my own children

14:01:07  23  that the school is approving what type of

14:01:12  24  outside speakers can come in and what topics

14:01:19  1  they can talk about; is that accurate?

14:01:21  2       A.  That's pretty standard.

14:01:24  3       Q.  And among other things, it says

14:01:33  4  they've been preapproved based upon their

14:01:36  5  alignment to the Forest Hills Strategic Plan,

14:01:39  6  Forest Hills School District Cornerstones and

14:01:42  7  Forest Hills Portrait of a Learner, as well as

14:01:43  8  following administrative guideline 2240,

14:01:47  9  correct?

14:01:51  10       MR. WHARTON:  Are you asking if

14:01:52  11  that's what the language says here or is what

14:01:54  12  is actually on the form itself?

14:01:56  13       Q.  Do you remember if -- 2240 is the

14:01:58  14  controversial issues policies, right?

14:02:01  15       MR. WHARTON:  Yeah, but you're

14:02:03  16  asking if that's on -- you're asking him about

14:02:03  17  what the language is here in the complaint or

14:02:06  18  if that language is actually on the form?

14:02:06  19       Q.  I'm asking him ultimately whether

14:02:09  20  or not it was on the form.

14:02:11  21       MR. WHARTON:  All right.  Answer

14:02:11  22  that if you can.

14:02:12  23       A.  I haven't seen the form.

14:02:14  24  BY MR. LUNDRIGAN:

14:02:14   1          Q.  Do you know whether or not outside
14:02:17   2   speakers are vetted for compliance with the
14:02:20   3   controversial issues policy 2240?
14:02:26   4          A.  Yes, they are vetted.
14:02:30   5          Q.  And that's the same policy that
14:02:35   6   Sara Jonas referred to on the kindness
14:02:42   7   resolution that's specifically referenced
14:02:44   8   within it, correct, in the sixth whereas
14:02:49   9   paragraph?
14:02:49  10          MR. WHARTON:  There may be a
14:02:50  11   difference and he can speak to this, because
14:02:53  12   you mentioned -- you quote the language of the
14:02:55  13   form.  It's referring to administrative
14:02:58  14   guideline 2240, where the resolution talks
14:03:02  15   about policy 2240.  And I'll let him answer
14:03:02  16   whether that's the same thing or if there's
14:03:08  17   something different there.
14:03:08  18          A.  Policy and administrative
14:03:11  19   guidelines are two different things.
14:03:13  20   Guidelines are kind of the how you do it, kind
14:03:18  21   of for lack of a better way, where the policy
14:03:24  22   is more overriding.  And, typically, guidelines
14:03:28  23   are not necessarily board approved; they're
14:03:33  24   just the steps an administrator may follow.

14:03:38    1           Q.  Is there an administrative

14:03:41    2    guideline 2240?

14:03:43    3           A.  I would have to look, but there's

14:03:44    4    usually guidelines that are connected to most

14:03:48    5    policies.  Not all of them, but most.

14:03:50    6           Q.  Can those be found in the policy

14:03:53    7    manual with the policy language?

14:03:55    8           A.  They're on BoardDocs online, yes.

14:03:57    9    I believe you can access those as well.

14:04:00   10           Q.  So it's your belief that they were

14:04:02   11    talking about an administrative guideline for

14:04:05   12    applying the controversial issues policy 2240;

14:04:12   13    is that correct?

14:04:12   14           A.  That's an assumption.

14:04:18   15           Q.  Well, if that language is on the

14:04:20   16    form, it relates to the controversial issues

14:04:24   17    policy in one way or another, either --

14:04:24   18           A.  Okay.

14:04:27   19           Q.  -- either it's explicitly relating

14:04:32   20    to the policy itself or it's relating to the

14:04:35   21    administrative guideline for the policy; is

14:04:47   22    that correct?

14:04:47   23           A.  Yes.  Typically, if the numbers

14:04:50   24    line up, they are connected.  Typically.

Q. What are the Forest Hills Cornerstones, if you know?

A. No. I don't know those right off the top of my head.

Q. And would you look at paragraph 68 of the complaint. This was, I believe, before you were hired.

A. Okay.

Q. But I'm curious as to whether or not you heard anything about this incident?

A. (Reviewing document) that they sent an email to me?

Q. No.

MR. WHARTON: No. This happened last school year.

