

EXHIBIT

A

## IN THE UNITED STATES DISTRICT COURT FOR THE
### SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

| | | |
|---|---|---|
| **SARAH UPDIKE,** *et al.* | : | Case No. 1:22-cv-00374 |
| | : | |
| Plaintiffs, | : | Judge Michael R. Barrett |
| | : | |
| v. | : | **SECOND AMENDED VERIFIED** |
| | : | **COMPLAINT FOR TEMPORARY,** |
| **SARA JONAS,** *et al.* | : | **PRELIMINARY, AND PERMANENT** |
| | : | **INJUNCTIVE RELIEF AND** |
| Defendants. | : | **DECLARATORY JUDGMENT** |
| | : | |

---

## INTRODUCTION

1.      This is an action brought by students, parents, residents and educators in the Forest Hills School District ("FHSD") challenging the race-based, unprecedented and unconstitutional censorship of discussions about "anti-racism," race, gender, identity and other subject matters in schools and in training through the passage by three Defendant Members of the Board of Education of the Forest Hills School District (the "Board") of the "Resolution to Create a Culture of Kindness and Equal Opportunity for All Students and Staff" ("Resolution") on June 22, 2022.

2.      A review of the Resolution reveals, on its face, that it most certainly is not about a "culture of kindness," but rather promotes hatred, racism and discrimination on the basis of race, identity, and gender, and silences voices in opposition to racism and discrimination, further endangering and diminishing already disenfranchised and vulnerable voices within the school district. While the Resolution harms all residents, teachers and students in FHSD, it inflicts disproportionate injury upon students of color and those who are LGBTQ+.

3.     The Resolution is a content-based restriction that prohibits curriculum, education and training on, among other things, "anti-racism," "identity," "Critical Race Theory," and "intersectionality," not only severely restricting but outright prohibiting discussions on such subjects in the School Districts' schools without any legitimate pedagogical purpose, but instead to further certain Board Members' partisan political agendas, using language that is simultaneously extraordinarily broad and vague.

4.     Educators are left wondering what is and what is not prohibited by the Resolution, and the Resolution's suppression of speech robs students of information, ideas, and instructional approaches that result in the type of robust dialogue the courts have long recognized as essential to a productive citizenry and preservation of this country's democracy. The Supreme Court has emphasized that: "The classroom is peculiarly the 'marketplace of ideas.' The Nation's future depends upon leaders trained through wide exposure to that robust exchange of ideas which discovers truth 'out of a multitude of tongues, (rather) than through any kind of authoritative selection.'" *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 512 (1969) (internal citations omitted). Recently, the United States Supreme Court confirmed that "[t]he First Amendment's protections extend to 'teachers and students,' neither of whom 'shed their constitutional rights to freedom of speech or expression at the schoolhouse gate.'" *See Kennedy v. Bremerton School District*, 597 U.S._ (Slip Opinion June 27, 2022), at syllabus (internal quotations and citations omitted). The United States Supreme Court further affirmed the importance of diversity of thought and expression and the "long constitutional tradition in which learning how to tolerate diverse expressive activities has always been 'part of learning how to live in a pluralistic society.'" *Id.* (internal citations omitted). By censoring and erasing the perspectives of marginalized communities and restricting a robust exchange of ideas, the Resolution prevents students from accessing information needed to learn to

think critically and become productive citizens in a diverse world – information to which they are Constitutionally entitled.

5.      The Resolution violates the First Amendment Rights of students established by, among other decisions, the United States Supreme Court in *Board of Educ., Island Trees Union Free School District No. 26 v. Pico,* 457 U.S. 853 (1982) (plurality), to receive information and ideas, a right that applies in the context of school curriculum and design. "[T]he discretion of the States and local school boards in matters of education must be exercised in a manner that comports with the transcendent imperatives of the First Amendment." *Pico,* 457 U.S. at 864. Government actors "may not, consistent with the spirit of the First Amendment, contract the spectrum of available knowledge." *See id.* at 866-67 (quotations omitted). This right of students to receive information is "an inherent corollary" of the rights of free speech explicitly guaranteed by the Constitution. *Id.*

6.      Moreover, the Resolution's prohibitions, most notably its prohibition on "anti-racism" curriculum, education and training is a discriminatory race-based policy on its face. It has been long-established in the United States that racism is abhorred by our Constitution, and has no legitimate place in any public school classroom in the United States. By prohibiting education, curriculum, and training regarding "anti-racism," the Resolution instead promotes racism by its very definition.

7.      The Resolution is illegal and unconstitutional on its face. It is an illegal and unconstitutional race-based and content-based restriction which violates the First and Fourteenth Amendment to the United States Constitution.  The Resolution's vague, overbroad, race-based and viewpoint discriminatory provisions impermissibly invade upon, among other things, students' First Amendment Right to receive information and free speech, educators' First Amendment Right of free speech and academic freedom, and the

3

Equal Protection Clause. The United States Constitution firmly rejects the Resolution's improper racial and partisan motives and methods for effectuating censorship. The Resolution silences speech through its vague, overbroad and viewpoint discriminatory terms, while at the same time intentionally targeting and denying access to ideas aimed at advancing the educational and civic equality of historically marginalized students because of Defendants' own disagreement with certain viewpoints.

8.      Courts considering recent similar bans on speech have applied the well-established First and Fourteenth Amendment precedent and struck down such legislation as violating the U.S. Constitution. A Florida District Court recently enjoined legislation banning similar categories of speech as a "naked viewpoint-based regulation that does not pass strict scrutiny" under the First Amendment. *See Honeyfund.com, Inc., et al. v. Ron DeSantis, et al.,* Case No. 4:22:cv227, United States District Court for the Northern District of Florida, *Preliminary Injunction*, Doc. 55, filed 8/18/22. The Court further stated:

> Florida's Legislators may well find Plaintiffs' speech "repugnant." But under our constitutional scheme, the "remedy" for repugnant speech "is more speech, not enforced silence." Whitney v. California, 274 U.S. 357, 377 (1927). Indeed, "it is the purpose of the First Amendment to preserve an uninhibited marketplace of ideas in which truth will ultimately prevail." Red Lion Broad. Co. v. FCC, 395 U.S. 367, 390 (1969). If Florida truly believes we live in a post-racial society, then let it make its case. But it cannot win the argument by muzzling its opponents. *Id.*

In *Santa Cruz Lesbian & Gay Cmty. Ctr. v. Trump,* 508 F. Supp. 3d 521, 543 (N.D. Cal. 2020), the district court found an Executive Order banning a list of "divisive concepts" in workplace training, covering many of the same ideas at issue in the Resolution, was void for vagueness among other Constitutional infirmities. *Id.*; *see also Gonzalez v. Douglas,* 269 F. Supp.3d 948, 972 (2017) (striking down statute banning ethnic studies); s*ee also Falls, et al. v. DeSantis, et al.*, United States District Court for the Northern District of Florida,

*Order Granting in Part and Denying in Part Motion to Dismiss*, Doc. 68, filed 7/8/22 (finding that students and teacher had standing to challenge regulation prohibiting, among other things, instruction in critical race theory).

9.      In addition to violating the First Amendment, the Resolution violates the Equal Protection Clause of the United Stated Constitution by, among other things, denying students, including the Plaintiff students, with equal access to education including educational resources and facilities.  Several of the student Plaintiffs are members of suspect classes targeted by the Resolution and are thus denied equal opportunities and equal protection as a result.

10.      In addition to its Constitutional repugnance, the Resolution violates Title VI of the Civil Rights Act of 1964, 42 U.S.C. 2000d et seq. ("Title VI") (which prohibits discrimination on the basis of race through intentional discrimination or program services that have a discriminatory effect), and Ohio law, including but not limited to R.C. §3313.60 and related regulations.

11.      Plaintiffs respectfully request this Court to declare the Resolution unconstitutional under the First and Fourteenth Amendments and issue injunctive relief striking it down and barring Defendants from enforcing it.

## PLAINTIFF PARTIES

12.      Plaintiffs Sarah Updike ("Sarah") and James Updike ("James") live within the FHSD and are the parents of three minor children I.U. ("IU"), A.U. ("AU"), and K.U. ("KU"), who are students within the FHSD. Sarah Updike is also a teacher in the FHSD at Nagel Middle School, and was part of the now-disbanded C.A.R.E. Committee for FHSD. Sarah speaks for herself about the Resolution and its damaging effects on her and other

teachers, her own children who are students in FHSD, and her students, as follows:

> I am a teacher and an intervention specialist in the FHSD at Nagel Middle School. In my job, I must teach and respond to students of diverse and varied backgrounds.
>
> My own children are of Arab/Welsh heritage on my side and Irish/Dutch heritage on their father's side. The multifaceted nature of my children's identities is significant to who they are as people and their need to be seen, understood, and celebrated. The theory of intersectionality applies directly to the different ways in which my children may experience discrimination. Teachers and staff being trained to recognize this may, in fact, help or lessen my children's exposure to discrimination and its effects. To prohibit staff training on the topic of intersectionality for FHSD staff has the effect of denying such possible benefits to my children should it be considered and adopted by FHSD. To date, it has not been. My youngest son is disabled by an unknown neurological condition which began when he was 3. As educators, we need to understand that experiences are unique to individual students, and biases and ignorance exist and can be harmful. For instance, it is common for schools to experience disproportionate discipline issues that have to be examined through the lens of identity. Students with special needs and students of color are often disproportionately disciplined more frequently than their non-disabled and white peers respectively. Girls and students of color are often overlooked for honors classes. Discipline should not be "equal". It should be *equitable*.
>
> When my child is experiencing disproportionate stress due to one or more facets of their identity, that needs to be taken into consideration. If my son is having a meltdown because he can still remember what it was like to be able to speak a year ago, but now has to struggle to tell others around him what he wants or needs, I would hope his identity would be taken into account. When my child with anxiety and depression was sick of being called names in gym class while their brother was spending yet another stay in the intensive care unit at Children's and they ran out of the gym, I was grateful for the equitable treatment rather than "equal" treatment.
>
> As a teacher I received a heart-breaking email from a student soon after the announcement of the resolution. It is significant to note that this student is black. To ignore their race is to overlook a problem our community is facing. This Resolution makes students of certain colors, races and identities and their families to not feel welcome. If this is not seen as a problem by our Board, that concerns me even more. To say that you do not support anti-racism implies the FHSD doesn't have the backs of our students of certain color, race or identity, and that we refuse to acknowledge their experiences, and refuse to remedy discrimination they may suffer in our schools as a result.
>
> In not taking race, socioeconomic class, religion, gender identity, sex, ethnicity or culture into consideration in administering academic programs, we also overlook the opportunity to expose our students, and my own kids, to more diverse readings, perspectives, and figures in history. "White", "straight", "able bodied", "cis gender" identities have become the default to the point that some people don't notice it anymore, unless they don't fit into those categories. My kids do not fit those

6

categories.

