## IN THE UNITED STATES DISTRICT COURT FOR THE
### SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

| | | |
|---|---|---|
| **SARAH UPDIKE, *et al.*** | : | Case No. 1:22-cv-00374 |
| | : | |
| Plaintiffs, | : | Judge Michael R. Barrett |
| | : | |
| v. | : | **PLAINTIFFS' NOTICE OF** |
| | : | **SUPPLEMENTAL AUTHORITY IN** |
| **SARA JONAS, *et al.*** | : | **SUPPORT OF MEMORANDUM IN** |
| | : | **OPPOSITION TO DEFENDANTS** |
| Defendants. | : | **SARA JONAS, LINDA HAUSFELD,** |
| | : | **KATIE STEWART, LARRY HOOK** |
| | : | **AND THE FOREST HILLS SCHOOL** |
| | : | **DISTRICT BOARD OF** |
| | : | **EDUCATION'S MOTION TO** |
| | : | **DISMISS SECOND AMENDED** |
| | : | **COMPLAINT (Doc. #53)** |

Plaintiffs submit this Notice of Supplemental Authority with the decision by the United States District Court for the Southern District of Ohio rendered on 7/28/23 in the case *Parents Defending Education v. Olentangy Local School District Board of Education, et al.,* Case No. 2:23-cv-01595 (Marbley, J.) (attached as Exhibit A). Therein, the Court found the plaintiff association, whose members included parents of students who would be subject to school anti-discrimination policies they sought to challenge, had standing to pursue their First and Fourteenth Amendment claims. Citing, among other cases, the U.S. Supreme Court's decision from last month in *303 Creative LLC v. Elenis*, 143 S. Ct. 2298 (2023) and noting the U.S. Supreme Court assumed standing "where the threat of enforcement relied on a chain of speculative events," *id.* at PAGEID 822, the Southern District of Ohio Court found the plaintiff had standing to make a pre-enforcement challenge because their speech had been chilled and the school district had refused to disavow the policies. *See id.* at PAGEID 820-22.

Dated:   July 30, 2023                    Respectfully submitted,

                                          *s/ Nicole M. Lundrigan*
                                          W. Kelly Lundrigan (0059211)
                                          Nicole M. Lundrigan (0075146)
                                          LUNDRIGAN LAW GROUP CO, LPA
                                          1080 Nimitzview Drive, Suite 402
                                          Cincinnati, Ohio 45230
                                          Phone (513) 813-7610
                                          klundrigan@lundrigan-law.com
                                          nlundrigan@lundrigan-law.com
                                          *Attorneys for Plaintiffs*

## **Certificate of Service**

The undersigned hereby certifies that a copy of the foregoing was filed electronically with the Court's CM/ECF electronic filing services and served upon all parties of record on the 30th day of July, 2023.

                                          *s/ Nicole M. Lundrigan*

Exhibit A

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| PARENTS DEFENDING EDUCATION, | : | |
| | : | |
| Plaintiff, | : | |
| | : | Case No. 2:23-cv-01595 |
| v. | : | |
| | : | Chief Judge Algenon L. Marbley |
| OLENTANGY LOCAL SCHOOL | : | |
| DISTRICT BOARD OF EDUCATION, | : | Magistrate Judge Kimberly A. Jolson |
| *et al.*, | : | |
| | : | |
| Defendants. | : | |

**OPINION & ORDER**

## I.     INTRODUCTION

The Olentangy Local School District ("OLSD" or "the School District") is the fourth largest school district in Ohio, operating sixteen elementary schools, five middle schools, and four high schools for students in southern Delaware and Franklin Counties.  The Board of Education for the School District has issued several policies regarding harassment, bullying, and the use of personal communication devices that are intended to "maintain an education and work environment that is free from all forms of unlawful harassment."  To that end, Policy 5517 prohibits students from engaging in discriminatory harassment or bullying based on the personal characteristics of other students, such as their race, national origin, sex, disability, religion, or ancestry.  Similarly, Policy 5136 prohibits students from using their personal devices to send messages that threaten, humiliate, harass, embarrass, or intimidate other students.  And lastly, the Code of Conduct prohibits speech that involves "discriminatory language," including the intentional misgendering of transgender students—*i.e.*, failing to address a student by their preferred pronouns.

1

Dockets.Justia.com

A number of anonymous students and parents take issue with the rule against intentional misgendering and, more broadly, with the prohibitions against discriminatory or harassing language set forth in Policy 5517, Policy 5136, and the Code of Conduct (collectively, "the Policies"). They argue that the Policies require the students to affirm the idea that gender is fluid, contrary to their deeply-held religious beliefs. Plaintiff Parents Defending Education ("PDE"), an organization to which these students and parents belong, has brought suit against Defendants Olentangy Local School District Board of Education ("the Board"); Mark T. Raiff in his official capacity as Superintendent of OLSD; Peter Stern in his official capacity as OLSD's Assistant Director of Equity and Inclusion; Randy Wright in his official capacity as OLSD's Chief of Administrative Services; and Kevin Darbekow, Brandon Lester, Kevin O'Brien, Libby Wallick, and Lakesha Wyse in their official capacities as members of the Board (collectively, "Defendants"). PDE asks this Court to declare OLSD's speech policies unconstitutional in violation of the First and Fourteenth Amendments. (*See generally* Compl., ECF No. 1).

Now before this Court is PDE's Motion for Preliminary Injunction (ECF No. 7). Upon consideration of the parties' briefs and the arguments presented at the Fed. R. Civ. P. 65 hearing held on July 24, 2023, this Court **DENIES** the motion because PDE has failed to establish a substantial likelihood of success on its First Amendment claim.

While schoolchildren do not wholly "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate," *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969), kindergarten through 12th grade ("K-12") educators nevertheless retain "comprehensive authority . . . consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools." *Id.* at 507 (citing *Epperson v. Arkansas*, 393 U.S. 97, 104 (1968); *Meyer v. Nebraska*, 262 U.S. 390, 402 (1923)). Thus, public schools are permitted to

2

proscribe student speech that "materially disrupts classwork or involves substantial disorder or invasion of the rights of others." *Id.* at 513 (citing *Blackwell v. Issaquena Cnty. Bd. of Educ.*, 363 F.2d 749 (5th Cir. 1966)).

The challenged speech policies fit squarely within this carve-out to schoolchildren's First Amendment rights: they prohibit only speech that gives rise to fears of physical or psychological harm, materially affect student performance, substantially disrupt the operation of the school, or create a hostile educational environment. Ultimately, transgender youth are far too often subject to harassment and bullying in public schools. They are threatened or physically injured in schools at a rate four times higher than other students. They are harassed verbally at extraordinarily high rates. More than one in five attempt suicide. *See* Michelle M. Johns et al., *Transgender Identity and Experiences of Violence Victimization, Substance Use, Suicide Risk, and Sexual Risk Behaviors Among High School Students — 19 States and Large Urban School Districts, 2017*, 68 MORBIDITY AND MORTALITY WEEKLY REP. 67 (2019). Allowing speech that creates a hostile environment for transgender students can have devastating consequences—reinforcing feelings of isolation and inferiority, imposing substantial psychological injuries that result in decreased school attendance and performance, and heightening the risk of serious physical harm. *See id.*; L.M. Bogart et al., *Peer victimization in fifth grade and health in tenth grade*, 133 PEDIATRICS 440 (2014). School policies intended to reduce the pervasive harassment of transgender students, in other words, advance public schools' mission of ensuring that all students have an opportunity to learn and grow in an environment "most conducive to speculation, experiment and creation." *Sweezy v. New Hampshire*, 354 U.S. 234, 263 (1957) (Frankfurter, J., concurring).

Nor do the likely merits of the Fourteenth Amendment claim favor PDE. The fundamental right of parents to direct the care, upbringing, and education of their children does not encompass a right "generally to direct *how* a public school teaches their child" or how the school disciplines their child. *Blau v. Fort Thomas Pub. Sch. Dist.*, 401 F.3d 381, 395 (6th Cir. 2005) (emphasis in original). This Court, mindful that "[b]y and large, public education in our Nation is committed to the control of state and local authorities," *Goss v. Lopez*, 419 U.S. 565, 578 (1976) (citation omitted), declines PDE's invitation to second-guess Defendants' efforts to combat harassment in the Olentangy Local School District.

## II.   BACKGROUND

The underlying facts of this case are largely undisputed. *See also Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981) ("[F]indings of fact and conclusions of law made by a court granting [or denying] a preliminary injunction are not binding at trial on the merits." (citations omitted)).

### A.   The Challenged Policies

At issue are three of the School District's policies governing student conduct and speech: Policy 5517; Policy 5136; and the Code of Conduct. This Court sets out the relevant provisions of the Policies in full.

Policy 5517. The "anti-harassment" policy, which was first adopted in May 2011 and most recently revised on April 10, 2023, prohibits harassment "based on race, color, national origin, sex (including sexual orientation and gender identity), disability, age (except as authorized by law), religion, ancestry, or genetic information (collectively, 'Protected Classes') that are protected by Federal civil rights law." (Pl.'s Ex. A at 1, ECF No. 7-1). The policy defines harassment as:

4

[A]ny threatening, insulting, or dehumanizing gesture, use of technology, or written, verbal, or physical conduct directed against a student or school employee that:

A. places a student or school employee in reasonable fear of harm to his/her person or damage to his/her property;

B. has the effect of substantially interfering with a student's educational performance, opportunities, or benefits, or an employee's work performance; or

C. has the effect of substantially disrupting the orderly operation of a school.

(*Id.* at 2–3). The purpose of this policy is "to maintain an education and work environment that is free from all forms of unlawful harassment." (*Id.* at 1).

