IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| **SARAH UPDIKE, *et al*.** | : | Case No. 1:22-cv-00374 |
| | : | |
| Plaintiffs, | : | Judge Michael R. Barrett |
| | : | |
| v. | : | |
| | : | **PLAINTIFFS' RENEWED MOTION** |
| **SARA JONAS, *et al*.** | : | **FOR PRELIMINARY INJUNCTION** |
| | : | |
| Defendants. | : | |

---

Plaintiffs Sarah Updike and James Updike, individually and as parents and next friends of their minor children I.U., A.U., and K.U., and I.U., A.U., and K.U. minors through next friends, and Jennifer Ciolino and Antonio Ciolino, individually and as parents and next friends of their minor child R.C., and R.C. a minor through next friends, and Natalie Wheeler Hastings and Jeffrey Hastings, individually and as parents and next friends of their minor child C.J, and C.J. a minor through next friends, and Janielle A. Davis, individually and as parent and next friend to her minor child J.D., and J.D. a minor by and through next friend (collectively "Plaintiffs"), hereby renew their motion for a preliminary injunction (originally filed on 7/1/22 at Docs. #13), pursuant to Rule 65 of the Federal Rules of Civil Procedure, and request this Court to enjoin and restrain Defendants Sara Jonas, Katie Stewart, Bob Bibb, Linda Hausfeld, Leslie Rasmussen, Larry Hook, the Forest Hills Board of Education and the Forest Hills School District (collectively "Defendants"), from taking any action to enforce the "Resolution to Create a Culture of Kindness and Equal Opportunity for All Students and Staff" (the "Resolution") passed by Defendant Board of Education of the Forest Hills School District on or about June 22, 2022, as well as any similar race-based, or content or viewpoint-based censorship.

Plaintiffs renew their Motion for Preliminary Injunction due to Defendants' violation of the Stipulation entered into in this case and approved by the Court following Plaintiffs' filing of their original motion for temporary restraining order and preliminary injunction (Doc. #13), whereby Defendants they agreed they would "not take any action to enforce, implement or attempt to enforce or implement" the Resolution while this lawsuit is pending. *See* Doc. #15-1. Defendants have indeed continued to take action to enforce the Resolution and censor speech, including their recent action to permanently paint over and destroy student artwork on topics banned by the Resolution with which certain Defendants did not agree.

A Memorandum in Support follows which demonstrates Plaintiffs are likely to succeed on the merits of their claims on multiple independent grounds, and have suffered and will continue to suffer irreparable harm in the absence of injunctive relief. The Resolution is vague, and a race-based, content-based and viewpoint discriminatory enactment which is unconstitutional on its face. Moreover, the balance of equities weighs heavily in favor of injunctive relief, Defendants will suffer no harm from the same, and an injunction protecting Plaintiff's constitutional rights is in accord with the public interest.

Dated:  October 30, 2023                      Respectfully submitted,

*s/ Nicole M. Lundrigan*
*s/ W. Kelly Lundrigan*
W. Kelly Lundrigan (0059211)
Nicole M. Lundrigan (0075146)
LUNDRIGAN LAW GROUP CO, LPA
1080 Nimitzview Drive, Suite 402
Cincinnati, Ohio 45230
Phone (513) 813-7610
klundrigan@lundrigan-law.com
nlundrigan@lundrigan-law.com
*Attorneys for Plaintiffs*

2

## MEMORANDUM IN SUPPORT

### I. INTRODUCTION

This case challenges the constitutionality of a school board Resolution – deceptively titled the "Resolution to Create a Culture of Kindness and Equal Opportunity for All Students and Staff" (the "Resolution") -- which caused immediate irreparable harm to students, parents and teachers of the Forest Hills School District ("FHSD") the moment it was enacted by three members of the Board of Education of FHSD over the vociferous objections of other Board members and the community. Although its shortfalls are numerous, the following sentence is perhaps its most egregious:

> FHSD **will not** utilize Critical Race Theory, intersectionality, identity, or ***anti-racism*** curriculum, for student education or any staff training.[1]

The Resolution cannot withstand the strict scrutiny it requires, and it must be struck down and its enforcement immediately enjoined to prevent further irreparable harm.

As is immediately apparent on its face, the Resolution is a race-based, unprecedented and unconstitutional censorship of discussions and training about "anti-racism" among a host of other prohibited topics, which violates both the First and Fourteenth Amendments.

> The Constitution abhors classifications based on race, not only because those classifications can harm favored races or are based on illegitimate motives, but also because every time the government places citizens on racial registers and makes race relevant to the provision of burdens or benefits, it demeans us all. **"Purchased at the price of immeasurable human suffering, the equal protection principle reflects our Nation's understanding that such classifications ultimately have a destructive impact on the individual and our society."** *Adarand Constructors, Inc. v. Peña,* 515 U.S. 200, 240, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995) (THOMAS, J., concurring in part and concurring in judgment).

---

[1] *See* Verified Compl. For Temporary, Preliminary and Permanent Injunctive Relief and Declaratory Judgment ("Verified Compl."), Doc. #1, at ¶28 and Ex. A; Larry Hook Depo., Doc. #40, at PAGEID 573, and Ex. 1 thereto.