A. Oh, okay.

Q. This was before your hiring. I'm just curious as to whether or not you were aware of this incident, if anybody has discussed it with you.

A. Yes, I am aware only because a teacher -- I'm trying to think of his name. AP geography at Turpin. If you said it, I would know it -- came to me and just said, you

14:07:41  1   know, he was upset.  I said, You teach AP

14:07:50  2   geography?  Yes.  Do you teach about red

14:07:54  3   lining?  Yes.  It's part of the standard.  I

14:07:58  4   said, You're good.  It happened.  It's not

14:08:01  5   right, but it happened.  Nothing wrong with it,

14:08:05  6   with talking about it.  I'm assuming that's

14:08:11  7   what you're talking about.  That's what I know

14:08:14  8   about it.

14:08:15  9          Q.  Okay.

14:08:18  10         A.  I did hear something about the

14:08:21  11  video but I don't know anything.  Never viewed

14:08:24  12  it.  I don't know what it -- it refers to a

14:08:28  13  video.  I don't know what that was about.

14:08:30  14         Q.  So have there been multiple

14:08:33  15  complaints about this and you ended up having

14:08:34  16  to deal with one yourself after you were hired

14:08:35  17  or is that --

14:08:35  18         A.  The teacher felt bad about it.  He

14:08:39  19  just -- you know, I said, Don't feel bad about

14:08:43  20  it.  I said, Teach your course.

14:08:46  21         Q.  Was the teacher concerned about it

14:08:50  22  because of the resolution, the kindness

14:08:54  23  resolution?

14:08:54  24         MR. WHARTON:  Objection.  Answer

14:08:55    1    if you know.

14:08:55    2          A. That I don't know, other than he

14:08:58    3    just felt singled out. He didn't feel -- he

14:09:06    4    wanted to make sure it was okay. I said,

14:09:09    5    You're fine. You have college standards for AP

14:09:12    6    courses, teach them.

14:09:15    7    BY MR. LUNDRIGAN:

14:09:15    8          Q. Do you think it's an appropriate

14:09:45    9    role for these board members to request an

14:09:58    10    investigation of a teacher for teaching a topic

14:10:03    11    like red lining?

14:10:05    12          MR. WHARTON: Objection. Answer

14:10:06    13    if you can.

14:10:18    14          A. I think board members -- and I've

14:10:25    15    been around a bunch of them, they will say a

14:10:29    16    lot of things. Doesn't mean I know what my

14:10:33    17    role is, and so -- as I would a parent, a

14:10:38    18    parent called and complained, depending on what

14:10:45    19    the topic was, it would depend on how deep of

14:10:49    20    an investigation it was. I don't know if that

14:10:52    21    makes sense.

14:10:52    22    BY MR. LUNDRIGAN:

14:10:52    23          Q. No, that makes perfect sense.

14:10:55    24    Thank you. Do you agree that this request for

an investigation by Sara Jonas against this teacher in this email from Ms. -- Board Member Hausfeld, saying the video is recklessly inappropriate, the teacher is using propaganda, do you think those things, combined with the existence of this kindness resolution and the things that it states about teaching anti-racism, would chill a teacher's belief that they could teach about the topic of red lining without being negatively impacted in their employment?

MR. WHARTON: Objection. Answer if you know.

A. The simplest answer is, I very purposely every year and I did this year, because I obviously knew that there was a resolution, made sure in convocation, teach your standards. If you're an AP teacher, teach your course. That's it. Do -- you know, we're talking about doing what's right for kids. Teach your course. Okay. They, like always, just stay neutral on politics. But run your course. And this specific thing the teacher asked me, but I've told principals, if you've

14:12:50    1   got a question, touch base with one of your

14:12:54    2   principals.  If they don't know, shoot me an

14:12:57    3   email.  I haven't had anybody ask me

14:13:00    4   specifically other than -- I'm assuming it's

14:13:02    5   the same teacher because there's only probably

14:13:06    6   one AP geography teacher there.