- **IU**

IU (16 years old, she/her): IU is a student at Turpin. IU is a member of the LGBTQ+ community who does not always feel safe to be herself at school and in public. Given her darker complexion as compared to many of her typical peers (and even her other siblings), she has faced comments from peers and has been misidentified as being Hispanic unless she has the opportunity to clarify. She is very uncomfortable around confrontation and is very uneasy complaining about it. She has a quick sense of humor and not a lot of self-confidence. She is amazing with her younger brother and has adapted so well to giving him the extra care he now needs.

As a high school student, IU wonders how health and history classes will be taught given the content of the kindness resolution. Racism, ableism, and sexism are not exclusive to the past and continue to exist not just in America, but in our schools. Not talking about them doesn't make them go away. How can we explore current events without talking about examples of injustice and inequity? Are we just not going to acknowledge them? If the next generation is meant to improve the workings of the country, they must first acknowledge the areas for improvement. Schools are meant to produce well-rounded citizens, and not just calculators and reciters.

During the student walkout, she was disheartened to hear white, male students nearby repeatedly using the "n" word and thinking it funny. IU was able to attend the student-led Diversity Day and wished that those same students had attended so they could learn how hurtful their behavior was since they hadn't learned that lesson from their homes, evidently. If a lot of the "unkindness" we see at school is rooted in sexism, racism, and homophobia, then the problem isn't kindness, it's ignorance grown from a place of privilege.

- **AU**

AU (13 years old, they/them): AU is a student at Nagel in FHSD. AU is also a member of the LGBTQ+ community. AU is currently exploring their own identity with the pronoun "they", but also goes by "she" at the moment at school because they fear the response peers and some teachers may have. AU is heavily involved in theater, performing professionally with Playhouse in the Park, Carnegie in Covington, and singing and dancing. AU is a lot more confident and outspoken than their older sister.

At AU's age, examining their own identity in a safe environment is essential. At this age, children AU's age are looking inward into who they are and need to know that what they see is okay, that it is enough. They look for that affirmation from those around them. That kind of exploration of identity doesn't happen in a vacuum or only at home. It is organically woven into every experience they have, school being a big part of that.

- **KU**

KU (5 years old, he/him): KU is 5 years old and in full day kindergarten in FHSD.

7

KU was a typical child until he began to drool and lose the use of his hands at the age of 3 at the very start of the COVID shutdown. He gradually lost the ability to walk and then very suddenly lost the ability to speak last summer. New and experimental medications have brought back some limited walking, and a few sounds, but he still has barely any use of his hands. Having an NG tube in his nostril (due to aspiration of fluids) and being in a wheelchair for a lot of his time in daycare and school has caused some children to misunderstand and fear him. My husband educated his peers at his preschool and this open conversation about his unequal life experiences brought about understanding, sympathy, and empathy. Such conversations would not be permitted under the kindness resolution and would condemn his peers to ignorance, and my son to loneliness.

To not have to examine or acknowledge one's own privilege is the very definition of privilege. Some people don't have to think "I hope my kid isn't beaten up for their orientation". "I hope my child isn't called a terrorist. AGAIN". "I hope my kid isn't excluded from play because he's disabled". "I hope my kid doesn't have a seizure in front of his peers without them first knowing what a seizure is because then they will fear him even more". Some don't have these worries, that is an area of privilege for those people. I know others have worries I don't. Those are my privileges. No one is stamped with "victim" or "oppressor" on anyone's heads. That's patronizing, hurtful, and is never our goal. We are all complex individuals, with our own baggage and our own strengths we worked hard for and privileges we didn't. The only way we will accept ourselves and each other is to understand and learn about our differences safely, respectfully, and with open minds. That is what I want for my children and my students. The Resolution has the coercive effect of preventing the open exchange of ideas and open minds, and preventing the examination of issues which are critical to children learning to socialize, live and interact with people who are different from them in our society. These skills are crucial and are necessary to successfully function in our society, and they are a large part of what we teach in our educational system. This Resolution will prevent me from teaching these skills.

13.   Plaintiffs Jennifer Ciolino and Antonio Ciolino reside within FHSD and are parents of their minor child R.C. ("RC"), who is a student at Turpin High School within FHSD. RC is a 16-year-old black (biracial), transgender boy in the 11th grade at Turpin High School, attending the Great Oaks satellite vocational school to study Digital Art. R.C. and his parents further state as follows:

R.C. will take advanced placement classes in Literature and Creative Writing, and Psychology as part of his education. RC is a solid student who struggles with symptoms of anxiety and depression. He is interested in video games, especially Japanese role-playing games and rhythm games. He is highly creative and has been

writing creatively for many years, including novels, plays, poetry, and song parodies. He has strong artistic skills and draws, paints, and creates animated digital art. He enjoys musicals and likes to sing and act, and he likes to dress-up as his favorite characters. RC aspires to make a living in the creative arts with a desire to live simply on a small farm with large gardens and animals. RC feels that the Board Defendants are trying to "erase" him with the Resolution. His parents further believe that the race-conscious language of the Resolution will cause RC fear and intimidate him in his interactions with his peers and fellow students both in the classroom and out. The ability to teach and train on the prevention of discrimination and racism, including racist words and actions, against students or staff by other students, and by teachers or staff against students or other staff is critical to achieving an open, inviting learning environment that is free of hostility or fear and which welcomes the free exchange of ideas so education and learning can occur. It is beyond words that telling our students, teachers and staff through the Resolution that they can't be taught or trained not to create a racist environment and engage in racial discrimination, or an environment which creates hostility or fear by preventing identity discrimination or hostility will have a negative effect on the learning process and socialization due to the hostile and intimidating environment it will allow.

14.    Plaintiffs Natalie Wheeler Hastings and Jeffrey Hastings are parents of their minor child,

C.J. ("CJ"). CJ attends Turpin High School in the FHSD. They speaks about the Resolution and its

damaging effects on them, and their child who is a student in FHSD as follows:

> In 2019, we transferred our child CJ into the Forest Hills School District from a private Christian school at his request. We worried that transferring into middle school during the school year would be difficult, but instead, he thrived. He went from being a student accused of showing disrespect at his former school to being a student encouraged to share his unique insights on the world.

> Today we are filing suit against this resolution because we fear the very things that enabled him to thrive as a student: psychological safety, freedom to say what he felt or believed as part of class discussion, and additional opportunities to further his academic interests are being taken away.

> When I asked CJ about his biggest concern with the resolution passed, he told me that it was the potential loss of Advanced Placement classes. While he's not always interested in turning in homework, CJ is very engaged in classes that interest him. This year, he took AP Human Geography. A child who mods geopolitical video games to play in different eras, and who plays more than 5 instruments is not a child who will thrive from the removal of advanced classes or limitations on the discussion in the classroom.

> As his parents, if you asked us about our biggest concern, it would be that we worry about his psychological safety. CJ has had the space to explore his identity and his interests at both Nagel Middle School and Turpin High School. The resolution is designed to restrict that very freedom of exploring diversity of any kind.

CJ is also concerned about his fellow students' safety. We have seen in the past few years how the lack of honoring a classmate's pronouns or acknowledgment of other things important to students affects CJ's own learning, even if it's not happening to him directly.

Which teachers are safe to ask questions? Which teachers are safe for being your authentic self? These are not questions my 11th grader should be having to ask.

15. Plaintiff Janielle A. Davis is mother to her minor child J.D. ("JD"), a biracial student at Mercer Elementary School within the FHSD. Ms. Davis expressed her fears and the effects the Resolution has in her and her daughter as follows:

JD is a happy child and has tons of friends. But she is aware of the Resolution and discussion over it and feels confused and frightened over what it is about. JD's teachers will be unable to teach JD and her classmates that it is wrong to be racist, not to be racist and not to discriminate on the basis of race because of the Resolution. The Resolution will render administrators, teachers and other staff unable to address and eliminate racism, racial discrimination, and speech that conveys racial hatred and will lead to an atmosphere of fear and intimidation at school. I worry about JD's ability to explore her own identity as she grows and feeling intimidated by the inability to discuss or examine identity issues at school. Issues of racism and racial discrimination must be able to be discussed and dealt with in the educational environment for it to be a welcoming, open environment which allows the free exchange of ideas and information.

I grew up in the neighboring neighborhood next door, Mount Washington and moved a few blocks down into to Anderson Township with my partner to get JD into FHSD about 5 years. Growing up in Mount Washington, our family was a minority and one of few African Americans living there at the time. There was a major lack of understanding of African American culture and it was very apparent due to the various micro-aggressions my family and I have endured throughout the years. I have been told everything from " I sound very intelligent for a black person" to being told I am "one of the good ones". As a young impressionable child, I didn't know that these comments were harmful but looking back, I'd be mortified if I heard anyone make comments like these to my daughter. I also struggled with my own identity, such as something as simple as not knowing how to take care of my hair, taking advice from peers because they thought it was unsanitary to not wash your hair everyday (which is very drying and damaging to African American hair). Although I believe most of the instances such as these are not intentionally malicious from our white friends and neighbors, they all have one thing in common and that is the lack of understanding of other people's culture. I have not always been as comfortable as I am now in my skin and my identity as I am now due to my upbringing and feeling different in my community and I do not want my daughter to suffer with these same feelings of invisibility and confusion due to the fear of not

being able to talk about our ethnicity, our history, and identity. With the school board banning the teaching of race, sexual orientation, and other diverse backgrounds, I'm afraid that the necessary education of other cultural backgrounds will perpetuate these micro aggressions and it will not be allowed to teach our children why they are harmful to people like me.