The policy also includes a provision prohibiting bullying. The provision defines bullying as "any unwanted and repeated written, verbal, or physical behavior, including any threatening, insulting, or dehumanizing gesture, by an adult or student, that is severe or pervasive enough to create an intimidating, hostile, or offensive educational or work environment; cause discomfort or humiliation; or unreasonably interfere with the individual's school or work performance or participation." (*Id.* at 2). It then explains that "[b]ullying rises to the level of unlawful harassment when one (1) or more persons systematically and chronically inflict physical or psychological distress on one (1) or more students or employees and that bullying is based upon one (1) or more Protected Classes, that is, characteristics that are protected by Federal civil rights laws." (*Id.*).

Policy 5136. OLSD also maintains a policy on students' use of personal communication devices ("PCDs"), such as cellphones, laptops, and tablets on- and off-campus. Among other requirements, students are prohibited from using a PCD:

In any way that might reasonably create in the mind of another person an impression of being threatened, humiliated, harassed, embarrassed or intimidated. In particular, students are prohibited from using PCDs to . . . transmit material that is threatening, obscene, disruptive, or sexually explicit or that can be

5

construed as harassment or disparagement of others based upon their race, color, national origin, sex (including sexual orientation/transgender identity), disability, age, religion, ancestry, or political beliefs.

(Pl.'s Ex. B at 2, ECF No. 7-1).

Code of Conduct. There are two provisions of the Code of Conduct, set out in the OLSD 2022–23 High School Student Handbook, that are at issue in this case. First, the Code includes a section on "Hazing, Harassment, Intimidation, Bullying, and Sexual Harassment," in which a single definition is set out for harassment, intimidation, and bullying:

Any intentional written, verbal, electronic, or physical act that a student has exhibited toward another particular student or students more than once and the behavior causes mental or physical harm to the other student(s) and is sufficiently severe, persistent or pervasive that it creates an intimidating, threatening or abusive educational environment for the other student(s).

(*Id.* at 16–17). A separate provision of the Code of Conduct prohibits the use of obscene or discriminatory language, with discriminatory language "defined as verbal or written comments, jokes, and slurs that are derogatory towards an individual or group based on one or more of the following characteristics: race, color, national origin, sex (including sexual orientation and transgender identity), disability, age, religion, ancestry, or genetic information." (*Id.* at 9).

These provisions are "in effect while students are under the authority of school personnel or involved in any school activity"—*i.e.*, not just when they are at school, but also when they are riding school buses or participating in off-campus "interscholastic competitions, extracurricular events, or other school activities or programs." (*Id.* at 8). They extend to "[m]isconduct by a student that occurs off school district property but is connected to activities or incidents that have occurred on school district property" or is "directed at a district official or employee." (*Id.*).

The Policies reflect the School District's efforts to combat discrimination in its schools and are patterned on federal anti-discrimination laws. They were modified in 2013 to include

6

provisions prohibiting discrimination based on gender identity (in addition to other personal identity characteristics already included).  Since then, however, the Policies have never been enforced to punish a student for speech directed at or about transgender students.  As of May 3, 2023, there were approximately 50 transgender students currently enrolled in Olentangy schools, out of 23,640 total.  *See Olentangy Schools Enrollment Report – May 3, 2023*, OLENTANGY LOC. SCH. DIST., https://perma.cc/HJ5Q-4QYA.

**B.  The Anonymous Parent's Concern**

In February 2023, a parent emailed OLSD officials raising a concern that their child could be disciplined pursuant to the Policies for referring to a fellow student using pronouns different from what that student prefers.  The parent asked:

> If my devoutly Christian child who believes in two biological genders male/female and that those genders are decided at conception by God, would they be forced to use the pronouns that a transgender child identifies with or be subject to reprimand from the district if they refuse to do so?

(Pl.'s Ex. S, ECF No. 7-2 at 13).  The parent was informed by the School District's counsel that "[w]hile [the] children certainly [may] maintain religious rights of freedom at school, those rights do not relieve them of the obligation to comply" with school policies.  (*Id.*).  As such, "[a] student purposefully referring to another student by using gendered language they know is contrary to the other student's identity would be an example of discrimination under Board Policy." (*Id.*).  When the parent sought further clarification on the scope of the policies, asking if their child would be disciplined for expressing the "religious beliefs that marriage is between a man and a woman OR that homosexuality is a sin," the School District noted that students would not be disciplined for their religious beliefs.  (*Id.*).  Thus, with respect to the parent's initial

7

question about pronouns, a student would be permitted to seek accommodations and "avoid using pronouns where doing so would be contrary to [their] religious beliefs." (*Id.*).

**C.    Procedural Background**

PDE, a nationwide membership organization whose members include students enrolled in the School District and parents whose children attend OLSD schools, filed suit in this Court on May 11, 2023.  That same day, PDE requested a preliminary injunction, relying on declarations from four pseudonymous parents, each of whom represents that their child or children is enrolled in an Olentangy school and has sincerely-held religious or scientific beliefs that biological sex is immutable and that individuals cannot transition from one sex to another.  (Mot. for PI, ECF No. 7; *see, e.g.*, Decl. of Parent A ¶¶ 4, 8, ECF No. 7-3).  The parents further explain that their children "wish[] to use pronouns that are consistent with a classmate's biological sex, rather than the classmate's 'preferred pronouns'" as an expression of "their deeply held views," but refrain from doing so out of self-censorship.  (*See, e.g.*, Decl. of Parent A ¶¶ 11, 13–14, ECF No. 7-3).

**III.    STANDARD OF REVIEW**

In assessing the need for a preliminary injunction, this Court considers whether the plaintiff has established that "he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of the equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (citations omitted).  To establish a strong likelihood of success, the plaintiff need not "establish his right to an injunction wholly without doubt," *Stenberg v. Cheker Oil Co.*, 573 F.2d 921, 924 (6th Cir. 1978) (internal quotation marks and citation omitted), nor "prove his case in full." *Certified Restoration Dry Cleaning Network, LLC v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007) (quoting *Camenisch*, 451 U.S. at 395).  The "strong likelihood" standard

8

"requires a showing greater than the one necessary to create a genuine issue of fact, but less than the one necessary to show a preponderance." *Clark v. A&L Homecare and Training Ctr.*, 68 F.4th 1003, 1011 (6th Cir. 2023).

While a strong likelihood of success on the merits is considered crucial at the preliminary injunction stage, the factors are generally to be balanced rather than treated as prerequisites. *McPherson v. Mich. High Sch. Athletic Ass'n, Inc.*, 119 F.3d 453, 459 (6th Cir. 1997); *see also Six Clinics Holding Corp., II v. Cafcomp Sys., Inc.*, 119 F.3d 393, 400 (6th Cir. 1997) (noting that "[n]o single factor will be determinative as to the appropriateness of equitable relief" (citation omitted)). But "[w]hen a party seeks a preliminary injunction on the basis of a potential constitutional violation, 'the likelihood of success on the merits often will be the determinative factor.'" *City of Pontiac Retired Emps. Ass'n v. Schimmel*, 751 F.3d 427, 430 (6th Cir. 2014) (en banc) (quoting *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012)). This is especially true in the First Amendment context. *See Fischer v. Thomas*, 52 F.4th 303, 307 (6th Cir. 2022).

Ultimately, a preliminary injunction is considered an "extraordinary remedy," intended "to maintain the status quo pending determination of an action on its merits." *Blaylock v. Cheker Oil Co.*, 547 F.2d 962, 965 (6th Cir. 1976) (citations omitted).

## IV. LAW & ANALYSIS

PDE asserts that it is likely to succeed on the merits because the Policies unconstitutionally compel speech, are impermissible viewpoint- and content-based restrictions on speech, and are overbroad. It suggests that the remaining preliminary injunction factors favor it as well. Defendants, on the other hand, argue that PDE lacks standing to challenge the Policies in the first instance and maintain that the Policies are permissible regulations, which do not

compel speech, are not content- or viewpoint-based, are not overbroad, and do not deprive parents of any fundamental rights.

### A.    Likelihood of Success on the Merits

#### 1.    Standing

Article III of the Constitution imposes strict limits on the jurisdiction of federal courts. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 559–60 (1992). The "case-or-controversy" requirement of Article III requires all plaintiffs bringing suit in federal court to first establish standing, *i.e.*, to show that they have suffered "(1) an injury in fact that is (2) fairly traceable to the defendant's conduct and (3) likely to be redressed by a favorable judicial decision." *Memphis A. Philip Randolph Inst. v. Hargett*, 2 F.4th 548, 555 (6th Cir. 2021) (citing *Lujan*, 504 U.S. at 560–61). At the preliminary injunction stage, a plaintiff need not establish standing beyond doubt, but merely a substantial likelihood that she will be able to do so. *See id.* at 557; *Waskul v. Washtenaw Cnty. Cmty. Mental Health*, 900 F.3d 250, 256 n.4 (6th Cir. 2018).