*Grutter v. Bollinger*, 539 U.S. 306, 353–54 (Emphasis supplied) (holding that race-conscious admissions policy, as with all racial classifications imposed by government, are subject to strict scrutiny under the Equal Protection Clause); *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.,* 600 U.S. 181 (2023) (same; a race-based classification which violates the Equal Protection Clause also violates Title VI for institutions receiving federal funds).

"Racism" is, by definition: "a belief that race is the primary determinant of human traits and capacities and that racial differences produce an inherent superiority of a particular race"; "a: doctrine or political program based on the assumption of racism and designed to execute its principles"; "b: a political or social system founded on racism, racial prejudice or discrimination."[2] Conversely, "anti-racism" is, by definition, "the policy or practice of opposing racism and promoting racial tolerance,[3]" and an "anti-racist" is one "opposed to racism."[4]

In direct violation of the Fourteenth Amendment to the United States Constitution, decades of long-standing legal precedents, federal statutes, state statutes and multiple decades of established, accepted teaching curriculum, the actions of Defendant Board of Education in passing the Resolution which expressly *prohibits anti-racism* and other vague categories of teaching and training flies in the face of long-recognized Constitutional principles. The Board seeks to prohibit teachers from teaching, and students from hearing and considering, curriculum which opposes the concept that racial differences produce an inherent superiority of a particular race, and that racial discrimination and prejudice resulting from racism is unconstitutional, illegal and wrong. By censoring and prohibiting "anti-racism," the Resolution is a tacit promotion of racism. While the

---

[2] *See* Merriam-Webster dictionary.
[3] *See* Oxford dictionary.
[4] *See* Merriam-Webster dictionary.

Resolution harms all residents, teachers and students in FHSD, it inflicts disproportionate injury upon students of color and those who are LGBTQ+.

Equally troubling is the Resolution's intrusion into spaces long recognized as being protected by the First Amendment, and its vagueness and overbreadth which constitutes separate Fourteenth Amendment Due Process violations. In addition to its censorship of "anti-racism," the Resolution is a content-based restriction which prohibits curriculum, education and training on, among other things, "identity," "Critical Race Theory," and "intersectionality," thus outright prohibiting discussions on such subjects within FHSD schools without any legitimate pedagogical purpose, but instead to further certain Board Members' partisan political agendas, using language that is simultaneously extraordinarily broad and vague.

The Supreme Court has long recognized, and recently confirmed, "[t]he First Amendment's protections extend to 'teachers and students,' neither of whom 'shed their constitutional rights to freedom of speech or expression at the schoolhouse gate.'" *See Kennedy v. Bremerton School District,* 597 U.S. ____, 142 S. Ct. 2407 (Slip Opinion June 27, 2022), at syllabus (internal quotations and citations omitted). As such, the Resolution violates the First Amendment Rights of students established by, among other decisions, the United States Supreme Court in *Board of Educ., Island Trees Union Free School District No. 26 v. Pico*, 457 U.S. 853 (1982) (plurality), to receive information and ideas, a right that applies in the context of school curriculum and design. Government actors "may not, consistent with the spirit of the First Amendment, contract the spectrum of available knowledge." *See id*. at 866-67 (quotations omitted). Similarly, educators are not merely mouthpieces of the government, and their right to academic freedom is likewise recognized as a special concern of the First Amendment. *See Keyshian v. Board of Regents of University of State of N.Y.,* 385 U.S. 589 (1967); *Meriwether v.*

*Hartop*, 992 F.3d 492, 504 (6th Cir. 2021). The Resolution's suppression of speech robs students of information, ideas, and instructional approaches that result in the type of robust dialogue the courts have long recognized as essential to a productive citizenry and preservation of this country's democracy. *Keyishian* 385 U.S. at 603 ("The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools.").

Finally, the breadth and vagueness of the Resolution leaves educators wondering what they may and may not teach, and what actions will put their jobs in jeopardy, all of which will inevitably cause educators to "'steer far wider of the unlawful zone' . . . than if the boundaries of the forbidden areas were clearly marked.'" *Grayned v. City of Rockford*, 408 U.S. 104, 108–09 (1972) (internal citations and quotations omitted) (enactment is void for vagueness if its prohibitions are not clearly defined or if it may lead to arbitrary or discriminatory enforcement). Thus, the vagueness of the Resolution compounds the already grave First and Fourteenth Amendment concerns raised by the race-conscious and viewpoint discriminatory provisions of the Resolution as educators "steer wide" to avoid any discussion near the zones of forbidden topics.

The Resolution is clearly and undeniably unconstitutional on its face. It has and will continue to cause irreparable harm to Plaintiffs in the absence of injunctive relief.

## II.     FACTS AND BACKGROUND

In the interest of efficiency, Plaintiffs renew and incorporate by reference their original Motion for Temporary Restraining Order and Preliminary Injunction (Doc. #13).