14:13:09    7   BY MR. LUNDRIGAN:

14:13:09    8        Q.  So it sounds like you, by telling

14:13:12    9   the teachers this, you were trying to -- you

14:13:20   10   were trying to tell them -- trying to comfort

14:13:26   11   them and tell them that as long as they're

14:13:29   12   teaching within the guidelines, they're safe?

14:13:31   13        A.  Yes.  Absolutely.  We want you to

14:13:34   14   teach those standards.  That's an expectation.

14:13:43   15        Q.  But at the same time, would you

14:13:44   16   agree with me that if you were a teacher, if

14:13:47   17   you were this AP human geography teacher and

14:13:51   18   you got -- you saw two emails like that from

14:13:55   19   these two board members, specifically saying

14:13:58   20   these things about your teaching and then you

14:14:01   21   have a board resolution that is voted into

14:14:09   22   existence by the board that on its face

14:14:14   23   prohibits what they obviously considered to be

14:14:18   24   anti-racism teaching, would that make you feel

14:14:24    1    like you were a target?

14:14:26    2            MR. WHARTON:  Objection.  Answer

14:14:27    3    if you know.

14:14:28    4            A.  Well, I'm -- human nature, if I

14:14:36    5    were a teacher and these people were not family

14:14:41    6    friends and I just knew that they were a board

14:14:44    7    member, that would certainly make you pause.

14:14:46    8    But I'd also be going right to my union advisor

14:14:52    9    and say, Am I doing something wrong?  I would

14:14:55   10    go to my principal and say, I was a biology

14:15:00   11    teacher.  I taught portions of evolution.  You

14:15:03   12    have to know how to be balanced in those

14:15:06   13    things.  I'm not saying he -- but hopefully --

14:15:09   14    this was the only person and I'm sure it's the

14:15:12   15    same person and I made sure that he was fine.

14:15:20   16    BY MR. LUNDRIGAN:

14:15:20   17            Q.  Okay.  I guess the distinction I'm

14:15:23   18    trying to make is that I get what you're saying

14:15:26   19    about board members will say what they're going

14:15:29   20    to say.  They're not professional educators.

14:15:34   21    They're voted into office by a political

14:15:36   22    process.  They have their own agendas.  But do

14:15:40   23    you agree with me there's a difference between

14:15:43   24    a single board member criticizing a teacher and

1   the board as a whole passing a resolution?

2         A. Technically, there's a difference,

3   you know. Yes.

4         Q. Do you know of any teachers who

5   have quit and cited the passage of the kindness

6   resolution as a reason? I'm thinking

7   specifically about a calculus teacher whose

8   letter I read at Turpin. I think an AP

9   teacher.

10         A. I may have seen it as she turned

11   it in with her retirement papers or resignation

12   papers. I would assume that Mr. Fellows, our

13   director of human resources, yes.

14         MR. WHARTON: Don't assume. If

15   you know, you know. If you don't know, you

16   don't know.

17         A. I don't recall the contents of the

18   letter. No.

19         Q. Okay. Give me just a few minutes

20   to talk with my boss here and -- actually, I'm

21   sorry, there's a couple of other things I need

22   to get through.

23         (Brief recess.)

24   (Exhibit No. 5 was marked for identification.)

BY MR. LUNDRIGAN:

Q. I'll give you a few minutes to look through that, Exhibit 5. I don't know if you've seen that before or not? I assume you have, but I don't know if you remember it.

A. (Examining document) Okay.

Q. Do you remember this situation?

A. Yes. It's been a little while but.

Q. And this was a complaint from a parent?

A. Mm-hmm.

Q. And he was upset because a kindergarten teacher was using pronouns after her signature and specifically she used she, her, hers after her email signature.

A. Mm-hmm. Yes.

Q. My question is not anything about the parents' concern, but my question is about Katie Stewart's email to Kyle, the parent, saying I wanted you to know this goes against board policy. Do you see that?