## DEFENDANT PARTIES

16.     Defendant Board of Education of the Forest Hills School District (the "Board") is a body politic under Ohio law capable of being sued. It is comprised of five members: Defendants Sara Jonas ("Jonas"); Linda Hausfeld ("Hausfeld"); Bob Bibb ("Bibb"); Katie Stewart ("Stewart"); and Dr. Leslie Rasmussen ("Rasmussen"). This action is brought against the Board, and the Board members in their official capacities as members of the Board. The Board and the Members of the Board hold policy-making authority for the Forest Hills School District.

17.     Defendant Forest Hills School District ("FHSD") is a public school district located in Anderson Township, Hamilton County, Ohio, and includes two high schools, one middle school, and six elementary schools. FHSD and its component schools are recipients of Federal financial assistance.

18.     Larry Hook is the Superintendent of FHSD. The Superintendent holds policy-making authority for FHSD with respect to implementation of laws, policies, regulations and procedures governing the FHSD schools, including enforcement of policies promulgated by the Board or otherwise within the District. This action is brought against the Superintendent in his official capacity.

19.     For purposes of 42 U.S.C. §1983, all actions of Defendants set forth herein are state actions and the Defendants are state actors operating under color of state law and are "persons" for purposes of 42 U.S.C. § 1983. The Resolution was enacted by the Board as official policy,

11

custom and practice for FHSD. As set forth herein, Defendants have intentionally violated clearly established rights of which a reasonable person should have been aware.

## JURISDICTION AND VENUE

20. This Court has Federal question subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331 and §1343 as Plaintiffs assert claims under 42 U.S.C. §1983. This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. §1367 as said claims are so related to the Federal law claims that they form one case or controversy for purposes of Article III of the United States Constitution.

21. Plaintiffs also seek a declaration regarding the Constitutionality of the Resolution and with respect to their rights under 28 U.S.C. §§2201, 2202.

22. This Court has personal jurisdiction over Defendants as they are located in Hamilton County, Ohio, which is within the area encompassed by the United States District Court for the Southern District of Ohio, and Defendant's wrongful and illegal actions occurred in Hamilton County, Ohio.

23. Venue lies in this forum pursuant to 28 USC §1391(a) and Southern District Local Civil Rule 82.1 because the claims arose in Hamilton County, Ohio where at all times material to this action the parties resided and committed the acts giving rise to this action.

## ADDITIONAL FACTUAL ALLEGATIONS

24. Educators within FHSD, including Plaintiff Sarah Updike who is an educator and an interventional specialist, must consider the race, socioeconomic class, religion, gender identity, sex, ethnicity and/or culture of students for a variety of reasons, including but not limited to, when developing appropriate IEP or other educational plans for students with special needs or who need extra assistance in one or more academic areas, in determining

the underlying causes of delay in academic development and plans to support a student, and in protecting students and responding to bullying by other students on one or more of these bases.

25. FHSD has experienced a number of student suicides over the past several years, and mental health and other health and wellness supports for students were implemented as a result.

26. The C.A.R.E. Committee was formed to support and implement the Health & Wellness cornerstone of FHSD's stated educational mission. It was implemented, at least in part, due to the high number of suicides by students within the FHSD over the past several years.

27. The FHSD website previously had several pages of information dedicated to the C.A.R.E. team, its mission and its work within FHSD. Among other things, it described the C.A.R.E. team as a district cornerstone "dedicated to enhancing relationships and wellness with students," as a mechanism to "help ensure our schools are welcoming and safe for all," and further stated "all teachers engage and enhance district practices through a continuum of diversity, belonging, inclusion and equity."

28. Plaintiff Sarah Updike was formerly part of the C.A.R.E. Committee for the FHSD, and became one of its Committee leaders. As a member of the C.A.R.E. Committee, Ms. Updike attended professional development meetings to learn about the diversity of the student body and how to support all students. This diversity education included, among other things, race, culture, religion, gender identity, sex, socioeconomic status, and intersectionality.

29. As part of the leadership for the FHSD C.A.R.E. Committee, Plaintiff Sarah Updike would then bring the information she learned to Nagel Middle School, specifically through speaking and teaching at professional development for teachers to make teachers aware of the diversity among FHSD students and how to be sensitive to the diversity within the FHSD student body and the needs of its students. Ms. Updike was quite passionate about the topics and felt that it was having a positive influence within the district in responding to the needs of FHSD students and improving their overall mental health

and wellness.

30.     Defendant Board members Jonas, Hausfeld, Bibb, and Stewart are newly-elected members of the Board. They took office following the November 2, 2021 election.

31.     Defendant Board members Jonas, Hausfeld, Bibb, and Stewart campaigned for office together as a group on the platform of being "AGAINST Critical Race Theory," and "AGAINST Comprehensive Sexuality Education." Among other things, these Board members also campaigned on platforms of being opposed to Social and Emotional learning ("SEL") principles. These Board members claimed in campaign materials that principles of Critical Race Theory were being concealed in language regarding race, gender, inclusion, belonging, diversity and equity, to "subvert your critical thinking." Defendant Stewart further stated during her campaign that she "[did not] believe in equity." In running their campaigns opposing Critical Race Theory ("CRT"), gender identity education and training, equity, and SEL, these Defendants accused the C.A.R.E. Committee of attempting to indoctrinate students and teachers with CRT, among other things. Part of Defendant Board members Jonas, Hausfeld, Bibb, and Stewart's campaign platform was to eliminate CRT, including the CARE team and the SEL it utilized, as part of the curriculum in the Forest Hills School District.

32.     Defendant Board members Jonas, Hausfeld, Bibb and Stewart's campaign messaging caused significant turmoil among residents, parents, students, teachers, and staff of FHSD.

33.     Upon taking office in January 2022, Board members Jonas, Hausfeld, Bibb and Stewart, who then held a majority of the seats on the Board, immediately began taking action to silence and censor speech within FHSD with which they did not agree. The allegations contained herein regarding their actions and statements regarding their intentions since taking office demonstrate, among other things: (i) their intent and efforts to suppress ideas and speech with which they do not agree and the harm that has already been inflicted as a result of such actions, and are illustrative of

14

their purpose in drafting, proposing, and enacting the Resolution; (ii) the harm and injury already inflicted as a result of the Resolution; and (ii) that the threat of additional enforcement and harm/injury as a result of the Resolution is imminent, concrete and real, without the need for enactment or adoption of any further "policies" by the Board, as demonstrated by the Board's enforcement of its other actions on topics which are now banned by the Resolution including threats of punishment against students and teachers.

34. In January 2022, upon taking office, Defendant Hausfeld submitted her "Board Priorities," which included, among other things:

- Root out components of divisive and dangerous CRT, SEL and CSE (CARE) from teacher PD, District Strategic Plans, Visions and Goals
    - *"The first step in realizing there is a problem is the admit the problem."*
        - Admit: Proclamation from OSBA laid CRT, SEL, CSE groundwork of policies and programs that flowed down to public schools
        - Admit: Melissa Buckalew and Kim Montgomery brought CRT components/program/ideology (whatever you want to call it) to FHSD with a presentation to the Board in 2019. Pilot program started in Maddux.
        - Admit: Next step it Ham Co. ESC brough it to FHSD through activist Consultant working with our teacher group during PD sessions to uncover implicit biases, white privilege, and also details through DBIE framework how she wants to disrupt and dismantle the system.
        - Admit: FHSD signed on to the program with accepting grant $$ to implement?
        - Admit: Truths about CAG meetings. What you learned about DBIE and how we will move forward as a District from this lesson.
        *BTW I need to tell you that when I was in OSBA Board 101, a question was raised to Kathy McFarland that many of the Board Members in the room ran on the platform of Anti-CRT and then specifically asked her if OSBA has materials they can share or assistance they can provide related to Anti-CRT. She said yes, they can provide it. I'd like to see what they have. This seems contradictory to what the gentleman (can't recall his name) from OSBA said when he spoke after CAG meeting. I remembered him saying that CRT doesn't exist, which is counter to what Kathy said at the Board 101 meeting.*
    - The second step to develop a plan on how you will communicate this to the District Parents and to the community. Years of time, money and effort has been spent on this massive programming effort.

- **Update FHSD Strategic Vision to remove anything with CRT lens**
  - **Review the (4) Cornerstones and update definitions where needed**
    - **Ie. Culture of Relationships & Wellness Cornerstone - will remove CRT (CARE) and become Mental Wellness Collaborative**

35. Similarly, upon taking office in January 2022, Defendant Jonas listed her board priorities which included the following:

- **Academic Excellence- Prioritize reading, writing, math, science, and history over social emotional learning/Do not follow social emotional standards which follow the CASEL guidelines/Eliminate CARE program and any cultural competence training/Forbid any school lessons using CRT lens**

36. In January 2022, after the current Board members took office, Plaintiff Sarah Updike was informed the C.A.R.E. Committee had been "disbanded." Thus, all speaking, teaching and receipt of information on topics from the C.A.R.E. Committee within FHSD permanently ceased. The C.A.R.E. Committee has not been invited or permitted to conduct any further staff training, although Plaintiff Updike remains a ready, willing and able speaker on the topics addressed by the C.A.R.E. Committee. Moreover, students and educators, including the student and teacher Plaintiffs herein, are deprived of their right to receive these ideas and speech.

37. Upon information and belief, the C.A.R.E. Committee was disbanded at the direction of the Board. Defendant Rasmussen testified in her deposition that the Superintendent of FHSD at that time, Scot Prebles, told her the incoming board members had instructed him to end the CARE program. This action was taken by the incoming board members without an official board vote and without creation of any new written policy or change to the official written "policies" of FHSD contained in its policy manual.

38. On or about March 30, 2022, the Board cancelled the annual "Diversity Day" at Turpin High School, one of the two high schools within FHSD – an opt-in voluntary in-school event whereby students could learn about cultural and racial issues and engage in discussions around diversity ---

scheduled for the next day, purportedly to permit parents to obtain additional information. The Board's action in cancelling Diversity Day was implemented and Diversity Day was cancelled.