When an organization brings suit, it may establish standing on its own or associational standing on behalf of its members. *See Ne. Ohio Coal. for the Homeless v. Husted*, 837 F.3d 612, 624 (6th Cir. 2016). Associational standing exists "when [the] members [of the organization] would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Env't Servs., Inc.*, 528 U.S. 167, 181 (2000) (citing *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)).

In effect, Defendants assert, for two and a half reasons, that PDE cannot establish associational standing because its members do not have standing to sue in their own right.[1] Defendants first argue that PDE's members have not suffered an injury in fact, because none of the students whose parents have filed declarations has been disciplined for violating any of the Policies. (*See generally* OLSD Resp. in Opp'n at 5–6, ECF No. 13). They also argue that this litigation, even if successful, would not provide a remedy that suitably redresses the alleged harm, because the Policies are compelled by Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681–88. (*See id.* at 6–8). And, in a footnote, Defendants suggest that this Court lacks jurisdiction over anonymous or pseudonymous parties, and thus over this case. (*Id.* at 6 n.1). But for the reasons that follow, this Court rejects Defendants' contentions and finds that PDE has sufficiently established standing at this preliminary stage.

*First*, Defendants' injury in fact argument appears to ignore the possibility of pre-enforcement challenges. They conclude that, because "students of Parents A-D *self-censor* out of a purported concern of disciplinary action" and thus have not yet been subject to disciplinary action, "there has been no injury to PDE vis-à-vis Parents A-D with respect to their children." (*Id.* at 6) (emphasis in original). But plaintiffs need not wait to be punished or prosecuted to bring a facial challenge, especially where they have refrained from engaging in certain conduct for fear of punishment. *See G&V Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1076 (6th Cir. 1994) ("It is well-settled that a chilling effect on one's constitutional rights constitutes a present injury in fact." (collecting cases)). Instead, in the First Amendment context, plaintiffs can bring a pre-enforcement challenge if: "(1) they intend to engage in expression that

---

[1] Defendants do not suggest that PDE's claims are not germane to its mission or that this action requires the participation of individual members, and nothing in the record suggests that PDE has not met those requirements of associational standing. *See Sandusky Cnty. Democratic Party v. Blackwell*, 387 F.3d 565, 574 (6th Cir. 2004).

the Free Speech Clause arguably protects, (2) their expression is arguably proscribed by the challenged [rules], and (3) they face a credible threat of enforcement from those [r]ules." *Fischer*, 52 F.4th at 307 (citing *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159, 162 (2014)).

All three elements have been established here. As the declarations provided by PDE show,[2] the children of Parents A-D wish to engage in speech that the Free Speech Clause arguably protects. (*See, e.g.*, Decl. of Parent A ¶ 10, ECF No. 7-3). The School District has indicated that, unless the students seek religious accommodations, misgendering students will be considered to have engaged in discriminatory speech in violation of the Policies, which the School District claims to "vigorously enforce." (Pl.'s Ex. A at 1, ECF No. 7-1; *see* Pl.'s Ex. S, ECF No. 7-2 at 13). And, as to a credible threat of enforcement, "the first and most important factor is whether the challenged action chills speech," *Fischer*, 52 F.4th at 307 (citing *McKay v. Federspiel*, 823 F.3d 862, 869 (6th Cir. 2016)), which Defendants do not deny has occurred. (*See* OLSD Resp. in Opp'n at 6, ECF No. 13). Moreover, the School District's refusal to disavow enforcement of the Policies lends further support to the proposition that there is a credible threat of enforcement. *See Kiser v. Reitz*, 765 F.3d 601, 608–09 (6th Cir. 2014); *Platt v. Bd. of Comm'rs on Grievances & Discipline of the Ohio Supreme Ct.*, 769 F.3d 447, 452 (6th Cir. 2014).

In short, PDE has sufficiently alleged that its members have suffered an injury in fact— its members have alleged "subjective chill" in addition to "some other indication of imminent enforcement." *McKay*, 823 F.3d at 869 (citation omitted); *cf. Morrison v. Bd. of Educ. of Boyd*

---

[2] Note also that PDE's "pseudonymity" attack, which argues that "federal courts lack jurisdiction over [] unnamed parties," is misplaced. (*See generally* OLSD Resp. in Opp'n at 6 n.1, ECF No. 13) (quoting *Citizens for a Strong Ohio v. Marsh*, 123 F. App'x 630, 637 (6th Cir. 2005)). While PDE has submitted declarations of pseudonymous parents, there is no obfuscation of identity here: PDE itself is the plaintiff.

*Cnty.*, 521 F.3d 602, 617 (6th Cir. 2008) (Moore, J., dissenting) (noting that other "circuits have held . . . that a chill on an individual's ability to exercise his or her right to free speech is a constitutional injury-in-fact" even without a credible threat of enforcement); *303 Creative LLC v. Elenis*, 143 S. Ct. 2298 (2023) (assuming standing where the threat of enforcement relied on a chain of speculative events).

*Second*, a plaintiff might lack standing if the injury in fact she has suffered is not redressable. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 106–09 (1998). Here, Defendants suggest that the Policies are compelled by federal antidiscrimination laws, in particular Title IX,[3] such that a decision from this Court in favor of PDE would not absolve Defendants of their obligations under Title IX to protect transgender students from discrimination and harassment on the basis of sex.

Title IX holds that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance" (subject to certain exceptions). 20 U.S.C. § 1681. Whether this prohibition against discrimination "on the basis of sex" covers discrimination on the basis of "gender identity" has not been squarely addressed by the Sixth Circuit. *See Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318, 324 (6th Cir. 2021) (noting only that *Bostock*'s modification to the "but-for causation" test "extends no further than Title VII and does not stretch to the ADEA); *Dodds v. U.S. Dep't of Educ.*, 845 F.3d 217, 221 (6th Cir. 2016) (suggesting that Title IX may prohibit discrimination on the basis of gender non-

---

[3] As Defendants acknowledge, the School District is not currently bound to implement the "Dear Educator" letter issued by the U.S. Department of Education ("DOE"), which advised schools that "Title IX's protection against sex discrimination encompasses discrimination based on sexual orientation and gender identity." *See generally Tennessee v. U.S. Dep't of Educ.*, 615 F. Supp. 3d 807 (E.D. Tenn. 2022); *see also* Enforcement of Title IX of the Educational Amendments of 1972 With Respect to Discrimination on Sexual Orientation and Gender Identity in Light of *Bostock v. Clayton County*, 86 Fed. Reg. 32637 (June 22, 2021).

conforming behavior while denying a school district's motion to stay a preliminary injunction imposed by this Court).

Other circuits have divided on this question following the Supreme Court's 2020 decision in *Bostock v. Clayton County*, which held that discrimination on account of gender identity violates Title VII's prohibition against discrimination "because of" an individual's sex. 140 S. Ct. 1731 (2020). Noting that "Congress modeled Title IX after Title VI," the Fourth Circuit has extended the *Bostock* interpretation of "on the basis of sex" to the Title IX context. *See Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 616 (4th Cir. 2020) ("Although *Bostock* interprets Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2(a)(1), it guides our evaluation of claims under Title IX." (citations omitted)). Thus, according to *Grimm*, a policy allowing for discrimination on the basis of a student's transgender identity would violate Title IX. On the other hand, the Eleventh Circuit arrived at the opposite conclusion when confronted with the same question: in *Adams ex rel. Kasper v. School Board of St. Johns County*, it held that the interpretation of the word "sex" set forth in *Bostock* does not apply to Title IX. *See* 57 F.4th 791, 811–14 (11th Cir. 2022) (en banc).

This Court is persuaded that the interpretation of "on the basis of sex" in *Bostock* does extend to the Title IX context. In the first instance, the fact that Title IX was "patterned after" the Civil Rights Act of 1964 strongly favors interpreting it the same way. *Cannon v. Univ. of Chi.*, 441 U.S. 677, 694 (1979); *see also Grimm*, 972 F.3d at 616. The Eleventh Circuit's decision in *Adams ex rel. Kasper* leaned heavily on its narrow definition of "sex" as "biological sex, i.e., discrimination between males and females." 57 F.4th at 812 (citations omitted). But, as dissents from Judges Wilson and Pryor pointed out, biological sex is not quite as binary as that definition presumes. Instead, the concept of "biological sex" encompasses a multitude of

14

biological components (including gender identity) that often diverge in the same individual; for any given person, some of their biological markers may align with maleness while other markers align with femaleness. *See id.* at 856–57 (Pryor, J., dissenting); *id.* at 821–23 (Wilson, J., dissenting) (discussing intersex individuals); *see also* Jennifer Levi & Kevin Barry, *"Made to Feel Broken": Ending Conversion Practices and Saving Transgender Lives*, 136 HARV. L. REV. 1112, 1117 (2023) (reviewing FLORENCE ASHLEY, BANNING TRANSGENDER CONVERSION PRACTICES: A LEGAL AND POLICY ANALYSIS (2022)). Sometimes, that divergence manifests in obvious physical ways: for example, in intersex individuals whose "reproductive or sexual anatomy [do not] fit into an exclusively male or female (binary) sex classification." *Intersex*, CLEVELAND CLINIC, https://perma.cc/FZW3-4G8C. In others, the divergence in their biological components is still physical, but in less obvious or outwardly apparent ways. *See, e.g.*, F.P. Kruijver et al., *Male-to-female transsexuals have female neuron numbers in a limbic nucleus*, 85 J. CLINICAL ENDOCRINOLOGY & METABOLISM 2034 (2000) (finding that the neuron numbers of female-to-male transsexual individuals was found to be in the male range, and vice versa for male-to-female transsexuals). Simply put, it is not so simple to define "biological sex" as just male or female. Similarly, it is not so straightforward to identify sex discrimination by reference only to an individual's reproductive organs at birth. Rather, the full scope of discrimination on the basis of "sex" must encompass discrimination on the basis of all the biological markers that comprise an individual's "biological sex"—including *inter alia* their organs, their chromosomes, their hormones, and their gender identity.