Plaintiffs are educators, parents, students and residents within the Forest Hills School District ("FHSD") challenging the race-based, unprecedented and unconstitutional censorship of discussions about "anti-racism," race, gender, identity and other subject matters in schools and in

training through the passage by the Board of the Resolution on June 22, 2022.[5]  Plaintiffs' claims include:  Count I – Violation of Fourteenth Amendment – Vagueness; 42 U.S.C. §1983; Count II – Violation of First Amendment – Right to Receive Information; 42 U.S.C. §1983; Count III – Violation of First Amendment – Freedom of Expression including Academic Freedom, Overbreadth, Viewpoint-Based Restriction; 42 U.S.C. §1983; Count IV – Violation of Fourteenth Amendment – Race-Based and Discriminatory Purpose; Invasion of Parental Liberty; 42 U.S.C. §1983; Count V – Violation of Equal Protection Clause of Fourteenth Amendment; 41 U.S.C. §1983; Count VI – Relief Under Title VI of the Civil Rights Act of 1964, 42 U.S.C. §2000(d) ("Title VI); and Count VII – Declaratory Relief.[6]

Among other things, the Resolution's most egregiously unconstitutional provisions include the following prohibitions:

- "FHSD *will not utilize Critical Race Theory, intersectionality, identity, or anti-racism curriculum, for student education or any staff training*."

- "WHEREAS**,** *Critical Race Theory (CRT), anti-racism, and all related euphemistic surrogates should similarly not be advocated in any form*, in FHSD's curricula or staff training.'"

- "Schools may not use race, socioeconomic class, religion, gender identity, sex, ethnicity, or culture as a consideration when hiring *or administering academic programs or evaluation systems.*"

- "Neither schools, nor instructors or guest speakers, *shall have students participate in class or complete assignments that require, guide, or nudge* the student to consider his or her race, socioeconomic class, religion, gender identity, sex, sexual preference, ethnicity, or culture as a deficiency or a label to stereotype the student as having certain biases, prejudices or other unsavory moral characteristics or beliefs based on these immutable characteristics."[7]

---

[5] *See* Second Amended Compl. ("SAC"), Doc. #51, ¶¶1, 13-16; original Verified Compl. (Doc. #1) and First Amended Verified Complaint (Doc. #. 26).
[6] *See* SAC, Doc. #51.
[7] *See* Ex. A. to Verified Complaint, First Amended Verified Complaint, and SAC (emphasis added); Larry Hook Depo., Doc. #40, at PAGEID 573, and Ex. 1 thereto.

Plaintiffs (and others within the school community) suffered immediate irreparable harm the moment the Resolution was enacted. Among other things, the Resolution significantly contracts the spectrum of available content and ideas students will receive in school, it enacts race-based and viewpoint-based censorship in curriculum and in the classroom, it silences speech through its vague, overbroad and viewpoint discriminatory terms, while at the same time intentionally targeting and denying access to ideas aimed at advancing the educational and civic equality of historically marginalized students because of certain Defendant Board Members' own disagreement with those viewpoints, educators do not know what they are permitted to teach and what is now prohibited which is already affecting curriculum for the upcoming school year, and those students and teachers who are already most vulnerable are now subject to a hostile educational and workplace environment.

Following the filing by Plaintiffs of their original Motion for TRO and Preliminary Injunction (Doc. #13), Defendants entered into a Stipulation, which was approved by this Court, whereby they agreed as follows:

> Defendants will not take any action to enforce, implement or attempt to enforce or implement the Forest Hills Local School District Board of Education (Board) "Resolution to Create a Culture of Kindness and Equal Opportunity for All Students and Staff" (Resolution) which was passed by the Board on June 22, 2022, nor will the Defendants create or commence the process to create any Policy of the Board which is intended to enforce or implement such Resolution during the pendency of this case in this Court.

(Doc. #15-1; *see also* Doc. #15.)[8]

Despite the Stipulation, Defendants have and continue to take action to implement and enforce the Resolution. Among other things:

- Following passage of the Resolution and of the Stipulation, Defendants sought to discipline a teacher for violating the Resolution by her use of pronouns following her name and the

---

[8] The Stipulation mooted Plaintiffs' original Motion for TRO and Preliminary Injunction, subject to re-filing if Defendants failed to abide it. *See, e.g.,* Minute Entry, 2/15/23.

inclusion of a link to explain the importance of utilizing the pronouns chosen by an individual.[9]

- Following passage of the Resolution and entry of the Stipulation, on or about September 21, 2022, during a Board meeting, Defendant Stewart made a motion to require students to utilize the bathroom which matched their sex assigned at birth rather than the gender with which they identified, directly targeting trans students at FHSD, including several student Plaintiffs. Defendant Stewart's motion was an action to enforce the Resolution.[10] The motion was not passed.

- Defendant Stewart thereafter drafted *another* policy in furtherance of the Resolution and her desire to ban transgender students, including student Plaintiffs, from utilizing the bathroom of the gender with which they identify. Defendants have sought to keep this action secret and have refused to provide a copy to date.[11]

- While the foregoing are extremely disturbing, Defendants most egregious actions to enforce the Resolution occurred in late August and September 2023. At the start of the 2023-2024 school year, Defendants covered student artwork – a large mural painted on the wall -- at Nagle Middle School with a vinyl banner. The Mural artwork conveyed messages of diversity, belonging and inclusion, specifically with respect to race, gender identity and religious diversity. The Mural is depicted here:



[12]

But the Mural had become a target of the Board majority, who did not like the message. Defendant Bibb, for example, stated in a public meeting in 2021 that he took issue with the symbols in the Mural relating to "sexual identity" and further stated he believed the mural promoted "segregation."[13]

Thereafter, on or about August 31, 2023, **Defendants permanently destroyed the Mural,**

---

[9] SAC, ¶72, 73; Hook Depo., Doc. 40, PAGEID 680-88, and Ex. 5, 6, 7, 8, and 9 thereto (teacher who utilized pronouns and link in her signature block was referred by Board member to administration for action).