A. Yes.

Q. I am hopeful this will be

14:24:02    1    corrected and won't be a concern going forward.
14:24:04    2    And you are carbon copied on the email, right?
14:24:09    3            A.   Yes.
14:24:10    4            Q.   And so is Mr. Fellows.
14:24:13    5            A.   Correct.
14:24:13    6            Q.   Mr. Fellows is at Anderson; is
14:24:18    7    that right?
14:24:18    8            A.   Rob Fellows is the former
14:24:22    9    principal of Anderson, but he is now the
14:24:24   10    director of human resources.
14:24:27   11            Q.   Oh, okay.  I didn't know that.
14:24:30   12    Tell him I said congratulations.
14:24:32   13            A.   Some days it's condolences as
14:25:04   14    well.
14:25:04   15            Q.   Exactly.  Do you know what board
14:25:07   16    policy Ms. Stewart is referring to?
14:25:09   17            A.   No.  Not right off the top of my
14:25:12   18    head.
14:25:13   19            Q.   Do you assume that she is talking
14:25:17   20    about the kindness resolution?
14:25:24   21            A.   No.  I wouldn't -- that's not how
14:25:29   22    I -- that's not what I assumed.
14:25:33   23            Q.   Do you know of any other board
14:25:35   24    policy that would be implicated by the use of

14:25:40　1　pronouns to indicate a gender identity?

14:25:45　2　　　　　MR. WHARTON:  Objection.  Answer

14:25:47　3　if you know.

14:25:48　4　　　　　A.  No.

14:25:50　5　BY MR. LUNDRIGAN:

14:25:50　6　　　　　Q.  Okay.  Clearly, she believes that

14:25:55　7　there is one.

14:25:56　8　　　　　MR. WHARTON:  Objection.  Answer

14:25:58　9　if you know.

14:25:58　10　　　　　A.  I don't know what she was

14:25:59　11　thinking.

14:25:59　12　(Exhibit No. 6 was marked for identification.)

14:26:00　13　BY MR. LUNDRIGAN:

14:26:00　14　　　　　Q.  This is Hook 6, and this is a

14:26:40　15　subsequent email dated August -- I'm sorry, a

14:26:44　16　prior email dated August 19, 2022, and you're

14:26:51　17　responding to Rob Fellows.  And you indicate,

14:27:01　18　Not much legal grounds to stop her.  Probably

14:27:05　19　wouldn't get much support in the courts.

14:27:13　20　　　　　A.  Okay.

14:27:15　21　　　　　Q.  Do you remember writing that

14:27:17　22　response?

14:27:18　23　　　　　A.  Probably.  Yes.  Mainly, I don't

14:27:27　24　care if they use their pronouns, that's up to

14:27:31  1    them.  That's what I was referring to.  I'm
14:27:34  2    sure that's what I was referring to.  Yeah.
14:27:42  3           Q.  Did you search through the
14:27:45  4    policies to see what Ms. Stewart was referring
14:27:48  5    to when she said that there was a policy that
14:27:51  6    was violated by the use of the pronouns?
14:27:54  7           MR. WHARTON:  Objection.  Go ahead
14:27:58  8    and answer if you know.
14:27:58  9           A.  No, I did not look through the
14:28:00  10   policy.
14:28:01  11   BY MR. LUNDRIGAN:
14:28:01  12          Q.  And just to clarify, these emails
14:28:07  13   to this complaint took place after the
14:28:11  14   stipulation was entered into between the
14:28:14  15   district and the plaintiffs in the lawsuit; is
14:28:19  16   that right?
14:28:19  17          A.  I'm not sure what the dates are.
14:28:33  18   Can you give me the dates?
14:28:35  19          Q.  The stipulation, I'll represent to
14:28:37  20   you, was entered into before your hire date.
14:28:40  21          A.  Oh, okay.
14:28:42  22          Q.  And why did you believe that it
14:28:54  23   would be a legal problem to try to prohibit
14:29:00  24   this teacher from doing what she was doing with

14:29:04  1   the pronouns?

14:29:05  2           A.  Rob asked me is there an issue,

14:29:07  3   and I go, No.  She can sign her name with

14:29:14  4   pronouns if she chooses to.  I'm sure she's

14:29:19  5   probably not the only one.  The only thing that

14:29:22  6   was a concern was that it was a live link to an

14:29:27  7   exterior site.

14:29:34  8           Q.  So the she, hers -- she, her,

14:29:40  9   hers, that being underlined, that indicates

14:29:43  10  it's a link; is that correct?