39.     Following the distribution of additional information to parents and minor modifications to the agenda, "Diversity Day" was re-scheduled by school administrators for May 18, 2022. However, on or about Sunday, May 1, 2022 at a special meeting called by the Board, a majority of the Defendant Board members again voted, upon Motion made by Defendant Bibb, to cancel "Diversity Day" and further prohibited the event from taking place during school hours, using school resources, or through the use of school or tax-payer funded resources. Diversity Day was "postponed" on the first occasion because Sara Jonas and Linda Hausfeld directed Scot Prebles to cancel it, who then directed the principal of Turpin High School to cancel it.  Diversity Day was then rescheduled but cancelled on the second occasion at a special board meeting of the FHSD called on a Sunday by means of a motion to cancel it made by Defendant Bibb which was then passed by all board members other than Leslie Rasmussen.

40.     Again, the Board took this action to censor speech it did not like first by the direct intervention of Jonas and Hausfeld, and the second time through a motion which passed. Each time the majority members of the Board's directive was followed and implemented, without any additional written "policies"  put into place to enforce and implement the Board's directives. Diversity Day, a six year custom and tradition at Turpin High School—and an area of curricula mandated to be taught in schools by law in Ohio --was cancelled and will no longer be permitted at FHSD as a result of these actions by two board members and passage of a Motion by the majority of the Board, and as a result of the Resolution, as more fully explained below.

41.     The speakers and organizers of Diversity Day included educators within FHSD, as well as speakers from well-respected institutions such as the National Underground Railroad Freedom Center. Upon information and belief, these speakers remain ready, willing and able to speak, but

are prevented from doing so by the Defendants. Students and educators, including the student and teacher Plaintiffs herein, are deprived of their right to receive these ideas and speech.

42.    Students, parents, and residents of FHSD protested the Board's decision. Hundreds of students at Turpin High School and Anderson High School held a walk-out to protest the Board's decision on May 18, 2022.

43.    Upon learning of students' intent to hold a peaceful protest on May 18, 2022 of the Board's cancellation of Diversity Day, Defendant Board Members began making inquiries of FHSD administrators of what could be done about it and whether students and employees would face consequences. Among other things:

   a.    On May 17, 2022, Defendant Jonas inquired of then Superintendent Scot Prebles, "Please advise – What is the district's definition of disruption?"

   b.    Defendant Bibb went further and inquired about the consequences that could be imposed upon students and school employees, stating in a May 16, 2022 email:

   What does the student code of conduct say about demonstrations/walking out of school? What consequences do students face for walking out of school?

   Is there an employee in our school district organizing this? It almost sounds like someone in the school is encouraging this behavior.

   We can not simply allow a group of students to disrupt the learning process of everyone else because they are unhappy. It sets a dangerous precedent. Once we allow one group of students to do something how long before another group comes along and wants to do the same thing? At what point do we say no?

   c.    Upon information and belief, prior to the May 18, 2022 protest, on or about May 2, 2022 at a board meeting following the cancellation of Diversity Day at which students and parents were peacefully protesting the Board's actions, Defendant Hausfeld took videos and/or pictures of the protestors without their consent, including students who were protesting, in an attempt to intimidate them and cause

18

fear of punishment. Multiple public records requests have been made to Defendants for the videos and pictures taken by Defendant Hausfeld, but Defendants have refused to provide them.

44.     Indeed, a "dangerous precedent" has been set as warned by Defendant Bibb, but not by students. Rather, a "dangerous precedent" of the disregard of the Constitutional rights of students and teachers has been set by these Board members which comprise a majority of the Board.

45.     Similarly, in the Spring of 2022, Nagel Middle School within FHSD was forced to cancel its "Go Offline Day" because some of the activities involved conversations about identity to foster empathy and understanding among the students. This cancellation occurred around the same time the FHSD Board voted to cancel Diversity Day at Turpin, and, upon information and belief, Go Offline Day was cancelled at Nagel due to the Board's cancellation of Diversity Day and its directive that no such conversations or events could take place during school hours, using school resources, or using tax-payer funded resources. Moreover, as described below, upon information and belief, Go Offline Day will not be permitted going forward as it involves discussion of topics banned by the Resolution. The speakers and organizers of Go Offline Day included educators within FHSD and others. Upon information and belief, these speakers remain ready, willing and able to speak, but are prevented from doing so by the Defendants. Students and educators, including the student and teacher Plaintiffs herein, are deprived of their right to receive these ideas and speech.

46.     On June 22, 2022, at a regularly scheduled meeting of the Board, the Resolution was raised for discussion and vote by the Board Member Defendants. The Resolution had been added to the agenda for the Board meeting by Defendant Jonas, thus giving notice to the community of its contents, just one day prior to the meeting. Despite the nearly non- existent notice, numerous students, parents and educators attended the June 22, 2022 Board meeting to express their opposition and fear if the Resolution were passed, and to plead with the Board to reject the Resolution.

47.     During public discussion of the Resolution at the June 22, 2022 meeting prior to its passage, the Defendant Board Members made a number of statements (memorialized in audio recordings of the meeting), including, but not limited to the following:

    a.  Defendant Jonas claimed to be the author of the Resolution and spoke to its meaning and intent.

    b.  Defendant Jonas indicated the Resolution was just a further action to implement already existing FHSD policies, including the Controversial Issues policy contained in FHSD policy code po2240. She indicated the Resolution was "just noting the controversial issues policy," which had been in effect since 2009. The Resolution specifically references "FHSD policy code po1422" relating to "Nondiscrimination and Equal Employment Opportunity;" "FHSD policy code po2240" relating to "Controversial Issues" and how such issues are to be handled in the classroom, and Ohio Administrative Code 3301-32-10(A)(24)[1] relating to the adoption of policies and procedures for school programs that are nondiscriminatory.

    c.  Defendant Jonas acknowledged that the definition of "anti-racism" which the Resolution would ban, is to oppose racism.

    d.  Defendant Jonas indicated her desire to prohibit what she viewed as activism and the reshaped and reenergized conversations about racial justice which had recently re-emerged in America.

    e.  Defendant Jonas indicated that, despite the Board being informed that the C.A.R.E. Team had been disbanded, "certain incidents" had taken place since that time which necessitated the Resolution: "While the district declares there is no CRT, I agree

---

[1] The Resolution incorrect cited the regulation as OAC 3301-32-10-24, but its quotation of the language makes clear it is in reference to OAC 3301-32-10(A)(24).

there is not CRT 101 class here. But the concern was again the CARE team, its association with its consultants, the professional development training on culturally responsive teaching using the books such as 'White Fragility' and utilizing this DBIE model…To fast forward to our first meeting as a board in 2022, the super said the CARE team had ended. And we took him for his word…but what happened the months into us being in office, certain incidents occurred that warranted this resolution."

f.  Defendant Jonas indicated that the ban on "other euphemistic surrogates" contained in the Resolution meant a ban on other topics related to opposing racism.

g.  Defendant Rasmussen noted her numerous concerns and objections to the Resolution, including that it would jeopardize FHSD's ability to offer Advanced Placement classes. She further indicated the College Board had been contacted and would be reviewing the Resolution and FHSD's ability to offer AP courses as a result. Defendant Rasmussen warned the Resolution would subject the Board to lawsuits, and further indicated it was filled with "very specific hate, and a desire to ignore anyone who isn't a straight white person."

h.  Defendant Jonas in her comments tacitly acknowledged the breadth and vagueness of the Resolution. She noted, however, that she and Defendants Bibb, Hausfeld and Stewart had run for office and been elected on an "anti-CRT" platform, and the Resolution was, in effect, being passed to effectuate their partisan political agenda.

i.  Moreover, Defendant Jonas indicated her desire that the Resolution "set the tone" for the new Superintendent.

48.  Defendant Board Members Jonas, Bibb, and Hausfeld ignored the pleas of the community. Upon motion made by Defendant Jonas, Defendants Jonas, Bibb and Hausfeld voted in favor of and therefore

21

passed the Resolution. A copy of the Resolution is attached hereto as <u>Exhibit A</u>. This conduct and the Resolution constitute official action and policy under color of state law, and no additional enactment of policy is needed for the Board to accomplish its goal of prohibiting and chilling speech and the free exchange of ideas in the FHSD educational environment.

49.     At the same Board meeting on June 22, 2022, Defendant Board member Rasmussen made a motion to reinstate "Diversity Day" at Turpin High School and create a similar event at Anderson High School, also within FHSD. The same Defendant Board Members who voted in favor of the Resolution – Defendants Jonas, Bibb, and Hausfeld – also voted *against* the motion to implement and reinstate "Diversity Day" at the high schools.

50.     During her deposition in this case, Defendant Jonas directly tied the Resolution to Diversity Day and the existence and work of the CARE Team, admitting that the "incidents" to which she had referred during the June 22, 2022 meeting which necessitated passage of the Resolution included the existence and work of the CARE Team and Diversity Day.  The Resolution was passed, at least in part, to ensure that Diversity Day would not ever be permitted at FHSD and all events, training, discussion and education similar to it would be banned within FHSD, and that no professional development and training similar to that of the CARE Team would ever be permitted at FHSD.  The Resolution is a further action to implement the policy of Defendants established with their cancellation of Diversity Day and disbanding of the CARE Team as the Resolution bans discussion, training, education or consideration of the topics addressed by both.

51.     Despite repeated requests and motions made at board meetings, the board has refused to rescind the resolution or disavow an intent to enforce it and instead continues to enforce it and makes plans for further enforcement.

52.     The Resolution is vague, overbroad, race-based and unconstitutional on its face, and its invidiously discriminatory purpose is likewise evidenced on its face and in the conduct of Defendant

Board Members.

53.     Among other things, the Resolution's most egregiously unconstitutional provisions include:

    a.  "FHSD *will not utilize Critical Race Theory, intersectionality, identity, or anti-racism curriculum, for student, education or any staff training*."

    b.  "WHEREAS**,** *Critical Race Theory (CRT), anti-racism, and all related euphemistic surrogates should similarly not be advocated in any form*, in FHSD's curricula or staff training."'

    c.  "Schools may not use race, socioeconomic class, religion, gender identity, sex, ethnicity, or culture as a consideration when hiring *or administering academic programs or evaluation systems.*"

    d.  "Neither schools, nor instructors or guest speakers, *shall have students participate in class or complete assignments that require, guide, or nudge* the student to consider his or her race, socioeconomic class, religion, gender identity, sex, sexual preference, ethnicity, or culture as a deficiency or a label to stereotype the student as having certain biases, prejudices or other unsavory moral characteristics or beliefs based on these immutable characteristics."