Nevertheless, this Court acknowledges that there is some uncertainty as to that conclusion, especially in the absence of binding precedent from the Sixth Circuit. More fundamentally, PDE has challenged the Policies on First Amendment grounds. If PDE is correct

on the merits, then its injury *must* be redressable.  Federal statutes must give way to the federal Constitution; an unconstitutional action cannot stand simply because it is authorized by a federal law.  *Cf. Hollis v. Lunch*, 827 F.3d 436, 441–42 (5th Cir. 2016).  Thus, if the Policies violate the First or Fourteenth Amendments, then they must be enjoined even if the School District is compelled by Title IX to combat harassment on the basis of gender identity.

This Court therefore concludes that there is a substantial likelihood that PDE can establish Article III standing, as the Policies have had a chilling effect accompanied by a credible threat of enforcement—an injury in fact that can be redressed by a decision from this Court.  Next, this Court turns to whether PDE has shown a substantial likelihood of success on the merits of its First and Fourteenth Amendment claims.

2. *First Amendment*

In *Tinker*, the Supreme Court announced the lofty principle that students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate."  393 U.S. at 506.  These rights—established in the First Amendment and made applicable to the states through the Fourteenth Amendment—encompass both "the right to speak freely and the right to refrain from speaking at all."  *Wooley v. Maynard*, 430 U.S. 705, 714 (1977) (citation omitted).  But they are not unlimited.  For while the First Amendment is not a nullity in public schools, *but see Mahanoy Area Sch. Dist. v. B.L. ex rel. Levy*, 141 S. Ct. 2038, 2059–61 (2021) (Thomas, J., dissenting) (observing that public schools retained "near plenary" authority to discipline students during the era when the Fourteenth Amendment was ratified), K-12 students enjoy a less robust set of free-speech rights "in light of the special characteristics of the school environment."  *Tinker*, 393 U.S. at 506; *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 682 (1986) (noting

16

that the First Amendment rights of school children "are not automatically coextensive with the rights of adults in other settings").

As such, "[t]he Supreme Court has outlined four categories of student speech that schools may regulate: (1) indecent, offensively lewd, or vulgar speech uttered during a school assembly on school grounds; (2) speech during school or at a school-sponsored event that schools 'reasonably regard as promoting illegal drug use'; (3) 'speech in school-sponsored expressive activities' if the schools' 'actions are reasonably related to legitimate pedagogical concerns'; and (4) on-campus and some off-campus speech that 'materially disrupts classwork or involves substantial disorder or invasions of the rights of others.'" *Kutchinski ex rel. H.K. v. Freeland Cmty. Sch. Dist.*, 69 F.4th 350, 356–57 (6th Cir. 2023) (internal citations omitted). Because the Policies reach speech that is not lewd, does not involve illegal drug use, and is not school-sponsored, they implicate primarily the fourth category.

This Court briefly reviews the caselaw governing this category of restrictions on a student's right to freedom of expression while in school. In *Tinker*, a group of students were suspended from school for wearing black armbands to protest the Vietnam War. This punishment was deemed unconstitutional because the high school had presented "no evidence whatever of [the students'] interference, actual or nascent, with the school's work or of collision with the rights of other students to be secure and left alone." *Tinker*, 393 U.S. at 508. And because the speech did not disrupt school or clash with the rights of other students, and instead implicated only an "undifferentiated fear or apprehension of disturbance," *id.*, the school could not regulate or punish the speech. Since then, *Tinker* has been understood to allow schools to regulate and punish speech that causes a substantial disruption or invades the rights of others.

17

The potential for racial tension, even without violence, is a common example of what courts have deemed a "substantial disruption." *See, e.g.*, *Barr v. Lafon*, 538 F.3d 554, 565–66 (6th Cir. 2008). Likewise, speech that would interfere with students' educational performance has also been understood to be a substantial disruption. *See Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 217 (3rd Cir. 2001). After all, "[t]he primary function of a public school is to educate its students; conduct that substantially interferes with the mission is, almost by definition, disruptive to the school environment." *Id.* Much less litigated or discussed is the second prong of *Tinker*, which allows for the regulation of speech if it invades the rights of others. Very few courts have analyzed the scope of this language, *see Harper ex rel. Harper v. Poway Unified Sch. Dist.*, 445 F.3d 1166, 1177–83 (9th Cir. 2006), *vacated as moot by*, 549 U.S. 1262 (2007), which is generally still viewed as "unclear." *Saxe*, 240 F.3d at 217.

A school need not wait for evidence of disruption caused by the speech at issue to act. Doing so "would place 'school officials . . . between the proverbial rock and hard place: either they allow disruption to occur, or they are guilty of a constitutional violation.'" *Barr*, 538 F.3d at 565 (quoting *Lowery v. Euverard*, 497 F.3d 591, 596 (6th Cir. 2007)); *see also D.B. ex rel. Brogdon v. Lafon*, 217 F. App'x 518, 525 (6th Cir. 2007) (per curiam). Instead, the Sixth Circuit has explained that a school speech restriction may be justified where a school has "reasonably forecast that the [prohibited speech] 'would cause material and substantial disruption to schoolwork and school discipline.'" *Kutchinski*, 69 F.4th at 359 (quoting *Barr*, 538 F.3d at 565).

*Tinker* applies to speech restrictions both on- and off-campus, though the authority of public schools to restrict students' speech off-campus is far more limited. *See Mahanoy Area Sch. Dist. v. B.L. ex rel. Levy*, 141 S. Ct. 2038 (2021). But the precise scope of schools' off-campus authority has not yet been delineated. *Mahanoy* did "not [] set forth a broad, highly

18

general First Amendment rule stating just what counts as 'off campus' speech and whether or how ordinary First Amendment standards must give way off campus to a school's special need to prevent, *e.g.*, substantial disruption of learning-related activities or the protection of those who make up a school community." *Id.* at 2045. It did make clear, however, that a school's interest in regulating off-campus speech is at its nadir when the speech does "not identify the school . . . or target any member of the school community with vulgar or abusive language," *id.* at 2047; *see also id.* at 2055 (Alito, J., concurring) (noting that "student speech that is not expressly and specifically directed at the school, school administrators, teachers, or fellow students and that addresses matters of public concern . . . is almost always beyond the regulatory authority of a public school"), or does not "take[] place during or as part of what amounts to a temporal or spatial extension of the regular school program." *Id.* at 2054 (Alito, J., concurring).

a.   <em>The School District's Policies</em>

Having sketched out the scope of *Tinker* and its progeny, this Court now unpacks what the Policies prohibit, reading them in light of ordinary principles of interpretation. *Cf. Broadrick v. Oklahoma*, 413 U.S. 601, 617 n.16 (1973) ("[A] federal court must determine what a state statute means before it can judge its facial unconstitutionality.").

Viewing the Policies as a whole, it is apparent that they do not prohibit all discriminatory speech (*i.e.*, speech that is based on some personal characteristic), but only a subset. Under the Policies, there are, broadly speaking, five categories of prohibited speech. *First*, the Policies prohibit discriminatory speech that creates a threat of physical harm or violence to another student. (*See, e.g.*, Pl.'s Ex. A at 2, 3, ECF No. 7-1) (defining unlawful harassment as speech that "places a student . . . in reasonable fear of harm to his/her person"). *Second*, the Policies prohibit speech that "has the effect of substantially interfering with a student's educational

performance, opportunities, or benefits." (*Id.*). *Third*, they prohibit discriminatory speech that "has the effect of substantially disrupting the orderly operation of the school." (*See, e.g.*, *id.*; Pl.'s Ex. B at 2, ECF No. 7-1). *Fourth*, they proscribe repeated and persistent speech that creates a hostile (*i.e.*, "intimidating, threatening or abusive") learning environment for students. (Pl.'s Ex. A at 2, ECF No. 7-1; Pl.'s Ex. D at 16, ECF No. 7-1). And *fifth*, they proscribe the use of derogatory language on the basis of an individual's identity, including the intentional misgendering of transgender students. (Pl.'s Ex. D at 9, ECF No. 7-1; *see* Pl.'s Ex. S, ECF No. 7-2).

The first three of these categories fit neatly within the ambit of the first prong of *Tinker*. They proscribe only speech that creates a threat of physical harm, substantial interference with student performance, or substantial disruption to the operation of the school. This is precisely what *Tinker* allows: restrictions on speech that cause substantial disruption to the school or its mission to educate children and keep them safe from physical harm. *See Saxe*, 240 F.3d at 217; *see also Morse v. Frederick*, 551 U.S. 393, 425 (2007) (Alito, J., concurring) ("But due to the special features of the school environment, school officials must have greater authority to intervene before speech leads to violence.").