[10] SAC, ¶75, 78; Depo. of Sara Jonas, Doc. #39, at PAGEID 499.

[11] SAC, ¶79; *see also* records produced by FHSD pursuant to public records request, attached hereto as Exhibit A.

[12] *See* Affidavit of Natalie Wheeler Hastings, attached hereto as Exhibit B, at par. 2-4.

[13] *See id.* at par. 5 and link to video found there.

**thereby censoring its message and student speech, by painting over it with blue paint**. During a September 20, 2023 interview given to Fox 19 news, when asked about Defendants' decision to permanently destroy the mural by painting over it, Defendant Hook stated:

> "We have board policy about, um, controversial issues. There's . . . yeah, you've got religious symbols on it. You've got other pieces that, you know, that's what the First Amendment is about. So in terms of interpretation of . . . is it violating policy? Probably."[14]

The Resolution specifically references the existing Controversial Issues Policy, and Defendant Jonas stated the Resolution was just a further action to implement already existing policies, including the Controversial Issues Policy.[15]

Defendants' primary arguments throughout this lawsuit have been (i) the Resolution is just a "vision statement" and is not a policy, and (ii) Plaintiffs lack standing to challenge the Resolution. This Court rejected both arguments in its Opinion & Order dated 10/26/2023, finding both that Plaintiffs had standing to challenge the Resolution, and the Resolution is a "policy" for purposes of 42 U.S.C. §1983 (Doc. #62). As a result, and due to Defendants' actions in violating the Stipulation and taking repeated action to enforce the Resolution and censor speech with which they disagree, Plaintiffs respectfully request that this Court enjoin Defendants as they have demonstrated they cannot be trusted to keep their word.

## III.    ARGUMENT

In determining whether to issue a preliminary injunction, courts commonly balance the following factors: (1) whether the party seeking the injunction has shown a substantial likelihood of success on the merits; (2) whether the party seeking the injunction will suffer irreparable harm absent the injunction; (3) whether an injunction will cause others to suffer substantial harm; and (4) whether the public interest would be served by the preliminary injunction. *See Doe v. Barron,*

---

[14] *See id.* at par. 6 and link to video found there.
[15] *See* the Resolution, at Larry Hook Depo., Doc. #40, at PAGEID 573, and Ex. 1 thereto; *see also* Depo. of Jonas, Doc. #39, at PAGEID 412, 416-19, and recording at Ex. 19.

92 F. Supp. 2d 694 (S.D. Ohio 1999). Plaintiffs respectfully submit that all factors weigh heavily in favor of injunctive relief here.

A. **Plaintiffs are Likely to Succeed on the Merits of Their Claims**

1. **The Resolution is Race-Based, Content-Based and Viewpoint Discriminatory On Its Face, and There is No Narrowly Tailored, Compelling Government Interest Which Can Save It**

The Resolution is undeniably both race-based and content-based on its face, triggering strict scrutiny under both the First Amendment and Fourteenth Amendment, which it cannot withstand.

When a statute on its face is based upon race or national origin, the legislation is subject to strict scrutiny. *See, e.g., Grutter*, 539 U.S. 306, 308   The burden of proof is on the government entity to demonstrate the challenged enactment furthers a compelling governmental interest, and is narrowly tailored to accomplish that interest. *See id.; see also Ohio Contractors Ass'n v. Econ. Dev. Admin.,* 452 F. Supp. 1013, 1021 (S.D. Ohio 1977), *aff'd,* 580 F.2d 213 (6th Cir. 1978). Statutes are subject to strict scrutiny under the Equal Protection Clause not just when they contain express racial classifications, but also when, they are race-conscious or, though race neutral on their face, they are motivated by a racial purpose or object. *See, e.g., Grutter,* 539 U.S. 306; *Miller v. Johnson*, 515 U.S. 900, 913 (1995).

Similarly, the First Amendment prevents a government from proscribing speech based upon its disapproval of the ideas expressed. *R.A.V. v. City of St. Paul, Minn.,* 505 U.S. 377, 382, 385-86 (1992).

> The First Amendment, applicable to the States through the Fourteenth Amendment, prohibits the enactment of laws "abridging the freedom of speech." U.S. Const., Amdt. 1. Under that Clause, a government, including a municipal government vested with state authority, "has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Police Dept. of Chicago v. Mosley,* 408 U.S. 92, 95, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972). Content-based

9

laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests.

*Reed v. Town of Gilbert, Ariz.,* 576 U.S. 155, 163 (2015). A regulation on speech is content based "when the content conveyed determines whether the speech is subject to restriction." *N. Olmsted Chamber of Com. v. City of N. Olmsted,* 86 F. Supp. 2d 755, 763 (N.D. Ohio 2000). Content-based restrictions on speech are likewise subject to strict scrutiny – the government must show the regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end. *Id.*at 764; *see also Kennedy*, 597 U.S. _____ (Slip Opinion June 27, 2022) (a government entity must normally satisfy "at least 'strict scrutiny'" in demonstrating that its restrictions on the plaintiff's protected First Amendment rights serve a compelling interest and are narrowly tailored).