14:29:46  11          A.  Usually that and it may be

14:29:49  12  colored.  Sometimes they --

14:29:51  13          Q.  Did you check the site that it

14:29:54  14  linked to?

14:29:58  15          A.  Yes, but I don't remember all the

14:30:02  16  specifics of it.  It's probably in here.

14:30:02  17  (Exhibit No. 7 was marked for identification.)

14:30:02  18  BY MR. LUNDRIGAN:

14:31:10  19          Q.  Do you have what's marked as

14:31:12  20  Exhibit 7?

14:31:14  21          A.  Yes.

14:31:15  22          Q.  And this is an email from Brooke

14:31:20  23  Lovely, the teacher at issue, to Rob Fellows.

14:31:24  24  It doesn't discuss what the meeting is about,

but it indicates that she was going to meet
with Rob and talk to him about the complaint;
is that right?

           A.  Yes.

           Q.  And then she writes back to him a
second time and says, Just following up.  Done
and done.  Have a great night.  Do you know
what she was asked to do?

           A.  Remove the link.

           Q.  And what was the reason for that?

           A.  It's not a school-approved site.

           Q.  What was the site?

           A.  I don't remember the exact -- what
it was.

           Q.  Was it a site that explained the
purpose behind using pronouns?

           A.  It's been a while since I looked
at it.  I would have to see it again.

           Q.  Was the site reviewed for approval
or was it decided that the teacher would just
have to remove the link because it had not been
approved at that time?

           A.  In general, you know, sites,
external sites need to be approved.  So that,

14:33:01 1   obviously if it's a curriculum site, that's one

14:33:07 2   thing.

14:33:08 3          Q.  Is that a policy of the district?

14:33:18 4          MR. WHARTON:  Is what a policy of

14:33:20 5   the district?

14:33:21 6          Q.  To review links to websites.

14:33:21 7          MR. WHARTON:  Answer if you know.

14:33:36 8          A.  Well, I can't quote a site.

14:33:38 9          Q.  You mean you can't quote a policy?

14:33:41 10         A.  A policy but.

14:33:41 11  (Exhibit No. 8 was marked for identification.)

14:33:44 12  BY MR. LUNDRIGAN:

14:33:44 13         Q.  And do you recognize Exhibit 8?

14:34:13 14         A.  Yes.

14:34:14 15         Q.  This is another email chain

14:34:18 16  generated at the top, August 29.  This is just

14:34:23 17  an email from Rob Fellows to        Katie

14:34:27 18  Stewart confirming that the teacher is asked to

14:34:30 19  remove the link and she did so.

14:34:32 20         A.  Yes.

14:34:33 21         Q.  Did that satisfy Ms. Stewart?

14:34:36 22         MR. WHARTON:  Objection.  Answer

14:34:37 23  if you know.

14:34:39 24         A.  I assume.  I didn't hear anymore,

14:34:41  1   that I can remember.

14:34:42  2   BY MR. LUNDRIGAN:

14:34:42  3        Q.  Did you have any conversations

14:34:51  4   with Ms. Stewart about whether or not her

14:34:53  5   request that this teacher be told she can't do

14:34:57  6   this would violate the stipulation that was in

14:35:01  7   place between the district and the plaintiffs?

14:35:16  8        A.  I'm trying to think specifically

14:35:19  9   to this.  I need a little more clarification.

14:35:47  10  Like, do I remember talking to her?  I don't

14:35:51  11  know if I -- I'm not sure who all I talked to

14:36:01  12  about that other than Rob, and I may have

14:36:04  13  responded to Katie, that she can do --there's

14:36:10  14  no violations of putting a pronoun on your

14:36:13  15  name.  I don't care.

14:36:14  16        Q.  Okay.  My question is, did you

14:36:18  17  talk with Rob or Katie or anybody else about

14:36:21  18  the fact -- other than your lawyers, other than

14:36:24  19  the fact that -- about the fact that Katie's

14:36:30  20  request, if it referred, in fact, to the

14:36:35  21  kindness resolution when she said policy, and

14:36:40  22  said this violates our policy, did you talk to

14:36:44  23  anyone about the fact that her request to

14:36:48  24  enforce that policy against the teacher could

be seen as a violation of the stipulation
between the school district and the plaintiffs
in the lawsuit?