54.     "Racism" is, by definition: "a belief that race is the primary determinant of human traits and capacities and that racial differences produce an inherent superiority of a particular race"; "a: doctrine or political program based on the assumption of racism and designed to execute its principles"; "b: a political or social system founded on racism, racial prejudice or discrimination."

55.     "Anti-racism" is, by definition, "the policy or practice of opposing racism and promoting racial tolerance."

56.     Defendants' prohibition of anti-racism, i.e., their anti-anti-racism, is a tacit promotion of racism. At a minimum, it indicates that Defendants, by their policy as set forth in the Resolution,

will tolerate racism and will not tolerate anti-racism.

57.     The topics of "Diversity Day" and "Go Offline Day" are now banned by the Resolution, despite the existence of ready, willing and able speakers. Teachers and students, including the Plaintiff students, will be denied access to this speech and these ideas.

58.     Many of the same topics discussed in the C.A.R.E. Committee and in professional development conducted by Plaintiff Sarah Updike and others within FHSD for teachers and then communicated to students are now banned by the Resolution, most notably training relating to "anti-racism" and gender identity. Ms. Updike remains a ready, willing and able speaker on these topics, but her speech has been censored and she has been forced to abandon the professional development training she previously conducted for FHSD staff as a result of the Resolution. Teachers and students, including the Plaintiff students, will be denied access to this speech and these ideas.

59.     Moreover, throughout her career as a teacher, and specifically while a teacher within FHSD, Plaintiff Sarah Updike has historically taught her students on a number of topics that are now banned by the Resolution, most notably, with respect to "anti-racism." Ms. Updike remains a ready, willing and able speaker to convey the information now banned by the Resolution to students, and she intends to continue to speak on the topic of "anti- racism" at a minimum as she believes it is essential for student education.

60.     In addition, Plaintiff Sarah Updike takes pride in organizing and celebrating Black History Month at Nagel, which necessarily involves an examination of the history, experiences, and writings involving, among other things, slavery, racism and Civil Rights (i.e., anti- racism). Ms. Updike intends to continue to do so, although the Resolution bans such "anti- racism" speech and education. However, Ms. Updike has eliminated other areas of her work which she would otherwise have presented to students as a result of the Resolution.

61.     Although the Resolution's ban on "anti-racism" speech, curriculum and education is clear, other

aspects of the Resolution are vague and unclear to educators, including Plaintiff Sarah Updike. Certain of the Resolution's prohibitions raise questions in the minds of teachers and students about the permissible scope of instruction and discussion within FHSD, which alone has a chilling effect upon speech and academic freedom. Examples of the issues and questions raised by the Resolution's vagueness and overbreadth include:

a. What is "identity" curriculum and training?

b. What is "intersectionality" curriculum and training?

c. What are "euphemistic surrogates" and what are the "euphemistic surrogates" of "anti-racism," and CRT which are banned by the Resolution?

d. Is instruction on slavery, reconstruction, Federal and state laws which were found to be race-conscious and unconstitutional, historical racism and the response to it (i.e., anti-racism), and the Civil Rights movement permitted?

e. Is instruction and teaching on any remaining effects and impacts of slavery, Jim Crow laws, and any institutional racism that has existed in the United States prohibited by the Resolution?

f. Are potential measures to remedy any remaining effects of racism and racial discrimination such as affirmative action in education and public contracting, reparations, or other measures, and whether such measures would be warranted and just, prohibited topics that cannot be examined as topics of the curriculum?

g. How, for example, may History and English Language Arts teachers teach and discuss topics involving our historical slavery and racism and our country's moral response in opposition to it?

h. If a student or employee is being harassed or discriminated against on the basis of his or her race or gender identity, assuming he or she would even feel comfortable

reporting it following the passage of the Resolution, may the school and educators address and remedy it? An appropriate response would, by definition, involve "anti-racism" and/or "identity" training or evaluation.

i. What constitutes "nudging" so as to fall within the prohibition on "nudging" students to consider his or her race, class, religion, gender identity, etc.?

j. How will FHSD meet its legal obligations under Titles VI and VII of the Civil Rights Act of 1964 if it may not train against racism and discrimination?

k. How may schools and educators implement individualized learning and instructional plans for students in need of such services if they are not permitted to consider the student's individual needs which may involve their race, culture, sex, or ethnicity in "administering academic programs" or "evaluations" to the child?

l. What is a "controversial issue," who determines what constitutes a "controversial issue," and when and how may "controversial issues" be discussed in the classroom?

m. Are educators, including Plaintiff Sarah Updike in particular, permitted to retain the Pride flag sticker on her classroom door which indicates to all students that she and her classroom are a safe place for all of them?

n. How may educators and administrators, including Plaintiff Sarah Updike, address bullying or harassment on the basis of race, religion, or gender identity within the school? May students be counseled to "place themselves in another's shoes" to teach them empathy for those who are different from them?

62. The Resolution has already impacted the content of class curriculum, discussion, and staff training. The Resolution has caused educators, including Plaintiff Sarah Updike, to make changes to their planned curriculum and censor certain speech and topics on which they would otherwise

teach students to avoid discipline for violating the Resolution. For example, Ms. Updike is uncertain whether she may purchase or utilize texts and materials relating to, for example, religion, race, or gender identity in the classroom. Were it not for the Resolution, Ms. Updike would also freely teach and discuss these topics as well as the topic of intersectionality. Students are denied access to these ideas and speech.

63. Following the filing of this lawsuit and Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction, the parties entered into a Stipulation approved by the Court whereby Defendants agreed to take no further action to implement or enforce the Resolution during the pendency of this lawsuit. Despite the existence of the Stipulation, Defendants continue to take action to enforce and implement the Resolution. Moreover, because Defendants have refused to rescind the Resolution despite repeated requests from the community, educators within FHSD believe the Resolution is being enforced and are avoiding topics and actions banned by the Resolution for fear of disciplinary action, and students are likewise suffering injury and damages as a result.

64. Defendant Rasmussen described in her deposition how her four fellow majority board members handpicked a new superintendent—Defendant Larry Hook--who was willing to enforce the Resolution. During the interview process Mr. Hook was asked if he would enforce the Resolution and Hook's reply was that "he would take the arrows for the Board" and enforce the Resolution.

65. Defendant Rasmussen and Defendant Hook admitted during their depositions that numerous teachers had approached them with concerns regarding the Resolution, their ability to teach, and consequences for running afoul of the Resolution.

66. These and other teachers have avoided topics banned by the Resolution altogether for fear of discipline and loss of employment.

67. Following passage of the Resolution, Defendants have taken numerous actions to enforce

27

and implement it. A non-exhaustive list of examples follows.

68.     Following passage of the Resolution, in late June or early July 2022, FHSD educators were on a trip to Washington D.C. with FHSD students to attend presentations for students who intend to pursue education as a career. The students were instructed by FHSD staff to leave a presentation being conducted by Tamir D. Harper on the topic of social and racial justice in education, as the topics of the presentation ran afoul of the broad prohibitions contained in the Resolution. This is an example of educators within FHSD censoring speech, adjusting their curriculum, and the loss by students of exposure to diverse ideas, to avoid running afoul of the Resolution. Other educators within FHSD have and will continue do the same. FHSD students were denied access to ideas and speech as a result of these actions and will continued to be denied access to ideas and speech.

69.     In addition, upon information and belief, as a result of the Resolution, many individualized surveys, assessments and evaluations have been prohibited within FHSD schools. Such individual surveys, assessments and evaluations necessarily touch upon or consider race, socioeconomic class, religion, gender identity, sex, ethnicity and culture in identifying student needs, and are accordingly banned by the Resolution's prohibitions, including, its ban on the consideration of "race, socioeconomic class, religion, gender identity, sex, ethnicity, or culture" in the administration of "academic programs or evaluation systems." Upon information and belief, teachers, including Plaintiff Updike, remain ready willing and able speakers on these topics, but are denied the ability to do so, and students are denied access to ideas and speech as a result. Moreover, students, including the student Plaintiffs, are denied their right to free expression as they are unable to express themselves on the banned topics. In addition to violation of the Constitutional rights of students and teachers, the ban on such evaluation and assessment systems is a dangerous and vile disregard of student needs.

        a.   For example, following passage of the Resolution, FHSD counselors have been

directed by FHSD that they may not utilize the term "SEL," which stands for Social Emotional Learning, at all.

b. As a further example, following passage of the Resolution, FHSD counselors have been directed by FHSD that they may not conduct the traditional individual "needs assessment" on students that FHSD had completed in prior years. The "needs assessment" was a survey in paper form distributed to all FHSD students to gather individual information and evaluate their social emotional wellbeing, academic and executive functioning needs, and academic and future plans in order to assist counselors in identifying students who may need additional academic and other assistance, students with diverse backgrounds and thus diverse needs, students who may be experiencing issues that may inhibit their academic success, as well as students who may be experiencing depression and/or suicidal thoughts. The "needs assessment" was based upon the model from the American School Counseling Association. However, it necessarily includes evaluation and administration of academic programs based upon individual needs, which requires consideration of the topics banned by the Resolution. This censorship harms educators and students alike, including Plaintiffs.

c. As an additional example, upon information and belief, following passage of the Resolution, FHSD has directed schools within the district to cease conducting the "school climate survey" with FHSD students, including the student Plaintiffs. Similar to the needs assessment, the school climate survey was designed, at least in part, to identify students experiencing challenges which inhibit their academic success so that educators may address and provide individualized supports to assist students. Like the needs assessment, the climate survey necessarily included

29

consideration and evaluation of topics and issues banned by the Resolution, and administration of academic programs based upon the same. Defendant Jonas expressed her criticism of the survey in at least one public Board meeting. This censorship, too, harms educators and students, including Plaintiffs.

d. To date, school counselors within FHSD have not conducted necessary surveys as a result of the Resolution and their fear that their actions will result in disciplinary action for violating the Resolution.