The fourth and fifth categories pose a closer call. It is an unsettled question whether a hostile environment—created by harassing language, bullying behavior, or discriminatory comments—is enough to constitute a substantial disruption on its own. *See also Harper*, 445 F.3d at 1198 (Kozinski, J., dissenting) (noting that "much of what harassment law seeks to prohibit, the First Amendment seems to protect" (citation omitted)). In *Saxe*, for example, then-Judge Alito found that the school's anti-harassment policy was overbroad because "the Policy's 'hostile environment' prong does not, on its face, require any threshold showing of severity or

20

pervasiveness." *Saxe*, 240 F.3d at 117. But the presumption that a hostile environment provides cause for concern only where it is "severe and pervasive" is unfounded. It appears to draw from the standard established by the Supreme Court for when "a public school student may bring suit against a school under Title IX for so-called 'hostile environment' harassment." *Id.* at 205 (citing *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629 (1999); *Franklin v. Gwinnett Cnty. Pub. Schs.*, 503 U.S. 60, 74–75 (1992)). Title IX, according to *Davis*, authorizes private damages actions against public school boards for student-on-student harassment where the board has acted with indifference to known harassment "that is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school." *Davis*, 526 U.S. at 650.

It does not follow, however, that the same high standard for when a school board can be held liable for failing to prevent student-on-student harassment should also dictate when a school may institute policies to restrict such harassment. Consider the categories of speech that schools can regulate, and the reasons why. The Supreme Court has permitted restrictions on lewd speech, for example, in deference to "the social interest in order and morality," *Fraser*, 478 U.S. at 684 (quoting *FCC v. Pacifica Found.*, 438 U.S. 726, 746 (1978)), and to the school's vital role in inculcating "fundamental values of 'habits and manners of civility' essential to a democratic society." *Id.* at 681; *see also Hazelwood School Dist. v. Kuhlmeier*, 484 U.S. 260, 272 (1988) (noting public schools' role "as 'a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment'" (quoting *Brown v. Bd. of Educ.*, 347 U.S. 483, 493 (1954))). Speech promoting drug use can also be punished, in light of the "'important—indeed, perhaps compelling' interest" in protecting students against the "physical, psychological, and addictive effects of drugs."

21

*Morse*, 551 U.S. at 407 (quoting *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 661 (1995)). There was no suggestion that the schools in these cases would have been exposed to liability for failing to promote the habits and manners of civility, to awaken students to cultural values, or to protect students from addiction, yet each restriction on speech was nevertheless permitted.

From these examples, it becomes clear that, in many circumstances, schools are allowed to restrict student speech even where a failure to do so would not expose the school to liability. It follows, therefore, that a school's restriction on speech that creates a hostile environment need not be tied to the *Davis* standard for Title IX liability—*i.e.*, "so severe, pervasive, and objectively offensive"—to meet the substantial disruption requirement of *Tinker*.

In fact, this Court concludes that a hostile environment created by discriminatory speech is enough to cause a substantial disruption on its own. A core component of a public school's mission is to educate children; its mission is also to safeguard the wellbeing of its students. This, of course, does not mean that a public school must prevent every "simple act[] of teasing and name-calling among school children." *Davis*, 526 U.S. at 652. But a hostile environment is more than just teasing and name-calling, and the negative effects of a hostile environment extend beyond merely taking offense. This is especially true where the hostile environment is created by comments, slurs, and jokes rooted in an individual's identity and in their personal characteristics, like their race, ethnicity, gender, sexual orientation, or religious or political beliefs. Identity-based comments cut to the core of who we are as individuals and belittle our sense of place in society—especially, though not exclusively, for individuals who are members of minority groups that have been historically oppressed. Such language serves to reinforce and re-emphasize "a feeling of inferiority as to [an individual's] status in the community that may affect their hearts and minds in a way unlikely ever to be undone." *Brown*, 347 U.S. at 494;

22

*Obergefell v. Hodges*, 576 U.S. 644, 675 (2015); *cf.* Charles R. Lawrence III, *Crossburning and the Sound of Silence: Antisubordination Theory and the First Amendment*, 37 VILL. L. REV. 787, 792–94 (1992).

Discriminatory language has been shown to have significant effects on schoolchildren, including, as relevant to this case, transgender students. The status hierarchies and sense of inferiority reinforced by these comments can severely hamper students' ability to learn effectively and even inhibit their willingness to attend school in the first place, *see Harper*, 445 F.3d at 1179 (discussing literature on the negative effects of "violence and verbal and physical abuse at school" on the school performance, including academic achievement and attendance, of LGBTQ youth), especially in light of the long history of stigmatization and erasure of transgender individuals. *See* Levy & Barry, *supra*, at 1129 (noting that the history of conversion practices reflects a long-standing depiction of "transgender identity as pathological and something to be eradicated"); *cf.* Andrew R. Flores et al., *Gender Identity Disparities in Criminal Victimization: National Crime Victimization Survey, 2017–2018*, 111 AM. J. PUB. HEALTH 726, 727 & fig.1 (2021) (finding that transgender adults suffer substantially higher rates of violent victimization and property crime than cisgender adults did). Oftentimes, they also serve as a pathway towards physical harms. Transgender youth are subject to violence in school at a far higher rate than other students: 23.8% are threated or injured with a weapon at school, compared to 6.4% of cisgender males and 4.1% of cisgender females. Johns et al., *supra*, at 69 tbl.2. Similarly, transgender youth consider suicide, make suicide plans, and attempt suicide at far higher rates than other students. *Id.*; *see also* Kirsty A. Clark et al., *Prevalence of Bullying Among Youth Classified as LGBTQ Who Died by Suicide as Reported in the National Violent Death Reporting System, 2003-2017*, 174 JAMA PEDIATRICS 1211 (2020) (finding that suicides

of LGBTQ youth were over four times more likely to be associated with prior bullying than suicides of non-LBTQ decedents).

Moreover, students cannot escape such comments. They are, in effect, a captive audience, *see Tinker*, 393 U.S. at 515 (Stewart, J., concurring) (citing *Ginsberg v. New York*, 390 U.S. 629, 649–50 (1968)); *see Fraser*, 478 U.S. at 684, who do not have a choice as to whether they hear harmful speech. *See Ginsberg*, 390 U.S. at 650 (Stewart, J., concurring) (suggesting that someone in a captive audience lacks the "full capacity for individual choice which is the presupposition of First Amendment guarantees"); *cf. Rowan v. U.S. Post Off. Dep't*, 397 U.S. 728, 736 (1970).

And the consequences that such comments can have on students are not abstract, faraway concerns. They affect students in central Ohio and the surrounding areas. Presently before this Court, for example, is a case involving a middle school student who suffered such severe bullying and harassment, which then escalated to a physical attack, that she was forced to move to a different school. (*See* Declaration of Anne Roe ¶¶ 18–20, ECF No. 13-1 [No. 3:22-cv-00337]). Two years ago, a fourteen year-old student in Washington Court House, an hour south of Columbus, committed suicide after experiencing repeated bullying from other students. *See Transgender teen commits suicide in rural Ohio after bullying*, Scioto Valley Guardian (June 2, 2021), https://perma.cc/239G-YMDX.

All told, discriminatory speech that arises to the level of creating a hostile environment can have severely negative effects on students' attendance and performance in school and their physical and psychological wellbeing—in other words, on the orderly operation of the school and its mission. *See Nuxoll ex rel. Nuxoll v. Indian Prairie Sch. Dist. No. 204*, 523 F.3d 668, 674 (7th Cir. 2008) ("From *Morse* and *Fraser* we infer that if there is reason to think that a particular

type of student speech will lead to a decline in students' test scores, an upsurge in truancy, or other symptoms of a sick school—symptoms therefore of substantial disruption—the school can forbid the speech."); *see also Morse*, 551 U.S. at 407.

Returning to the particulars of this case, this Court considers whether the provisions of the Policies banning certain speech that may create a hostile environment go too far. PDE has provided, through its declarations and briefs, some examples of speech that its members believe are proscribed by the Policies. These can be categorized into two groups: (1) the use of pronouns differing from those preferred by transgender students; and (2) speech questioning the prevalence of gender dysphoria and discussing issues of gender identity.

It is important to note a key distinction here. Students do not enjoy a right to be free from mere offense or from the exchange of ideas. The former would be too broad, the latter contrary to the goals of education. But, as Professor Jeremy Waldron has noted, there exists a "basic distinction between an attack on a body of beliefs and an attack on the basic social standing and reputation of a group of people." JEREMY WALDRON, THE HARM IN HATE SPEECH 120 (2012). In short, it is vital to "distinguish between the respect accorded to a citizen and the disagreement we might have" with how they conduct themselves or the convictions they hold. *Id.*

Thus, speech that directly targets individual students on account of their identity—what Professor Emily Gold Waldman calls "verbal bullying"—must be separated from speech that discusses a political, social, or religious perspective in a non-derogatory manner. *See* Emily Gold Waldman, *A Post-Morse Framework For Students' Potentially Hurtful Speech (Religious and Otherwise)*, 37 J.L. & EDUC. 463, 492–96 (2008); *cf.* Eugene Volokh, *Comment: Freedom of Speech and Workplace Harassment*, 39 UCLA L. REV. 1791, 1871–72 (1992) (suggesting that "[d]irected speech can be suppressed with minimum impact on First Amendment interests"

25

because the political viewpoint of an *ad hominem* attack is often separable from the attack itself). Allowing the latter while prohibiting the former ensures that students still have an opportunity to express their social, political, and religious views and to engage in intellectual and civil discussions with other students.