Here, the Resolution is undeniably race-based and content-based on its face. It prohibits, among other things, curriculum, teaching and training on "anti-racism," gender identity, Critical Race Theory and a list of other topics disfavored by three members of the FHSD Board of Education. The content conveyed is determinative of whether the speech is subject to censorship by the Resolution. Defendants cannot demonstrate any compelling interest which is furthered by, among other things, banning discussion of being opposed to racism (i.e., anti-racism). Nor can they demonstrate the Resolution is narrowly tailored to further a compelling government interest. Indeed, the Resolution is a broad and sweeping content and race-based censorship of speech that serves no legitimate purpose whatsoever.

The Resolution is not just content-based, but also viewpoint discriminatory. Defendants seek to not only outright ban discussion and teaching of certain topics based upon their content, but also certain viewpoints with which they disagree – i.e., for example, "anti-racism" and Critical Race Theory which involve, among other things, the discussion and examination of the history

10

and harm of racism in this country, including structural racism and its effect upon our social institutions. Defendant Jonas in her deposition said it was her intent to censor the viewpoint of "anti-racism" in the form of actively opposing racism as advocated by Ibram X. Kendi. While the ban on "anti-racism" as that term is defined and as commonly understood is much broader than this, Defendant Jonas' testimony demonstrates Defendants' intent to censor a certain viewpoint through passage of the Resolution.[16]

The United States Supreme Court has repeatedly made clear that viewpoint discrimination is an egregious form of content-based discrimination which cannot be tolerated.

> ***Discrimination against speech because of its message is presumed to be unconstitutional***. See *Turner Broadcasting System, Inc. v. FCC,* 512 U.S. 622, 641–643, 114 S.Ct. 2445, 2458–2460, 129 L.Ed.2d 497 (1994). These rules informed our determination that the government offends the First Amendment when it imposes financial burdens on certain speakers based on the content of their expression. *829 *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.,* 502 U.S. 105, 115, 112 S.Ct. 501, 507–508, 116 L.Ed.2d 476 (1991). ***When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant.*** See *R.A.V. v. St. Paul,* 505 U.S. 377, 391, 112 S.Ct. 2538, 2547, 120 L.Ed.2d 305 (1992). ***Viewpoint discrimination is thus an egregious form of content discrimination. The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction***. See *Perry Ed. Assn. v. Perry Local Educators' Assn.,* 460 U.S. 37, 46, 103 S.Ct. 948, 955, 74 L.Ed.2d 794 (1983).

*Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 828–29 (1995) (emphasis added); *see also Shurtleff v. City of Bos., Massachusetts*, 596 U.S. 243, 259, 142 S. Ct. 1583, 1593, 212 L. Ed. 2d 621 (2022) (a governmental entity may not exclude speech based upon its viewpoint); *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 578–79 (2011) ("The State may not burden the speech of others in order to tilt public debate in a preferred direction."

---

[16] Depo. Sara Jonas, Doc. 39, at PAGEID 399-402. Relevant to the vagueness and overbreadth challenges, Defendant Jonas also stated that the term "anti-racism" should have been better defined in the Resolution. *See id.* at PAGEID 402.

A Florida District Court recently enjoined legislation banning similar categories of speech as a "naked viewpoint-based regulation that does not pass strict scrutiny" under the First Amendment. See *Honeyfund.com, Inc. v. DeSantis*, 622 F. Supp. 3d 1159, 1168 (N.D. Fla. 2022). The Court further stated:

> Florida's Legislators may well find Plaintiffs' speech "repugnant." But under our constitutional scheme, the "remedy" for repugnant speech "is more speech, not enforced silence." *Whitney v. California*, 274 U.S. 357, 377, 47 S.Ct. 641, 71 L.Ed. 1095 (1927). Indeed, "it is the purpose of the First Amendment to preserve an uninhibited marketplace of ideas in which truth will ultimately prevail." *Red Lion Broad. Co. v. FCC*, 395 U.S. 367, 390, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969). If Florida truly believes we live in a post-racial society, then let it make its case. But it cannot win the argument by muzzling its opponents.

*Id.* at 1180.

The same is true here and the same result is warranted here.

## 2.   The Resolution is Unconstitutionally Vague and Overbroad

With language that is both sweeping and unclear (e.g., banning lists of topics such as Critical Race Theory, and undefined "euphemistic surrogates" of anti-racism and other banned topics which even the FHSD Superintendent admits he does not know the meaning[17]), the Resolution is also void for vagueness and overbreadth on its face under the Due Process Clause of the Fourteenth Amendment.

> Imprecise laws can be attacked on their face under two different doctrines. *City of Chicago v. Morales,* 527 U.S. 41, 52, 119 S.Ct. 1849, 144 L.Ed.2d 67 (1999). First, the overbreadth doctrine permits the facial invalidation of laws that inhibit the exercise of First Amendment rights if the impermissible applications of the law are substantial when "judged in relation to the statute's plainly legitimate sweep." *Id., quoting Broadrick v. Oklahoma,* 413 U.S. 601, 612–615, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973). Second, even if an enactment does not reach a substantial amount of constitutionally protected conduct, it may be impermissibly vague because it fails to establish standards for the police and public that are sufficient to guard against the arbitrary deprivation of liberty interests.