    MR. WHARTON:  Objection.  Answer
if you know.

    A.  I'm not aware if that's what she
meant.

BY MR. LUNDRIGAN:

    Q.  Did you consider that possibility?

    MR. WHARTON:  Objection.  Answer
if you can.

    A.  I didn't.  I did not.  When
somebody says policy, I think board policy not
-- not the resolution.  I didn't think about
that, to be honest with you.

(Exhibit No. 9 was marked for identification.)

BY MR. LUNDRIGAN:

    Q.  And would you look at what's
been marked as Exhibit 9.  And I think the
significance of this email is just that's
it's Linda Hausfeld, another board member,
asking for the same thing, which is to look
into the teacher using the pronouns.  Same
teacher, same complaint from the same parent,

| | |
|---|---|
| 14:38:09 | 1 |
| 14:38:09 | 2 |
| 14:38:27 | 3 |
| 14:38:28 | 4 |
| 14:38:32 | 5 |
| 14:38:33 | 6 |
| 14:38:35 | 7 |
| 14:38:37 | 8 |
| 14:38:39 | 9 |
| 14:38:40 | 10 |
| 14:38:42 | 11 |
| 14:38:43 | 12 |
| 14:38:44 | 13 |
| 14:38:46 | 14 |

1  correct?

2          A.  Yes.  It looks like the same.

3              MR. LUNDRIGAN:  All right.  I am

4  finished.  And I doubt that these folks have

5  any questions for you.

6              MR. WHARTON:  I have no questions

7  for him.

8              MR. DETERS:  Nothing from me.

9              MR. WHARTON:  We will take

10  signature.

11             MR. LUNDRIGAN:  And I'll order a

12  copy.

13             MR. WHARTON:  We'll take a copy as

14  well.

15             MR. LUNDRIGAN: Thank you.

16

17

18

19

20

21

22

23

24

1

2

3

4

5   _____

6                LARRY HOOK

7

8           - - -

9

10  (Deposition concluded at 2:40 p.m.)

11

12          - - -

13

14

15

16

17

18

19

20

21

22

23

24

1          C E R T I F I C A T E

2    STATE   OF   OHIO:
                           SS:
3    COUNTY OF HAMILTON:

4          I, Cynthia A. Oliver, (Sposato) a duly

5    qualified and commissioned notary public in and

6    for the State of Ohio, do hereby certify that

7    prior to the giving of his deposition, the

8    within named LARRY HOOK, was by me first duly

9    sworn to testify the truth, the whole truth and

10   nothing but the truth; that the foregoing pages

11   constitute a true and correct transcript of

12   testimony given at said time and place by said

13   deponent; that said deposition was taken by me

14   in stenotypy and transcribed under my

15   supervision; that I am neither a relative of nor

16   attorney for any of the parties to this

17   litigation, nor relative of nor employee of any

18   of their counsel, and have no interest

19   whatsoever in the result of this litigation.

20   I am not financially interested in the action; I

21   am not, nor is the court reporting firm with

22   which I am affiliated, under a contract as

23   defined in Civil Rule 28(D).

24              IN WITNESS WHEREOF, I hereunto set

1  my hand and official seal of office at

2  Cincinnati, Ohio this __8th__   day of

3  __December__, 2022.

4  MY COMMISSION EXPIRES: _Cynthia A. Oliver_
   October 13, 2023   CYNTHIA A. OLIVER RPR

5                       NOTARY PUBLIC-STATE OF OHIO

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1          OLIVER REPORTING ERRATA SHEET

2  PLEASE NOTE ANY STENOGRAPHIC OR TYPOGRAPHICAL

3  ERRORS BY LISTING THE PAGE NUMBER, LINE NUMBER

4  AND A BRIEF DESCRIPTION OF THE ERROR.  UPON

5  COMPLETION, PLEASE SIGN AND DATE THIS SHEET AT

6  THE BOTTOM.  THANK YOU.

7    Page  Line No.   Correction and    Reason

8    _____

9  _____

10 _____

11 _____

12 _____

13 _____

14 _____

15 _____

16 _____

17 _____

18 _____

19 _____

20 _____

21 _____

22 _____Signature:_____

23 _____Date:_____

24