70. Following passage of the Resolution and even following entry of the Stipulation in this case whereby Defendants agreed they would not take any action to enforce or implement the Resolution during the pendency of this lawsuit, Defendants sought to discipline a teacher for violating the Resolution by her use of pronouns following her name and the inclusion of a link to explain the importance of utilizing the pronouns chosen by an individual. Specifically, following a parent complaint about this teacher utilizing pronouns after her name, on August 29, 2022, Defendant Stewart referred the teacher and the matter to Defendant Hook and another member of FHSD administration, and stated:

> Hi Kyle,
>   Thank you for the update. I have sent this message on to both Larry Hook and Rob Fellows. I am waiting on a reply from them, but I wanted you to know this goes against board policy. I am hopeful this will be corrected and won't be a concern going forward.
>
> Katie Stewart

71. Defendant Jonas admitted during her deposition that the only "policy" to which Defendant Stewart could have been referring as being violated by the teacher is the Resolution. Specifically, this conduct violates the prohibition in the Resolution upon training, education, curricula and evaluation systems regarding or which consider identity. The teacher was required to meet with administration regarding this violation of the Resolution. Following the meeting, the FHSD administrator reported back to Defendant Stewart that he had met with the teacher referred to them

by Defendant Stewart, had her remove the offending information, and that he did not expect further concerns with the teacher going forward.

72. Teachers within FHSD, including Plaintiff Updike, are aware of these actions by Defendants to enforce the Resolution, and fear similar enforcement action and discipline against them as a result.

73. On or about September 21, 2022, during an FHSD Board meeting, Defendant Stewart made a motion to require students to utilize the bathroom which matched their sex assigned at birth rather than the sex with which they identified, directly targeting trans students at FHSD, including several student Plaintiffs. Defendant Stewart's motion was an action to enforce the Resolution with respect to its ban on any training, education, curricula or evaluation systems that take identity into consideration.

74. Students and teachers within FHSD, including Plaintiffs, are aware of this and other actions to enforce the Resolution and have suffered injury and harm as a result. For example, at one student Plaintiff is a trans student who is so fearful of his safety and the possibility of discipline and embarrassment as a result of Defendants' actions to pass and implement the Resolution that he is unwilling to utilize the bathroom at all during the school day.

75. The student and teacher Plaintiffs are being denied equal protection under the Constitution as they are being denied the equal opportunity to speak and receive information as a result of the Resolution. In addition, the student Plaintiffs are being denied equal access to education and other benefits, including educational resources and opportunities, as a result of the Resolution. For example, by eliminating evaluation systems which identify individual needs, including on topics such as race, sex and gender identity which are banned by the Resolution, students are not provided with the educational resources they need to obtain an education on an equal basis with other students who are not members of traditionally marginalized groups. Moreover, Defendants are denying these

31

same students, including the student Plaintiffs, with equal access to FHSD facilities, such as the bathroom which aligns with their identity. *See, e.g., Ray v. McCloud*, 507 F. Supp.3d 925 (S.D. Ohio 2020); *Board of Ed. of Highland Local School District v. United States Department of Educ.*, 208 F. Supp.3d 850 (S.D. Ohio 2016).

76.     Defendant Rasmussen scolded Defendant Stewart by email on September 22, 2022 following the September 21, 2022 meeting for taking this action to enforce the Resolution (specifically as it related to sex and gender identity) which also violated the Stipulation entered in this litigation whereby Defendants agreed they would not take any action to implement or enforce the Resolution during the pendency of this litigation.  She also scolded Defendant Stewart for again taking action to further enact policy outside the procedures set forth in the bylaws for the Board.

77.     Upon information and belief, Defendants have recently taken additional similar action to enforce the Resolution.  The FHSD log of public records requests indicates Defendant Stewart has drafted another policy in furtherance of the Resolution and her desire to ban transgender students, including student Plaintiffs, from utilizing the bathroom of the gender with which they identify.

78.     Upon information and belief, Defendants have also taken steps to enforce the Resolution by censoring or banning books which discuss or consider the topics banned by the Resolution.  Upon information and belief, certain Defendant Board Members have taken steps to review and/or form an advisory committee to review the books in the library of Nagel Middle School, so that books which they deem to be inappropriate or in violation of the Resolution may be censored, removed or banned.

79.     Upon further information and belief, books have not been added to FHSD school libraries as a result of the Resolution because educators fear that they run afoul of the Resolution as they discuss topics banned by the Resolution (such as gender identity).  These educators seek to present ideas and information to students through these books and through discussions regarding the same but are unable to do so as a result of the Resolution, and

students, including the student Plaintiffs, are denied access to information and ideas as a result.

80.    Following passage of the Resolution and the cancellation of Diversity Day, students at Turpin High School within FHSD sought to establish a Diversity Club.  School clubs require a teacher sponsor. No teacher at FHSD was willing to serve as a teacher sponsor of the Diversity Club as a result of the Resolution and their fear of discipline.

81.    Plaintiff Updike and other teachers, counselors and employees within FHSD are and remain ready, willing and able speakers on the topics banned by the Resolution but have curtailed their speech as a result of the Resolution.  Students, including the student Plaintiffs, would have received access to these ideas and speech, but for the existence of the Resolution.

82.    As a result of the Resolution, Defendants are also denying students, including the student Plaintiffs, additional rights of free expression by banning students from discussing and surveying other students regarding certain topics without "pre-approval," including with respect to their feelings regarding the Resolution, its impact upon their learning, and thus the harm and injury they have suffered as a result.

83.    For example, upon information and belief, on or about September 8, 2022, an FHSD high school student created a survey she sought to send to other students at the FHSD high school to discuss and obtain their input and to allow them to express their opinions on the Resolution, whether they believed the Resolution was impacting their education, and whether they felt their teachers were "holding back" material and discussion on topics that otherwise would have been held due to the prohibitions contained in the Resolution. The student created the survey on her FHSD Google Account. The student then invited FHSD students to open the link and respond to her questions. Several students responded to the

survey with their opinions that their learning had been impacted by the Resolution, including the following:

> **With the school boards new rules has there ever been a time where you felt teacher avoided topics/questions due to new policies?**
>
> 5 responses
>
> | |
> |---|
> | If they didn't already, they 100% did after the board decision |
> | Yes |
> | I can't really say for sure, we haven't been in school long |
> | yes |
> | A bunch of my teachers have been dancing around the subject of things because of new policies. Especially the teachers who I know don't believe in the new policies. |

> **How has that impacted you?**
>
> | |
> |---|
> | ██████████ but in all seriousness what the school board has done is unacceptable. I don't feel comfortable in school anymore because I'm afraid I will be persecuted for being who I am. They cut off the right to talk ab sexuality and identity and those two things are very important to me. But they also cut off the talk of racism and sexism, those things can be very important to others in the school even if it is only a few. |
> | it has made me feel like there is something that is being left out, like the teacher is intentionally avoiding something and it makes me feel like i'm not getting a good education |
> | I had to take a permission slip home to my parents to be able to watch documentaries in AP human geo which is understandable but still annoying. |
> | I haven't gotten to learn about certain things that go on in the world that I feel I need a better understanding of. |
> | Sometimes I can't even express who I truly am even to teachers who know exactly who I am. One of my favorite teachers can't talk to me fully anymore ab the things that I've gone through just because they are scared they will get fired. I felt like I lost an adult who truly cared about me |

***

34

However, shortly after the student began receiving responses, Defendants "disabled" the student's account and she was instructed to cease her activities.





Your account has been disabled

⊗ ████████@foresthills.edu

Your Google Account was disabled by your Google Workspace administrator. Contact your administrator for help.

Defendants did not tell the student what rule, if any, she had broken. The student was simply informed that only "pre-authorized" surveys could be created and sent on FHSD accounts due to policy. The student discontinued her activities out of fear of further discipline.

84.     In fact, there is no "preapproval" requirement for all surveys sent on FHSD accounts. Students create and send surveys to other students on their FHSD accounts on a regular basis without obtaining or receiving "preapproval" and their accounts are not blocked. Rather, this "preapproval" requirement and account-blocking censorship apparently applies only to topics on which Defendants do not want discussion, and is yet another example of Defendants' content-based restriction on speech they do not like as a result of the implementation and enforcement of the Resolution.

85.     The foregoing demonstrates Defendants' intent and action in suppressing the free expression and speech of teachers and students based upon the content of their speech,

35

including the student Plaintiffs (at least three of whom are at a FHSD high school) who were unable to express themselves in response to the survey, as a result of the Resolution, despite the existence of ready, willing and able speakers. Defendants seek to prevent students and teachers from even discussing or expressing the harm and injury they have suffered as a result of the Resolution. It also denies the student Plaintiffs access to ideas and speech. Such censorship as a result of the Resolution demonstrates the harm and injury that has already been caused by it, as well as the threat of additional imminent harm.

86.      In addition, upon information and belief, the Board majority now requires speakers within FHSD schools to be "pre-approved." Upon information and belief, this requirement is being enforced, at least in part, as a result of the Resolution including its ban upon "guest speakers" who have FHSD students participate in activities that require them to consider his or her "race, socioeconomic class, religion, gender identity, sex, sexual preference, ethnicity, or culture as a deficiency or a label to stereotype the student as having certain biases, prejudices or other unsavory moral characteristics or beliefs based on these immutable characteristics."

87.      For example, on or about September 6, 2022, Nagel Middle School sent an email with a permission slip to parents of students with a "Guest Speaker Release Form," indicating, among other things with respect to the 9United guest speaker that "Per district policy, this speaker has been pre approved based upon their alignment to the Forest Hills Strategic Plan, FHSD Cornerstones, and the Forest Hills Portrait of a Learner. . . As well as following administrative guideline 2240." Upon information and belief, the Board majority is taking action to censor speech of speakers by requiring that they be "pre approved" in furtherance of the Resolution. This censorship harms students, including the student Plaintiffs, as it denies them the ability to have exposure to diverse ideas and speech.

88.      The foregoing examples of censorship, restrictions and prohibitions imposed on individualized assessments, surveys, and speakers also demonstrates the Defendants are

implementing and enforcing the Resolution without any additional "policies" being placed in their written "policy book."