While both types of speech express disagreement with the behavior and beliefs of the students targeted by the speech, only the latter does so in a manner that demonstrates civility and recognizes the dignity of the listener, of their "entitl[ement] to be treated as equals in the ordinary operations of society." WALDRON, *supra*, at 5; *see also Sypniewski v. Warren Hills Reg'l Bd. of Educ.*, 307 F.3d 243, 264 (3d Cir. 2002) (noting that "[t]here is no constitutional right to be a bully"). By contrast, "verbal bullying," targeted as it is towards individuals, does more than just express a social viewpoint. It also sends a message of disrespect toward the listener; it is an attack on their social standing, their place in society. *Cf. R.A.V. v. City of St. Paul*, 505 U.S. 377, 432 (1992) (Stevens, J. concurring) (noting that while the cross burning at issue in the case was considered "expressive conduct," the act "directed as it was to a single African-American family trapped in their home[] was nothing more than a crude form of physical intimidation"). It creates, in other words, a hostile environment. The harms caused by the two are the same. A hostile environment for students, as discussed earlier, is associated with more frequent physical attacks on the targeted students, lower school performance, and increased rates of self-harm, just as "there is a clear and direct causal link between verbal bullying and subsequent student harm" such as psychological and physical distress. Waldman, *supra*, at 493. So, even as schools must allow for civil discussion of sensitive issues, they need not allow for "verbal bullying"—*i.e.*, attacks on the social standing of individual students on account of their identity, rather than pure disagreements with their choices or beliefs.

26

The intentional misgendering of students constitutes "verbal bullying." Of course, sincere questions about an individual's preferred pronouns, civil discussions about transgender issues, and accidental misgendering are considered neither harassment nor derogatory. *See* Jessica A. Clarke, *They, Them, and Theirs*, 132 HARV. L. REV. 894, 958 (2019); *see also* Waldman, *supra*, at 497. But using pronouns contrary to an individual's preferences intentionally (or repeatedly) poses a different issue. It evinces disrespect for the individual. It plays into stereotypes. It lacks basis in scientific reality. And it is deeply harmful, "inflict[ing] measurable psychological and physiological harms." Chan Tov McNamarah, *Misgendering as Misconduct*, 68 UCLA L. REV. DISCOURSE 40, 43 (2020) (collecting literature on the harms caused by misgendering transgender individuals). Intentional misgendering has the effect of creating a hostile environment for transgender students on account of their gender identity and thereby causes a substantial disruption.

On the other hand, much of the speech discussed by PDE consists of neutral, respectful, and generalized discussions of gender identity issues. (*See, e.g.*, Decl. of Parent D ¶ 21, ECF No. 7-6) (noting their children's desire to "express[] an opinion about the nature of biological sex (whether based on science or religion)"). Such speech should be permitted, as it neither targets nor expresses disrespect for particular individuals or groups. And, in fact, there is nothing to suggest that such speech is prohibited under the Policies, except for the parents' subjective beliefs that it is. No email, communication, or past enforcement of the Policies provides any indication that they cover speech expressing disagreement with transgender students' identity or beliefs in a respectful, non-derogatory manner.

Instead, a plain reading of the Policies indicates that they prohibit only that subset of discriminatory speech that creates a threat of physical harm, interferes with students' educational

opportunities, substantially disrupts the operation of schools, or causes or contributes to a hostile environment. Each of these reasons for regulating school speech is permitted by the First Amendment. It also appears that the Policies allow students to continue engaging in well-intentioned, respectful discussions about gender identity, as the First Amendment contemplates.

### b. Parents Defending Education's Objections

There remains the possibility that, though the Policies pass muster under *Tinker*, they violate the First Amendment in some other fashion. *See Defoe ex rel. Defoe v. Spiva*, 625 F.3d 324, 336 (6th Cir. 2010). PDE suggests that that may be the case, for three reasons. It alleges that the Policies are unconstitutional because they: (1) compel speech; (2) restrict speech based on viewpoint and content, but fail strict scrutiny; and (3) are overbroad. (*See generally* Mot. for PI at 10–17, ECF No. 7). This Court, however, finds that each of the objections is unavailing "in light of the special characteristics of the school environment." *Tinker*, 393 U.S. at 506.

*First*, "[u]nder the compelled-speech doctrine, 'the First Amendment stringently limits a State's authority to compel a private party to express a view with which the private party disagrees.'" *New Doe Child #1 v. Cong. of U.S.*, 891 F.3d 578, 593 (6th Cir. 2018) (quoting *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 219 (2015)). This is because "freedom of speech 'includes both the right to speak freely and the right to refrain from speaking at all.'" *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2463 (2018) (citation omitted). Thus, "in most contexts any such efforts [to compel individuals to express support for a view they find objectionable] would be universally condemned." *Id.* At issue here, according to PDE, is that the Policies—which, by Defendants' own admission, effectively require students to use the preferred pronouns of other students—impermissibly compel speech.

28

Of course, public schools fall outside the usual First Amendment "context." *See Fraser*, 478 U.S. at 682. The prohibition against compelling speech clearly does not extend with full force within the schoolhouse gate. Instead, "it is clearly established that a school may compel some speech. Otherwise, a student who refuses to respond in class or do homework would not suffer any consequences. Students, moreover, generally do not have a right to reject curricular choices as these decisions are left to the sound discretion of instructors." *Brinsdon v. McAllen Indep. Sch. Dist.*, 863 F.3d 338, 350 (5th Cir. 2017); *see also C.N. v. Ridgewood Bd. of Educ.*, 430 F.3d 159, 178 (3d Cir. 2005) ("[I]t seems clear that a school may compel some speech.").

The compelled speech doctrine in the public school context focuses on the rationale behind the policy. *See* James Ryan, *The Supreme Court and Public Schools*, 86 VA. L. REV. 1335, 1423 (2000) (differentiating between a school's academic functions and its role in inculcating general values). The question before this Court is not whether the Policies compel speech, but whether they do so for an impermissible reason. On the one hand, courts have disapproved of schools' attempts to promote social values or goals through compelled speech. In the seminal case on this topic, the Supreme Court struck down a requirement that all schoolchildren salute the American flag, which was "not adopt[ed] . . . because it was claimed to have educational value . . . [but out of] concern[] with promotion of national unity." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 631 n.12 (1943). A school cannot dictate speech so as "to compel the speaker's affirmative belief" in a political, religious, or social viewpoint, like national unity; to do so would be "to force orthodoxy." *Brinsdon*, 863 F.3d at 350.

On the other hand, "[p]ublic educators may limit 'student speech in school-sponsored expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns,'" *Ward v. Polite*, 667 F.3d 727, 733 (6th Cir. 2012) (citation omitted), and courts have

29

presumed that the corollary of that rule—*i.e.*, compelling student speech if reasonably related to legitimate pedagogical concerns—is likewise permitted. *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1290 & n.9 (10th Cir. 2004). Consequently, courts have frequently permitted schools to compel speech in the classroom when it is tied to academic goals, rather than to the promotion of social values. *See Wood v. Arnold*, 915 F.3d 308, 318–19 (4th Cir. 2019), *cert denied*, 140 S. Ct. 399 (2019); *see also Brinsdon*, 863 F.3d at 350–51; *Mahanoy*, 141 S. Ct. at 2050 (Alito, J., concurring) ("In a math class, for example, the teacher can insist that students talk about math, not some other subject." (citation omitted)).

Requiring students to use preferred gender pronouns may simply reflect a school's desire to maintain a safe and civil learning environment, which has long been considered a legitimate pedagogical concern. *Poling v. Murphy*, 872 F.2d 757, 758, 762 (6th Cir. 1989); *see also Bonnell v. Lorenzo*, 241 F.3d 800, 822 (6th Cir. 2001) ("A college's or university's interest in maintaining a hostile-free learning environment . . . is well recognized."); *Nuxoll*, 523 F.3d at 674; *Harper*, 445 F.3d at 1189 & n.39; *cf.* Ryan, *supra*, at 1354 n.78. By creating an environment in which each individual feels respected, acknowledged, and heard by their classmates, the use of preferred pronouns in schools allows all students to feel comfortable participating in discussion and sharing their perspectives—and thus promotes learning. *See also Kutchinski*, 69 F.4th at 360 ("Courts thus provide educators a high degree of deference in the exercise of their professional judgment lest they substitute their own notions of sound educational policy for those of the school authorities which they review." (internal quotation marks and citation omitted)).