---

[17] Hook Depo., Doc. #40, PAGEID 605 ("Well, I'm not sure what it means.  What is a euphemistic surrogate?  I don't know what that refers to."); PAGEID 635 ("I don't even know what Critical Race Theory is, to be totally honest with you.")

*Miller v. City of Cincinnati*, 709 F. Supp. 2d 605, 626 (S.D. Ohio 2008), aff'd, 622 F.3d 524 (6th Cir. 2010).

"It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104 108–09 (1972). "[W]e insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Id.* If arbitrary and discriminatory enforcement is to be avoided, "laws must provide explicit standards for those who apply them." *Id.* Finally, "where a vague statute 'abut(s) upon sensitive areas of basic First Amendment freedoms,' it 'operates to inhibit the exercise of (those) freedoms.' Uncertain meanings inevitably lead citizens to 'steer far wider of the unlawful zone' . . . than if the boundaries of the forbidden areas were clearly marked.'" *Id.* (internal citations and quotations omitted); *see also Hill v. Colorado,* 530 U.S. 703, 732 (2002).

Here the resolution both "fails to provide people of ordinary intelligence a reasonable opportunity to know what is prohibited," and risks "arbitrary and discriminatory enforcement," thus rendering it void for vagueness. Indeed, in *Santa Cruz Lesbian & Gay Cmty. Ctr. v. Trump*, 508 F. Supp. 3d 521, 543 (N.D. Cal. 2020), the district court found an Executive Order banning a list of "divisive concepts" in workplace training, covering many of the same ideas at issue in the Resolution, was void for vagueness among other Constitutional infirmities. The vagueness of the Resolution and the resulting uncertainty of which actions will trigger discipline for its violation compounds the already grave First and Fourteenth Amendment concerns raised by the race-conscious and viewpoint discriminatory provisions of the Resolution as educators "steer wide" to avoid any discussion near the zones of forbidden topics.

13

Similarly, the Resolution is unconstitutionally overbroad on its face. The overbreadth doctrine is an exception to the traditional rules of standing and is applicable in the First Amendment context to ensure that an overbroad statute does not "chill" the exercise of rights guaranteed by the First Amendment. *Leonardson v. City of E. Lansing,* 896 F.2d 190, 195 (6th Cir. 1990). Under this doctrine, litigants may challenge a statute because the statute may cause others not before the court to refrain from constitutionally protected speech or expression. *See id.* To be found unconstitutional on overbreadth grounds, "there must be a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the court...." *Id.* (internal citations omitted).

That is certainly the case here. There are countless educators and students within FHSD who are not parties to this action but nonetheless affected by this Resolution. Educators in particular are affected by this Resolution. What are "euphemistic surrogates"? What is banned with the prohibition on teaching and discussing intersectionality? What falls within the banned topic of "identity"? How can educators conduct needs assessments for students who need extra assistance if they cannot consider "use race, socioeconomic class, religion, gender identity, sex, ethnicity, or culture" in "administering academic programs"? What conduct constitutes a "nudge" in violation of the Resolution's ban on nudging students to consider their own race, identity, culture, etc. in discussions about historical events, for example slavery? Educators will most certainly censor themselves and steer wide of speech that could violate the Resolution for fear of adverse employment consequences, and FHSD students also suffer from this lack of access to ideas and ability to engage in discussion on topics banned by Defendants.

**3. <u>The Resolution Violates the First Amendment Rights of Students and Parents By Restricting Students' Right to Access Information With No Legitimate Purpose</u>**

14

The Resolution violates the First Amendment Rights of students established by the United States Supreme Court in *Board of Educ., Island Trees Union Free School District No. 26 v. Pico,* 457 U.S. 853 (1982) (plurality), to receive information and ideas, a right that applies in the context of school curriculum and design. *See also Gonzalez v. Douglas,* 269 F. Supp.3d 948, 972 (2017) (striking down statute banning ethnic studies). "[T]he discretion of the States and local school boards in matters of education must be exercised in a manner that comports with the transcendent imperatives of the First Amendment." *Pico,* 457 U.S. at 864. Government actors "may not, consistent with the spirit of the First Amendment, contract the spectrum of available knowledge." *See id.*at 866-67 (quotations omitted). This right of students to receive information is "an inherent corollary" of the rights of free speech explicitly guaranteed by the Constitution. *Id.; see also Stanley v. Georgia,* 394 U.S. 557, 564 (1969) ("It is now well established that the Constitution protects the right to receive information and ideas.")

While government actors enjoy some discretion in the school setting, its restrictions upon students' First Amendment rights must be "reasonably related to a legitimate pedagogical interest." *See Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 273 (1988). Discretion may not be utilized in a narrowly partisan or political manner or for other illegitimate motives. *See Pico*, 457 U.S. at 870.

> In brief, we hold that local school boards may not remove books from school library shelves simply because they dislike the ideas contained in those books and seek by their removal to "prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion." . . . Such purposes stand inescapably condemned by our precedents.

*Pico*, 457 U.S. at 872.