89.     In addition, there is a significant amount of bullying that takes place by students within FHSD, often directed to students of color or those who identify as LGBTQ+. Plaintiff Sarah Updike indicates it is not uncommon that, as part of this bullying, the targeted students are called derogatory and abusive names. Educators, including Ms. Updike, have been required to address this bullying to protect those being bullied and educate and discipline those students who are acting as the bullies, and they must have conversations related to, among other things, race, "anti-racism," gender identity, and diversity in order to effectively do so. This Resolution's ban on these categories of speech disarms Ms. Updike and other educators and administrators from protecting students who are being bullied, and preventing and addressing bullying which does occur. The Resolution places bullied children at further risk, and denies students access to these ideas, speech and education.

90.     Based upon the statements and prior conduct of this Board majority and FHSD, Plaintiff Sarah Updike fears that the teaching and discussions in which she intends to continue including, for example, with respect to "anti-racism" and gender identity, and taking action to protect students from bullying and addressing bullying by offending students, will lead to discipline and the termination of her employment because such actions violate the Resolution's prohibitions. Ms. Updike fears complaints, sanctions and discipline for continuing to teach material relating to race, anti-racism, gender or sexual orientation, among other things. Her fear of discipline and termination has also chilled her speech.

91.     Defendants' similar actions to enforce and discipline teachers in similar circumstances also demonstrates the imminence of further injury here.  Upon information and belief, other teachers within FHSD have been investigated at this Board's direction in response to complaints for exposing students to views with which the Board majority does not agree and teaching on topics considered to be "controversial," such as racial "redlining." As a specific example, in March 2022 a student

sent an email to Defendants Hausfeld, Jonas, Bibb and Stewart with a video he had been shown in AP Human Geography class regarding the historical practice of redlining and how it has impacted urban and suburban populations. The video was apparently perceived as "left- leaning" by certain Defendant Board Members. Defendant Jonas thereafter sent an email to the Superintendent, and high school principals, among others, demanding: "Please conduct a full investigation and report back. How is this part of an approved curriculum?" Defendant Hausfeld similarly sent an email to the Superintendent and a high school principal directing in relevant part:

> Please see email, attachments and watch the video. I would like for an investigation into this matter and a report on the findings.
> A few questions:
> Do you honestly think this is appropriate teaching material?
> What are the main teaching points of this class?
> Is this the best we can do for an AP class?
> I now wonder what other teachers use propaganda videos like this as teaching material.
> The video is recklessly inappropriate.

92.     FHSD administrators conducted an investigation of this teacher as directed by the Defendant Board members, pointed out to the Board members that this was a college-level AP class, and concluded the teacher had complied with school policy by presenting multiple perspectives on an issue that was part of the curriculum for the class. Nonetheless, it is clear these Board members sought to punish the teacher at issue and instituted a disciplinary investigation with that aim. Teaching regarding racial "redlining" and the impact of racism in the law is banned by the Resolution's prohibition upon, among other things, teaching regarding "anti-racism," and thus there is a real, concrete and imminent threat of discipline and harm/injury to teachers who teach such topics, and the loss by students, including the students Plaintiffs, of access to this speech and these ideas.

93.     Upon information and belief, educators and administrators within FHSD have quit, retired, been forced out, and/or taken other jobs as a result of the Board majority's action in passing the Resolution and as a result of the Board majority's political views and actions. Teachers are scared to even express that they support diversity for fear of loss of their jobs.

94.     Defendants' conduct as described herein also demonstrates a real and imminent threat of discipline and further injury to students, including student Plaintiffs, who seek to express themselves in opposition to the Board, with respect to ideas with which the Board does not agree, or in opposition to the Board's actions.

95.     Upon information and belief, the Resolution also places FHSD in jeopardy with respect to its ability to offer Advanced Placement ("AP") Classes within its high schools. Advanced Placement is a program created by the College Board which offers college-level curricula and examinations to high school students. FHSD's offering of a broad array of AP Classes, with its highly-skilled educators, is one of FHSD's characteristics of excellence. AP Classes, particularly those such as AP U.S. History, AP U.S. Government and Politics, AP Human Geography, and AP English Literature and Composition, necessarily require and teach critical thinking on topics including slavery, the role of racism in our history and steps taken to address racism, the Civil War, Reconstruction, the Civil Rights movement and opposition to racism, red-lining, and Black history and authors, among other things. The Resolution's prohibitions on curricula and teaching means that teachers may not fully teach and explore these topics with students, and students will not receive the full array of information and ideas to which they are entitled. The College Board recently set forth a new Statement of Principles and has indicated that any high schools that ban "required topics" in their AP classes could lose AP designation. *See, e.g.,* "*What AP Stands For,*" https://apcentral.collegeboard.org/about-ap/what-ap-stands-for; "*High schools could lose AP classes if they ban 'required topics' from being taught,*" https://www.today.com/parents/high-schools-lose-ap-classes-banning-required-topics- rcna18813. As set forth above, Defendant Rasmussen has indicated the College Board is looking into the Resolution and its effect upon FHSD's ability to offer AP classes. Again, this represents a loss of exposure to ideas and speech which will be suffered by FHSD students, including the student Plaintiffs.

96.     Defendants have not disavowed their intention to enforce the Resolution. Nor have they disavowed an intention to discipline educators such as Plaintiff Sarah Updike, or the student

Plaintiffs, for violating its provisions. Instead, even after this lawsuit was filed, the Board has remained steadfast in expressing its intention to implement and enforce the Resolution, including, for example:

    a.   The Board indicated through its spokesperson on July 22, 2022 in relevant as follows: "The Board intends to vigorously defend the Resolution's validity and the Board's legal authority to adopt the Resolution that promotes kindness and equality for students and staff. . . The Board, through Counsel, intends to prepare and file with the court, a motion to dismiss the matter and to eventually dispose of the case."

    b.   The Board indicated through its spokesperson on August 24, 2022 in relevant part as follows: "Attorneys representing Forest Hills School District filed a motion today to dismiss the lawsuit filed in regards to the Board's resolution passed on June 22, 2022. The District and the Board of Education remain committed to pursuing the mission, vision and values of FHSD and maintaining a focus on student learning and achievement. While the District and the Board respect the judicial process, it is their shared belief that this lawsuit should be dismissed. The Plaintiffs lack standing to pursue the claims and have not indicated a claim upon which relief can be granted. Additionally, the Court lacks subject matter jurisdiction. The motion to dismiss is consistent with the Board's legal authority to adopt the Resolution that promotes kindness and equality for students and staff." Ironically, the FHSD "Vision" and "Mission" statement provides in relevant part -- "Our educational programs should address the needs of the total person." . . . "We must maintain a safe and secure learning environment." . . . "All persons deserve respect and acceptance of their individuality and diversity." -- all of which are undermined by the Resolution.

     c.   At the August 2022 regular Board meeting, after again hearing comments from the community pleading for rescission of the Resolution, Defendant Rasmussen made a motion to rescind the Resolution. Her motion did not receive a second and was thus not voted upon, demonstrating the Board Defendants' intention to keep the Resolution in place and continue to enforce it.

97.    There can be no doubt the Resolution is official action of the Board as defined by relevant law, including 42 U.S.C. §1983. The Board takes action on a regular basis by motion and/or resolution, and the Board's directives in this regard are implemented whether they are labelled a "policy" and placed in the Board's "policy book" or not. The foregoing paragraphs in this Amended Complaint demonstrate as much. In addition, at virtually every Board meeting held in 2022, actions were taken by the Board by simple motion and vote.

98.    In addition, during the deposition of Sara Jonas taken in this case, Defendants admitted and stipulated that the Resolution was legislation rather than a mere unenforceable "vision statement" as Defendants have alleged in their Motion to Dismiss. During the deposition of Ms. Jonas, counsel objected and Ms. Jonas refused to answer certain questions about the Resolution on the basis of "legislative privilege," which is applicable only with respect to legislative acts. Counsel for Plaintiffs responded by asking whether Defendants would stipulate that the Resolution was legislation, and Defendants' counsel responded in the affirmative. Defendants cannot simultaneously take the position that the Resolution is merely a vision statement with no meaning or enforceability, and also that it is legislation to which a legislative privilege applies to shield them from answering questions, and Defendants have now admitted and stipulated that the Resolution is indeed legislation passed by the FHSD Board.

99.    Moreover, Defendants have indicated the Resolution is merely an expansion upon or clarification of the existing policies of FHSD, including but not limited to the "controversial issues"

policy contained in po2240. It is thus an amendment and clarification of an existing policy.

100.     Moreover, the Resolution references existing FHSD policies and Ohio Administrative

Code 3301-32-10(A)(24), and the Resolution is official action by the Board to implement those

existing policies of FHSD and the requirements of the OAC. The OAC requires the Board of

Education to implement actions in furtherance of its requirements, including that set forth in OAC

3301-32-10(A)(24) which was referenced in the Resolution.

101.     Alternatively, the Board Defendants violated the Board's own policies and bylaws by

voting upon and passing the Resolution, and the Resolution is void as a result.

102.     The Resolution is subject to strict scrutiny, as set forth below, which it cannot pass.

103.     Defendants' conduct violates clearly establishes constitutional rights of which a reasonable person

would know.

104.     In addition to its Constitutional repugnance, the Resolution violates the mandates of Ohio

law, including but not limited to R.C. §3313.60 which provides in relevant part:

> (A) The board of education of each city, exempted village, and local school
> district and the board of each cooperative education school district
> established, pursuant to section 3311.521 of the Revised Code, shall
> prescribe a curriculum for all schools under its control. Except as provided
> in division (E) of this section, in any such curriculum there shall be included
> the study of the following subjects:
> * * *
> (2) Geography, the history of the United States and of Ohio, and national,
> state, and local government in the United States, *including a balanced
> presentation of the relevant contributions to society of men and women of
> African, Mexican, Puerto Rican, and American Indian descent as well as
> other ethnic and racial groups in Ohio and the United States*;
> (3) Mathematics;
> (4) Natural science, including instruction in the conservation of natural
> resources;
> (5) Health education, which shall include instruction in: . . . (i) Beginning
> with the first day of the next school year that begins at least two years after
> March 24, 2021, in grades six through twelve, at least one hour or one
> standard class period per school year of *evidence-based social inclusion
> instruction*, except that upon written request of the student's parent or
> guardian, a student shall be excused from taking instruction in social
> inclusion.