Recently, the Sixth Circuit has held that a professor's use of pronouns in the classroom implicates the prohibition against compelled speech, because the pronouns were understood to

30

express a viewpoint, to affirm a belief held by the professor. *See Meriwether v. Hartop*, 992 F.3d 492 (6th Cir. 2021). But it is not so evident that the Policies here do so in the same manner. *Meriwether* involved a university professor who taught a political philosophy course where discussions about gender identity "'often' come[] up." *Id.* at 506. By prohibiting him from using the pronouns that he preferred when addressing students, the university "silenced a viewpoint that could have catalyzed a robust and insightful in-class discussion." *Id.*

But while the use of pronouns by the professor in the classroom setting in *Meriwether* implicated his personal beliefs on gender identity, given the context of the course he was teaching, the use of pronouns when talking to others in everyday situations is not so inherently fraught. As Professors Amar and Brownstein suggested, "it may not make sense to construe salutations to be pure, content-based speech rather than essentially conduct-infused interactions in which speech plays the same relevant but non-substantive role that 'speech acts' do in so many social interactions." Vikram David Amar & Alan E. Brownstein, *Analyzing the Recent Sixth Circuit's Extension of 'Academic Freedom' Protection to a College Teacher Who Refused to Respect Student Gender-Pronoun Preferences*, UC DAVIS SCH. L., FAC. BLOG (Apr. 26, 2021), https://perma.cc/E7EK-CHVX?type=image. Consider the example they provide: a teacher taking roll-call. The teacher will use students' pronouns in doing so, but "that seems more like a mechanical exercise than the expression of substantive content." *Id.* Similarly, a student walking down a middle school hallway uses pronouns not to wade into the gender identity debate or to express a personal belief about gender identity, but simply to carry out the standard back-and-forth ritual of greeting and acknowledging friends. Participating in this "exercise" requires nothing more than respect for others' right to choose a path for themselves—not agreement with the choices, or with their underlying beliefs. *Cf. Lawrence v. Texas*, 539 U.S. 558 (2003).

31

This Court therefore concludes that, while the Policies may compel speech, PDE has failed to show a substantial likelihood that they do so outside the bounds of what is permissible for public schools; requiring the use of preferred pronouns promotes "legitimate pedagogical concerns," without "compel[ling] the speaker's affirmative belief." *Brinsdon*, 863 F.3d at 350.

*Second*, the traditional First Amendment prohibitions against content- and viewpoint-based speech regulation must also be viewed against the backdrop of *Tinker* and other public school speech cases. While content-based speech restrictions—*i.e.*, restrictions that "appl[y] to particular speech because of the topic discussed or the idea or message expressed"—typically must satisfy strict scrutiny, *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015), such restrictions have been repeatedly permitted in the public school setting as long as they are reasonable. *See, e.g.*, *Kutchinski*, 69 F.4th at 359 (allowing school to regulate sexual and violent speech based on a "reasonable forecast" of substantial disruption); *Morse*, 551 U.S. at 401 (noting that the principal's interpretation of the banned banner as promoting drug use was "reasonable"); *Fraser*, 478 U.S. at 689 n.2 (Brennan, J., concurring) ("[I]t was not unreasonable for school officials to conclude that respondent's remarks were inappropriate for a school-sponsored assembly.").

The application of the more lenient "reasonableness" standard to content-based speech in schools makes sense. For otherwise, "it is impossible to see how a school could function if administrators and teachers could not regulate on-premises student speech, including by imposing content-based restrictions in the classroom." *Mahanoy*, 141 S. Ct. at 2050 (Alito, J., concurring); *see also Barr*, 538 F.3d at 573. The fact that the Policies are content-based therefore presents little concern, especially as Defendants reasonably believe that the Policies would reduce discrimination against transgender students—undoubtedly, a compelling interest. *Saxe*, 240 F.3d at 209 ("Certainly, preventing discrimination in the workplace—and in the

32

schools—is not only a legitimate, but a compelling, government interest." (citation omitted)); *cf. Spiva*, 625 F.3d at 339 (Rogers, J., concurring) ("Just as the Supreme Court went on to recognize an 'important, perhaps compelling' interest in deterring drug use in the schools, there is of course a comparably 'important, perhaps compelling' interest in reducing racial tension in the public schools.").

While the Policies are certainly content-based restrictions, it is not so clear that they are viewpoint-based restrictions. PDE focuses on the fact that the Policies bar harassment based on certain classes, like sex, race, or age. (*See* Mot. for PI at 13, ECF No. 7). But the Sixth Circuit has repeatedly upheld public school bans on racially discriminatory expression, rejecting arguments that such bans constituted viewpoint-based restrictions. *See, e.g.*, *Defoe ex rel. Defoe v. Spiva*, 625 F.3d 324 (6th Cir. 2010); *Barr v. Lafon*, 538 F.3d 554 (6th Cir. 2008). The crux is whether the ban applies equally to individuals on either side of a given debate. *See Barr*, 538 F.3d at 572 (noting that "there [was] no evidence that the ban on disruptive symbols would not have been applied equally to a student displaying a Confederate flag in solidarity with hate groups, and another who displayed a Confederate flag in a circle with a line drawn through it").

The Policies do so. They prohibit all derogatory speech that targets individuals on the basis of gender identity (or race, age, religion, etc.); they apply with equal force to students who identify as transgender as to those who identify as cisgender, to those who seek to denigrate students on account of their transgender identity and to those who seek to harass students who believe that gender at birth is immutable. *Cf.* Clarke, *supra*, at 959 & n.398 (observing that misgendering is problematic when referring to both cisgender and transgender individuals). The Policies allow for an individual who believes "that sex is binary and that someone's internal perceptions about themselves cannot change biology" to express that viewpoint; they allow for

33

an individual who disagrees to express the opposing viewpoint as well.  (Decl. of Parent D ¶ 8, ECF No. 7-6).  The only prohibitions are against discriminatory and harassing speech based on gender identity, including the use of gender pronouns contrary to a cisgender or transgender individual's preferences.

But, as discussed previously, a student's use of pronouns in a public school hallway or classroom is not viewpoint-based in the same way that the use of pronouns by a political philosophy professor in his classroom is.  *See Meriwether*, 992 F.3d at 508–09.  The professor is engaged in an act of teaching, of explaining and provoking debate about different belief systems, about morality and ethics, and about the role of nature versus nurture.  The student in a school hallway, on the other hand, uses pronouns because it is required by the English language when engaging in the mechanical exercise of greeting classmates, exchanging pleasantries, and joking with friends—*i.e.*, contexts that are not intrinsically laden with affirmative beliefs about gender identity.  The use of pronouns in daily conversation is ever-present, but rarely is it preceded by a reflection on and re-commitment to an underlying belief about the (im)mutability of sex and gender.  Moreover, on this Court's read, nothing in the Policies prohibits a student who has a firmly-held belief that sex and gender are binary and set in stone from expressing that belief while also using a transgender classmate's preferred pronouns.  Pronouns, in such a case, cannot be construed as affirming the speaker's agreement with the classmate's beliefs on gender identity, given that the speaker has already plainly expressed her disagreement.  *Cf. id.* at 510 (noting that the university "refused to permit Meriwether to comply with its pronoun mandate while expressing his personal convictions in a syllabus disclaimer").

As such, the Policies are viewpoint-neutral.

*Third*, a facial challenge alleging that a speech restriction is overbroad "must establish that no set of circumstances exists under which the [law] would be valid or show that the law lacks a plainly legitimate sweep . . . or a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Ams. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2387 (2021) (internal quotation marks and citations omitted) (alteration in original). As discussed previously, PDE proposes various statements or types of statements that it suggests would violate the Policies, but should be protected by the First Amendment. (*See* Mot. for PI at 15–16, ECF No. 7). It argues, in other words, that a substantial number of applications of the Policies are unconstitutional. These examples include statements that the children of Parents A-D want to express about their beliefs that there are only two genders at birth and that gender is immutable. (*See, e.g.*, *id.*). In suggesting that these sample statements "unquestionably" violate the Policies, PDE relies on nothing more than speculation. It has presented no evidence suggesting that the School District will interpret or enforce the Policies so broadly, and no argument suggesting that the statements are contemplated by a natural reading of the Policies.

In fact, the Policies are clearly limited in scope. They prohibit discriminatory speech that rises to a certain severity level, such as speech that causes a reasonable threat of harm or interferes with student performance. They prohibit speech that is "systematic[] and chronic[]" and "severe or pervasive." (Pl.'s Ex. A at 2, 3, ECF No. 7-1). They do not prohibit, by contrast, genuine efforts to discuss issues of gender identity or to express beliefs on the topic. Distinguishing between derogatory or harassing speech that targets individuals and speech that espouses and discusses ideas respectfully—prohibiting the former and allowing the latter—is not overbroad.

35

PDE also argues that Policy 5136 (on the use of PCDs) and the Code of Conduct are overbroad because they purportedly "prohibit the political and religious speech that the Students wish to express off schoolgrounds through their cell phones." (Mot. for PI at 18, ECF No. 7). While *Mahanoy* limited the authorities of schools to police student speech off-campus, it did not do so for off-campus speech that targeted other students. *See Mahanoy*, 141 S. Ct. at 2047; *id.* at 2055 (Alito, J., concurring). And that alone is what Policy 5136 prohibits. It does not bar students from expressing a political or religious viewpoint on gender identity or engaging in debate on such topics through their cell phones; it only prohibits such expression where it "can be construed as harassment . . . of others,"[4] *i.e.*, speech targeted towards other students in a manner that creates a threat of physical harm, interferes with student performance, or causes substantial disorder. (Pl.'s Ex. B at 2, ECF No. 7-1; *see also* Pl.'s Ex. A at 3, ECF No. 7-1).