The U.S. Supreme Court recently reiterated that, "the First Amendment's protections extend to 'teachers and students,' neither of whom 'shed their constitutional rights to freedom of

speech or expression at the schoolhouse gate.'" *See Kennedy*, 597 U.S. ____ (Slip Opinion June 27, 2022), at syllabus (quoting *Tinker v. Des Moines Independent Community School Dist*., 393 U. S. 503, 506 (1969)). Although the *Kennedy* decision involved the First Amendment rights of a school coach, rather than a student, it's holding regarding the protections of the First Amendment apply equally to students. The Supreme Court affirmed the importance of diversity of thought and expression and the "long constitutional tradition in which learning how to tolerate diverse expressive activities has always been 'part of learning how to live in a pluralistic society.'" *Id.* (internal citations omitted). This is "a trait of character essential to 'a tolerant citizenry.'" *Id.* (internal citations omitted). The Supreme Court soundly rejected the school district's argument that it suppressed the coach's religious speech to ensure order at football games:

> Government "justification[s]" for interfering with First Amendment rights "must be genuine, not hypothesized or invented post hoc in response to litigation." United States v. Virginia, 518 U. S. 515, 533 (1996). ***Nor under our Constitution does protected speech or religious exercise readily give way to a "heckler's veto."***

*Id.* (emphasis added).

The basic Constitutional principles announced by the Court in *Tinker,* 393 U.S. 503, remain the bedrock and exemplify the importance of zealously protecting the First Amendment rights of students:

> In our system, state-operated schools may not be enclaves of totalitarianism. School officials do not possess absolute authority over their students. Students in school as well as out of school are 'persons' under our Constitution. They are possessed of fundamental rights which the State must respect, just as they themselves must respect their obligations to the State. In our system, students may not be regarded as closed-circuit recipients of only that which the State chooses to communicate. They may not be confined to the expression of those sentiments that are officially approved.
>                                            * * *
> In Keyishian v. Board of Regents, 385 U.S. 589, 603, 87 S.Ct. 675, 683, 17 L.Ed.2d 629, Mr. Justice Brennan, speaking for the Court, said:
> "The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools.' Shelton v. Tucker, (364 U.S. 479), at 487 (81 S.Ct. 247, 5 L.Ed.2d 231). The classroom is peculiarly the 'marketplace of ideas.'

> The Nation's future depends upon leaders trained through wide exposure to that robust exchange of ideas which discovers truth 'out of a multitude of tongues, (rather) than through any kind of authoritative selection."

*Tinker,* 393 U.S. 503, 511–12 (1969).  These same interests of students, parents and teachers have also been recognized as constitutionally protected "liberty interests" under the Fourteenth Amendment.  *See Meyer v. Nebraska*, 262 U.S. 390 (1923) (finding law prohibiting the teaching of any subject in language other than English or the teaching of languages other than English unconstitutional as depriving teachers and parents of liberty interest and due process of law in violation of 14th amendment).

Here, the Resolution significantly reduces the spectrum of knowledge available to students, including the student Plaintiffs.  It denies access to ideas aimed at advancing the educational and civic equality of historically marginalized students, solely as a result of certain Board Members' political ideology.  FHSD students, however, may not be treated as "closed-circuit recipients" of only that which the Board wishes for them to hear.

**4.  The Resolution Violates the First Amendment Rights of Teachers as It is Viewpoint Discriminatory and Infringes Upon Academic Freedom**

In addition to the reasons set forth above, the Board's attempt to suppress and constrict the topics educators may discuss and the viewpoints that may be presented violates the rights of educators, including Plaintiff Updike, to academic freedom.  This right of academic freedom of educators serves alongside students' constitutional right to receive information and ideas, all of which are critically necessary for our democracy.

"Academic freedom, though not a specifically enumerated constitutional right, long has been viewed as a special concern of the First Amendment." *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 312 (1978); *see also Keyshian,* 385 U.S. at 603 ("Our nation is deeply committed to safeguarding academic freedom which is of transcendent value to all of us and not merely to the

teachers concerned."); *Sweezy v. State of N.H. by Wyman*, 354 U.S. 234, 250, 77 S. Ct. 1203, 1212, 1 L. Ed. 2d 1311 (1957) ("Teachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die."). The Supreme Court has made clear that "[b]ecause First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity." *Keyishian*, 385 U.S. at 604 (citing *N.A.A.C.P. v. Button*, 371 U.S. 415, 438 (1963)).

In *Garcetti v. Ceballos,* 547 U.S. 410 (2006), the Supreme Court held that normally "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulation their communications from employer discipline." *Id.* at 421. However, *the Court expressly declined to address* whether its analysis would apply to academic freedom.[18]

As a result, the Sixth Circuit in *Meriwether v. Hartop*, 992 F.3d 492, 504 (6th Cir. 2021), found that, even after *Garcetti*, the First Amendment protects the academic freedom rights of professors in Universities when they are teaching. *See id.* at 505.

> If professors lacked free-speech protections when teaching, a university would wield alarming power to compel ideological conformity. A university president could require a pacifist to declare that war is just, a civil rights icon to condemn the Freedom Riders, a believer to deny the existence of God, or a Soviet émigré to address his students as "comrades." That cannot be. "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe" such orthodoxy.