105.     The Resolution is unconstitutional on its face and in its purpose. It is already having a destructive impact upon residents, parents, students and teachers, including Plaintiffs. Among other things, the Resolution has already impacted curriculum and teaching of students, teachers are denied their right of free expression and academic freedom, and students are deprived of their corresponding right to receive information and ideas. Plaintiffs have suffered concrete and particularized Constitutional injuries caused by Defendants' actions as set forth herein and will imminently suffer additional injuries. There is a credible threat the Resolution will be enforced against teachers, including Plaintiff Sarah Updike, who is at imminent risk of loss of her employment, as well as students including the student Plaintiffs. There is likewise a credible threat that students' Constitutional right to receive information and engage in a robust exchange of ideas will be further severely curtailed. Injunctive and declaratory relief is necessary and will redress Plaintiffs' injuries.

## CLAIMS FOR RELIEF

### COUNT I
### VIOLATION OF FOURTEENTH AMENDMENT – VAGUENESS; 42 U.S.C. §1983

106.     Plaintiffs incorporate the foregoing allegations as if fully restated here.

107.     The Fourteenth Amendment to the U.S. Constitution provides "nor shall any State deprive any person of life, liberty, or property, without due process of law."

108.     Defendants acted under color of state law, and while acting under color of state law, subjected Plaintiffs that deprive them of rights and privileges under the U.S. Constitution, including but not limited to the 1st Amendment and the 14th Amendment.

109.     A law or restriction is void for vagueness if its prohibitions are not clearly defined. Where First Amendment rights are at stake, a strict application of this principle is required. A law is impermissibly vague if it either fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits or authorizes or even encourages arbitrary and

43

discriminatory enforcement.

110. The Resolution is unconstitutionally vague on its face, and is already having a damaging impact upon parents, students and teachers, including Plaintiffs.

111. Among other things, the Resolution fails to provide fair notice of what educators can and cannot include in their courses, and because it invites arbitrary and discriminatory enforcement.

112. Educators, including Plaintiff Updike, are confused, and concerned about what they can teach and the risk of loss of employment.

113. As a result of Defendants' unlawful conduct, Plaintiffs have suffered and will continue to suffer irreparable harm, including violations of their Fourteenth Amendment rights to due process.

## COUNT II
## VIOLATION OF FIRST AMENDMENT – RIGHT TO RECEIVE INFORMATION; 42 U.S.C. §1983

114. Plaintiffs incorporate the foregoing allegations as if fully restated here.

115. The First Amendment protects, among other things, the right to receive information and prohibits actions which limit the spectrum of knowledge available to students.

116. The Resolution violates the First Amendment, as applied by the Fourteenth Amendment, on its face because it prohibits educators from teaching about specific topics, including for example "anti-racism," and it imposes restrictions upon the ideas to which students may be exposed in the FHSD public school system.

117. The prohibitions imposed by the Resolution are not based upon any legitimate pedagogical concerns, but rather based upon Defendants' narrow political and partisan agendas. To the extent the Resolution could be interpreted as having any legitimate pedagogical concerns, it is overbroad because a substantial number of its applications are unconstitutional.

118. The Resolution is overbroad and violates the First Amendment right of the Plaintiffs, particularly the students, to receive information and ideas, on its face and in its purpose, and it is

already having a destructive impact upon parents, students and teachers, including Plaintiffs.

119.    As a result of Defendants' unlawful conduct, Plaintiffs have suffered and will continue to suffer irreparable harm, including violations of their First Amendment rights to receive information and ideas.

<u>**COUNT III**</u>
<u>**VIOLATION OF FIRST AMENDMENT – FREEDOM OF EXPRESSION INCLUDING ACADEMIC FREEDOM; OVERBREADTH; VIEWPOINT-BASED RESTRICTION; 42 U.S.C. §1983**</u>

120.    Plaintiffs incorporate the foregoing allegations as if fully restated here.

121.    The First Amendment protects, among other things, freedom of expression including academic freedom.

122.    The Resolution is overbroad and imposes content and viewpoint-based restrictions, as well as impinges upon academic freedom, both on its face and in its purpose, in violation of Plaintiffs' First Amendment rights, and it is already having a destructive impact upon parents, students and teachers, including Plaintiffs.

123.    The purpose and effect of the Resolution is to ban speech on topics involving race, gender, and identity, among other things, because of certain Defendant Board Members' personal objections to the messages that discussion of such topics may involve.

124.    The Resolution is subject to strict scrutiny and is not narrowly tailored to achieve any compelling interest that may be served by this type of content-based and viewpoint censorship.

125.    As a result of Defendants' unlawful conduct, Plaintiffs have suffered and will continue to suffer irreparable harm, including violations of their First Amendment rights to speech because the Act is overbroad, viewpoint discriminatory, violates Plaintiffs' right to free expression, and infringes on academic freedom.

**COUNT IV**
**VIOLATION OF FOURTEENTH AMENDMENT – RACE-BASED AND**
**DISCRIMINATORY PURPOSE; INVASION OF PARENTAL LIBERTY**
**RIGHTS; 42 U.S.C. §1983**

126.    Plaintiffs incorporate the foregoing allegations as if fully restated here.

127.    The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution provides that: "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

128.    An official action taken for the purpose of discriminating on account of race has no legitimacy under the United States Constitution.

129.    The Resolution is a race-based and race-conscious restriction on its face. It likewise was enacted with a racially discriminatory purpose. The Resolution is already having a damaging impact upon parents, students and teachers, including Plaintiffs.

130.    The Resolution was enacted, at least in part, with the purpose to discriminate against students of color by chilling and suppressing speech aimed at enhancing the educational, social, and civic experiences of students of color and their families. The Resolution explicitly singles out for prohibition concepts related to race, gender identity, and sex. The Act will foreseeably disparately harm students of color and those who identify as LGBTQ+.

131.    The Resolution violates Plaintiffs' Fourteenth Amendment right to Equal Protection on its face and in its purpose.

132.    The Resolution likewise violates the liberty interest and due process rights of parents and teachers in the education of their children and students in violation of the 14th amendment. *See Meyer v. Nebraska,* 262 U.S. 390 (1923).

133.    The Resolution is subject to strict scrutiny and is not narrowly tailored to achieve any compelling interest.

134.    As a result of Defendants' unlawful conduct, Plaintiffs have suffered and will continue to suffer irreparable harm, including violations of their Fourteenth Amendment rights to liberty, due process, and equal protection.

**COUNT V**
**VIOLATION OF EQUAL PROTECTION CLAUSE OF**
**FOURTEENTH AMENDMENT; 42 U.S.C. §1983**

135.    Plaintiffs incorporate the foregoing allegations as if fully restated here.

136.    The Resolution and Defendants actions to enforce it deny Plaintiffs, and specifically the student Plaintiffs, with equal protection of the laws.

137.    Plaintiffs, specifically including the student Plaintiffs, have been denied equal access to ideas, speech, and the benefits, resources, opportunities and facilities of the FHSD public education system as a result of the Resolution.

138.    Plaintiffs are members of suspect classes and are within the classes of persons targeted by the Resolution.  The Resolution and Defendants' actions to enforce it are subject to strict or intermediate scrutiny, which they cannot withstand.

139.    As a result of Defendants' unlawful conduct, Plaintiffs have suffered and will continue to suffer irreparable harm, including violations of their Fourteenth Amendment rights to liberty, due process, and equal protection.

**COUNT VI**
**RELIEF UNDER TITLE VI OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C.**
**2000(d) et seq. ("TITLE VI")**

140.    Plaintiffs incorporate the foregoing allegations as if fully restated here.

141.    Private individuals may sue to enforce Section 601 of Title VI, which provides "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or

activity receiving Federal financial assistance" and may seek injunctive relief." *Alexander v. Sandoval*, 532 U.S. 275, 279–80 (2001).

142.    Section 601 of Title VI prohibits intentional discrimination and racial classifications which violate the Equal Protection Clause.

143.    FHSD receives Federal financial assistance every year distributed through the Ohio Department of Education, making FHSD subject to the prohibition of 42 U.S.C. § 2000(d).

144.    The Resolution of the FHSD Board of Education is race-conscious on its face, constitutes invidious racial discrimination, violates Title VI, and must be enjoined by this Court.

## COUNT VII
## DECLARATORY RELIEF

145.    Plaintiffs incorporate the foregoing allegations as if fully restated here.

146.    The Resolution, and the effect it has upon Plaintiff Parents, their children who are students in FHSD, and Teachers of FHSD present a case of actual controversy under 28 U.S.C § 2201 and Plaintiffs, who are interested parties, seek a declaration from this Court as to the constitutionality and enforceability of the Resolution under the claims made herein and such further relief as is necessary and proper against all Defendants pursuant to 28 U.S.C § 2202.

**WHEREFORE**, Plaintiffs demand relief against Defendants as follows:

A.    A declaration that the Resolution and Defendants' actions are unconstitutional in violation of the First and Fourteenth Amendments to the U.S. Constitution, 42 U.S.C. § 2000(d), and that the Resolution likewise violates Ohio state law as set forth in R.C. §3313.60, and that the Resolution is void and unenforceable;

B.    A temporary, preliminary and permanent injunction which strikes down the Resolution and enjoins Defendants, their employees, agents, and successors in office, from enforcing it or taking further action to enact similar race-based or content-based policies;

C. Costs;

D. Attorneys' Fees; and

E. Any other relief to which Plaintiffs may be entitled.


Dated:  _____   Respectfully submitted,


            *s/*_____

            *s/*_____

            W. Kelly Lundrigan (0059211)
            Nicole M. Lundrigan (0075146)
            LUNDRIGAN LAW GROUP CO,
            LPA
            1080 Nimitzview Drive, Suite 402
            Cincinnati, Ohio 45230
            Phone (513) 813-7610
            klundrigan@lundrigan-law.com
            nlundrigan@lundrigan-law.com
            *Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a copy of the foregoing was filed electronically with the Court's CM/ECF electronic filing services and served upon all parties of record on the _____ day of _____, 2023.

_____