Nor did *Mahanoy* strip schools of the authority to police student speech off-campus where it is related to school activities. The Code of Conduct does not punish every off-campus use of discriminatory language; it applies "while students are under the authority of school personnel or involved in any school activity" and to off-campus "[m]isconduct . . . connected to activities or incidents that have occurred on school district property." (Pl.'s Ex. D at 8, ECF No. 7-1). The former category falls within "a temporal or spatial extension of the regular school program," *Mahanoy*, 141 S. Ct. at 2054 (Alito, J., concurring), during which schools can regulate student speech even off-campus, while the latter falls just outside that boundary line. But

---

[4] Although PDE focuses on the broad introductory statement—that students may not "use a PCD in any way that might reasonably create in the mind of another person an impression of being threatened, humiliated, harassed, embarrassed or intimidated"—Policy 5136 goes on to explain two specific categories of actions students cannot do. The first is the transmission of materials that can be construed as harassment or disparagement of others, defined in reference to Policy 5517. (*See* Pl.'s Ex. B at 2, ECF No. 7-1). This Court presumes that the more specific sub-provision governs the general introductory language. *See Bloate v. United States*, 559 U.S. 196, 207–08 (2010) ("A specific provision controls over one of more general application." (citation omitted)).

36

regulation of such speech can be justified for the same reason as the regulation of speech uttered during off-campus school activities: "the need for orderly and effective instruction and student protection." *Id.* (Alito, J., concurring); *see also id.* at 2045. Statements "connected to" school events are, at bottom, statements about the school, its students and teachers, and their actions during the "times when the school is responsible for the student"—in other words, statements closely linked with the school's *in loco parentis* role. *Id.* at 2045. Regulation of these statements is permissible under *Mahanoy*.

### 3.     Fourteenth Amendment

Closely related to the overbreadth issue is PDE's contention that Policy 5136 and the Code of Conduct also violate the Fourteenth Amendment by infringing on "the fundamental right of parents to make decisions concerning the care, custody, and control of their children." *Troxel v. Granville*, 530 U.S. 57, 66 (2000) (plurality). This right, at least with respect to public school education, is somewhat more limited than it would first seem. As the Sixth Circuit has explained, "[w]hile parents may have a fundamental right to decide *whether* to send their child to a public school, they do not have a fundamental right generally to direct *how* a public school teaches their child." *Blau*, 401 F.3d at 395 (emphasis in original). Instead, "school discipline . . . [is] generally 'committed to the control of state and local authorities.'" *Id.* (quoting *Goss*, 419 U.S. at 578); *see also Gruenke v. Seip*, 225 F.3d 290, 304 (3d Cir. 2000) (noting that there are "circumstances in which school authorities, in order to maintain order and a proper educational atmosphere . . . may impose standards of conduct on students that differ from those approved by some parents" (collecting cases)).

Although regulations burdening fundamental rights are typically subject to strict scrutiny, the Supreme Court has set forth "almost eighty years of precedent analyzing parental rights in

the context of public education under a rational-basis standard" because the parental right does not extend into schools. *Littlefield v. Forney Indep. Sch. Dist.*, 268 F.3d 275, 289 (5th Cir. 2001) (discussing *Meyer v. Nebraska*, 262 U.S. 390, 396–97 (1923), *Pierce v. Soc'y of Sisters*, 268 U.S. 510, 530–31 (1925), and *Wisconsin v. Yoder*, 406 U.S. 205, 207 (1972)). Little has changed since then. *See id.* at 291 ("*Troxel* does not change the above reasoning in the context of parental rights concerning public education."); *Blau*, 401 F.3d at 396 (applying rational-basis review). *But see Kanuszewski v. Mich. Dep't of Health & Hum. Servs.*, 927 F.3d 396, 419 (6th Cir. 2019) (applying strict scrutiny with respect to a parent's right to control his child's medical care).

While PDE suggests that Policy 5136 and the Code of Conduct "exceed[] [the District's] authority" by reaching "well beyond the confines of the school day and into the privacy of families' homes," this Court rejects this contention for the same reason it rejects the overbreadth claim: PDE's reading of the Policies reach far beyond their actual scope. (*See* Mot. for PI at 18, 19, ECF No. 7-1). There is nothing in the Policies that suggests that they prohibit parents from discussing gender identity issues with their children, or reach in some other way into the privacy of families' homes. (*See, e.g.*, Pl.'s Ex. D at 8, ECF No. 7-1). Nor is there any suggestion that the Policies extend to speech unrelated to school, school activities, or fellow students.

Policy 5136 and the Code of Conduct impose disciplinary rules for only that subset of off-campus speech associated with the "regular school program": how students conduct themselves in relation to each other during school, school-sponsored activities, or in connection with events at school. *See Mahanoy*, 141 S. Ct. at 2054 (Alito, J., concurring). The parent-members of PDE do not have enjoy a fundamental right to exempt their kids from these policies, *Blau*, 401 F.3d at 396, and have not shown that the Policies fail to satisfy rational-basis review.

## B.     Remaining Criteria

Having established that PDE has failed to establish a strong likelihood of success on the merits of its constitutional claims, this Court touches briefly upon the remaining preliminary injunction criteria.  *See Fischer*, 52 F.4th at 307 ("[I]n First Amendment cases, only one question generally matters to the outcome: Have the plaintiffs shown a likelihood of success on the merits of their First Amendment claim?"); *Schimmel*, 751 F.3d at 430 (en banc).

Irreparable Harm.  Were PDE likely to succeed on the merits, this factor would favor PDE as "'[t]he loss of First Amendment freedoms, for even minimal periods of time,' amounts to irreparable injury."  *Sisters for Life, Inc. v. Louisville-Jefferson Cnty.*, 56 F.4th 400, 408 (6th Cir. 2022) (quoting *Roman Catholic Diocese v. Cuomo*, 141 S. Ct. 63, 67 (2020) (per curiam)).  But PDE is unlikely to succeed on the merits and it has not alleged any other basis for suffering an irreparable injury.  This factor favors Defendants.

Balance of Harms and the Public Interest.  The third and fourth preliminary injunction requirements "merge when the Government is the opposing party."  *Nken v. Holder*, 556 U.S. 418, 435 (2009).  These factors, like the second, turn on whether PDE is likely to succeed.  If the answer is in the affirmative, "it is always in the public interest to prevent violation of a party's constitutional rights."  *Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cnty.*, 274 F.3d 377, 400 (6th Cir. 2001) (quoting *G & V Lounge*, 23 F.3d at 1079).  But if the answer is in the negative, as this Court finds, then the public interest disfavors an injunction; enjoining the Policies in their entirety would lift all restrictions against harassing and discriminatory speech within the School District, without sufficient time to draft a new policy before the start of the school year.  *Cf. Purcell v. Gonzalez*, 549 U.S. 1, 4–5 (2006).

39

Consider, also, which individuals or groups of individuals can most easily bear or adjust to the burdens of any injuries caused by the Policies. Although the children of Parents A-D may not utter the pronouns they wish to under the Policies, PDE does not suggest that this hardship imposes physical harms on them, threatens their ability to learn in school, or stamps a badge of inferiority upon them. It is easy to work around this obstacle. They can seek accommodations from the School District.[5] They can refer to transgender students by their first names, instead of using pronouns, or employ gender-neutral pronouns with the other student's consent. *See, e.g.*, *Meriwether*, 992 F.3d at 510–11 (noting that a professor, when confronted with a university policy mandating the use of preferred pronouns, proposed and employed without issue an accommodation whereby he referred to a transgender student by the student's last name alone). By contrast, if the Policies are enjoined, transgender students enrolled in the School District cannot escape the harms of being subject to misgendering, to harassment, to systematic and chronic bullying. They are a captive audience. *See Fraser*, 478 U.S. at 684. They are individuals who, having been told repeatedly by society that they do not belong, that they are inferior, that they are an aberration, simply seek "to be secure and to be let alone" at school. *Tinker*, 393 F.3d at 508.

The Sixth Circuit in *Meriwether* suggested that our nation's future depends on the classroom being a "marketplace of ideas." *Meriwether*, 992 F.3d at 504–05 (quoting *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967)). For that to be the case, it is important that all students enjoy a sense of safety and dignity in the classroom, such that they are willing and able to contribute to classroom discussion—*i.e.*, for the school to "provide that atmosphere which is

---

[5] There is nothing in the record that explains what such accommodations would look like, as no member of PDE has sought accommodations.

most conducive to speculation, experiment and creation." *Sweezy*, 354 U.S. at 263 (Frankfurter, J., concurring). It is important, then, to consider the ways in which allowing for discriminatory or harassing speech in the name of vindicating First Amendment rights too often causes a new set of First Amendment injuries, by silencing the voices of already-marginalized listeners, by "den[ying] [them] the humanizing experience of self-expression." Lawrence III, *supra*, at 803; *see Arroyo Gonzalez v. Rossello Nevarse*, 305 F. Supp. 3d 327, 333 (D.P.R. 2018) (noting that policies that "expose[] transgender students to a substantial risk of stigma, discrimination, intimidation, and danger . . . hurt[] society as a whole by depriving all from the voices of the transgender community"). Giving full effect to the right to free speech in a pluralistic democratic society requires acknowledging and addressing the ways in which those who are members of "discrete and insular minorities," *United States v. Carolene Prods Co.*, 304 U.S. 144, 152 n.4 (1938), are systematically silenced by discrimination. Their right to speak must also be acknowledged and defended.

In short, the second, third, and fourth factors for a preliminary injunction cut against PDE's request for a preliminary injunction.

## V. CONCLUSION

For the reasons stated more fully above, the Court **DENIES** Plaintiff Parents Defending Education's Motion for Preliminary Injunction (ECF No. 7).

**IT IS SO ORDERED.**

**ALGENON L. MARBLEY**
**CHIEF UNITED STATES DISTRICT JUDGE**

**DATE: July 28, 2023**

41