*Id.* at 506; *Kerr v. Hurd*, 694 F. Supp. 2d 817, 844 (S.D. Ohio 2010) (recognizing an "academic freedom" exception to *Garcetti*; such exception is important to protecting First Amendment values as "Universities should be the active trading floors in the marketplace of ideas.") Although the

---

[18] The Supreme Court's decision in *Kennedy v. Bremerton Sch. Dist.,* No. 21-418, 2022 WL 2295034, at *11 (U.S. June 27, 2022), likewise did not address questions of "academic freedom" that involve additional First Amendment interests beyond those at issue in the *Garcetti* framework.

cases above relate to teaching at the college level, their holdings are no less true at the high school level (where students are actually taking college-level AP classes), the middle school level, and even the elementary level. *See Evans-Marshall v. Bd. of Educ. of Tipp City Exempted Vill. Sch. Dist.,* No. 3:03CV091, 2008 WL 2987174, at *8 (S.D. Ohio July 30, 2008), *aff'd,* 624 F.3d 332 (6th Cir. 2010) (holding that *Garcetti* did not apply to claim made by high school teacher that her First Amendment right to academic freedom was violated when she was terminated based upon her choice of curricula).

Here, the Resolution seeks to impose sweeping viewpoint-based restrictions upon the academic freedom of educators in FHSD. In censoring and suppressing certain viewpoints, the Resolution has cast an unconstitutional "pall of orthodoxy" in FHSD schools. *See Keyishian*, 385 U.S. at 603. That the Resolution is unconstitutional on this additional basis cannot be denied.

**B.  Plaintiffs Will Suffer Irreparable Injury in the Absence of Injunctive Relief**

There can be no doubt the Constitutional injuries set forth herein constitute irreparable harm justifying immediate injunctive relief. Constitutional injuries, and particularly those involving the First Amendment, are irreparable as a matter of law.

> This court previously has approved the granting of a preliminary injunction on the grounds that "even minimal infringement upon First Amendment values constitutes irreparable injury sufficient to justify injunctive relief." *Newsom v. Norris,* 888 F.2d 371, 378 (6th Cir.1989); *see also Foti v. City of Menlo Park,* 146 F.3d 629, 643 (9th Cir.1998) (quoting *Elrod* ); *New York Magazine,* 136 F.3d at 127 (2d Cir.1998) (same); *Maceira v. Pagan,* 649 F.2d 8, 18 (1st Cir.1981) ("It is well established that the loss of first amendment freedoms constitutes irreparable injury."). The irreparable injury stems from " 'the intangible nature or the benefits flowing from the exercise of those rights; and the fear that, if these rights are not jealously safeguarded, persons will be deterred, even if imperceptibly, from exercising those rights in the future.' " *Newsom,* 888 F.2d at 378 (quoting *Cate v. Oldham,* 707 F.2d 1176, 1188–89 (11th Cir.1983)).

19

*United Food & Com. Workers Union, Loc. 1099 v. Sw. Ohio Reg'l Transit Auth.,* 163 F.3d 341, 363 (6th Cir. 1998); *see also Elrod v. Burns*, 427 U.S. 347, 373 (1976); *Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67, 208 L. Ed. 2d 206 (2020).

**C.  An Injunction Will Not Harm Defendants or Others and the Public Interest is Served by an Injunction**

The final factors for consideration likewise weigh heavily in favor of granting injunctive relief to Plaintiffs.  Protecting First Amendment rights in FHSD schools, and protecting against race-based censorship in violation of the Fourteenth Amendment, will benefit students, teachers and the public as a whole.  Inclusive education benefits every student who receives it, as well as society as a whole.  Injunctive relief will not harm defendants nor any other third parties.  As set forth above, there is no legal or legitimate basis for the Resolution's prohibition and censorship of "anti-racism" and other topics.  Moreover, even if the Resolution is ultimately determined to be Constitutional and enforceable, an injunction would, at most delay its enforcement. Moreover, the Sixth Circuit has recognized that "it is always in the public interest to prevent the violation of a party's constitutional rights." *G & V Lounge, Inc. v. Michigan Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994).

**D.  Bond**

No bond should be required of Plaintiffs.  Defendants will suffer no damages if injunctive relief is granted, and Plaintiffs should not be required to post a bond to protect their Constitutional rights.

**IV.  CONCLUSION**

For all the foregoing reasons, Plaintiffs respectfully submit this Court should enter an order temporarily and preliminarily enjoining enforcement of the Resolution and all similar content-based and race-conscious restrictions.

Dated: October 30, 2023              Respectfully submitted,

                              *s/ Nicole M. Lundrigan*
                                *s/W. Kelly Lundrigan*
                              W. Kelly Lundrigan (0059211)
                              Nicole M. Lundrigan (0075146)
                              LUNDRIGAN LAW GROUP CO, LPA
                              1080 Nimitzview Drive, Suite 402
                              Cincinnati, Ohio 45230
                              Phone (513) 813-7610
                              klundrigan@lundrigan-law.com
                              nlundrigan@lundrigan-law.com
                              *Attorneys for Plaintiffs*

## **Certificate of Service**

The undersigned hereby certifies that a copy of the foregoing was filed electronically with the Court's CM/ECF electronic filing services and served upon all parties of record on the 30th day of October, 2023.

                              *s/ Nicole M. Lundrigan*